# 16-2361-cr

*To be Argued by*:
Anthony DiPietro, Esq.

==================================================

## In the

## United States Court of Appeals

## For the Second Circuit

### Docket No. 16-2361

———————

UNITED STATES OF AMERICA,

-vs-                                                    *Appellee,*

CARMINE PERSICO,

*Defendant-Appellant.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

════════════════════════════════════════

**APPENDIX OF DEFENDANT-APPELLANT
CARMINE PERSICO**

════════════════════════════════════════

Anthony DiPietro, Esq.
Law Office of Anthony DiPietro
15 Chester Avenue
White Plains, NY 10601
(914) 948-3242

*Attorney for Carmine Persico*

On Brief:
Gianna M. Del Grippo
Juris Doctorate Candidate 2017, Pace University School of Law
Internship at Law Office of Anthony DiPietro

## TABLE OF CONTENTS

Notice of Appeal.................................................. 1

The District Court's Memorandum & Order, dated 6/24/2016....... 2

The Government's Sentencing Memorandum, dated 12/22/1986...... 26

Presentence Investigation:
(Memos Filed Jointly in Defendants' Pre-Sentence Reports)

- U.S. Dept. of Probation Investigation Memo.............. 86

- The Government's "Version of Offense" Memo............. 102

Sentencing Transcript(1/13/1987)............................ 116

FOIPA Correspondences....................................... 195

Instances of Undisclosed *Brady* Evidence:

- *Brady* evidence proving that Mr. Persico was not the "boss"
  of the Colombo family in the 1970s or member of the
  "Commission" when Carmine Galante was murdered ........ 206

- *Brady* evidence proving that the "Commission's" approval is
  not required before the killing of another Mafia "boss"
  occurs................................................. 278

- *Brady* evidence proving that Mr. Persico was not involved in
  the murder of Thomas Spero ............................ 280

- *Brady* evidence demonstrating that an unreliable informant,
  Gregory Scarpa Sr., was the Government's key source in the
  "Commission" case...................................... 290

Docket Sheet................................................ 301

Receipt # 46540701322(1950S (VF)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA,

    -v-

CARMINE PERSICO,

              Defendant.

-------------------------------------------------------------X

FILED
U.S. DISTRICT COURT

2016 JUL -1 AM 10: 13

S.D. OF N.Y.W.P.

85 Cr. 139 (KTD)

**NOTICE OF APPEAL**

Notice is hereby given that CARMINE PERSICO appeals to the United States Court of Appeals for the Second Circuit from the Memorandum and Order (Doc. No. 365), entered June 24, 2016, denying his motion for sentence correction pursuant to the pre-November 1, 1987 version of Rule 35 of the Federal Rules of Criminal Procedure.

Dated: July 1, 2016
       White Plains, NY 10601

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: July 1, 2016

Anthony DiPietro, Esq.
15 Chester Avenue
White Plains, NY 10601
Tel: (914) 948-3242
Fax: (914) 948-5372
Dipietrolaw@yahoo.com

*Attorney for Carmine Persico*

A.1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

UNITED STATES OF AMERICA,     :

      :

      :

      :

     - v. -      :

      :

CARMINE PERSICO,     :

      :

             Defendant.   :

----------------------------------------X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: June 24, 2016 |

85 Cr. 139-10 (KTD)

**MEMORANDUM AND ORDER**

**KEVIN THOMAS DUFFY, U.S.D.J.**

    This postconviction motion arises out of an extensively litigated nearly 30-year-old racketeering case concerning the "Commission of La Cosa Nostra" (the "Commission"), the "board of directors" of the American Mafia. On November 19, 1986, following an eleven-week jury trial, defendant Carmine Persico was convicted of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), substantive violations of RICO, conspiracy to commit extortion and extortion, and aiding and abetting labor bribery violations. Judge Richard Owen, then presiding, sentenced Persico to 100 years' imprisonment. This case was reassigned to me on July 15, 2015. Before the Court is Persico's motion to correct his purportedly illegal sentence, pursuant to former Federal Rule of Criminal Procedure 35(a) (1985) (the "Motion"). For the following reasons, Persico's motion is DENIED.

## I. Background

Beginning in the late 1970s, Persico was the boss of the "Colombo Organized Crime Family of La Cosa Nostra" (the "Colombo Family"), which was one of the five La Cosa Nostra families in New York (the others were the Genovese, Gambino, Lucchese, and Bonanno families). See United States v. Salerno, 868 F.2d 524, 528 (2d Cir. 1989). As the boss of the Colombo Family, Persico also sat on the Commission. Id. The Commission, controlled by the bosses of the organized crime families, acted as a ruling body over the five families in New York and was an enterprise distinct from the individual families. The general purpose of the Commission was to resolve interfamily disputes, regulate and facilitate the relationships between and among the families, and promote and coordinate "joint ventures" between the families. Id. The Commission also had the exclusive prerogative to approve any murders of family bosses. Id. at 533.

On June 25, 1985, the government filed a 22-count indictment alleging racketeering acts related to three general Commission schemes.[1] United States v. Salerno, et al., No. SSS

---

[1] In a separate case, Persico and thirteen individuals were charged in a superseding indictment filed on April 4, 1985, with conspiring to participate and participating in the affairs of the Colombo Family enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), (d) (1982). Persico was also charged with substantive counts of extortionate conspiracy and extortion, labor bribery, official bribery, loansharking, and gambling. See United States v. Persico, et

**A.3**

85 Cr. 139 (the "Commission case"). The first scheme, which involved Persico and all of the defendants except Anthony Indelicato, was an extortion and labor bribery operation known as the "Club." The Club was a cooperative venture among the families, and the Commission set rules and settled major disputes arising out of the scheme. The Club's rules included the rule that only concrete construction companies selected by the Commission would be awarded concrete construction contracts worth more than $2 million in New York City, as well as the rule that any construction company the Commission selected would be required to pay the Commission two percent of the construction contract price. Salerno, 868 F.2d at 529. The second scheme, a loansharking conspiracy, only involved defendants Anthony Corallo and Salvatore Santoro. Id. The final scheme involved the murders of Carmine Galante and two associates on July 12, 1979, allegedly as part of a Commission plan to end an internal Bonanno family dispute. Id. Indelicato was the only defendant charged with the murders as predicate acts in the RICO counts.

On January 30, 1986, Judge Richard Owen ruled on a number of motions filed on behalf of various defendants in the Commission case. United States v. Salerno, No. 85 CR. 139 (RO),

al., No. S 84 Cr. 809 (the "Persico case"); see also United States v. Persico, 832 F.2d 705 (2d Cir. 1987). It is not necessary to recount the full procedural history of the Persico case for this motion.

**A.4**

1986 WL 1450, at *1 (S.D.N.Y. Jan. 30, 1986).  Judge Owen denied
defendants' applications for a list of witnesses and turnover of
statements of prospective witnesses in light of allegations in
the indictment of threats and murder to accomplish Commission
goals.  Id.  He also denied defendants' request for
identification of "'individuals with information helpful to the
defense'" to the extent the request called for production beyond
that required under Brady v. Maryland, 373 U.S. 83 (1963), and
its progeny.  Salerno, 1986 WL 1450, at *2.  Finally, "[i]n the
framework of the allegations" of the case, Judge Owen denied
defendants' demand for disclosure of informants and undercover
agents, and noted that the "government has asserted its
recognition of its obligation under Brady and its progeny."  Id.

     During the eleven-week jury trial, a great deal of the
government's evidence consisted of recorded conversations.  The
government also presented live testimony, including testimony by
Angelo Lombardo, a former acting boss of the Cleveland La Cosa
Nostra family; Joseph Cantalupo, a former member of the Colombo
family; Fred DeChristopher, a cousin by marriage of Persico at
whose home Persico stayed while a fugitive from November 1984 to
February 1985; and Joseph Pistone, an undercover FBI agent who
successfully infiltrated the Bonanno family.  Salerno, 868 F.2d
at 534.  DeChristopher testified that Commission member Persico
had told him that he (Persico) had voted against the Galante

killing, which provided evidence that the Commission had taken a vote on the matter. Id. at 533.

On November 19, 1986, Persico was convicted of (1) RICO conspiracy in violation of 18 U.S.C. § 1962(d) (1982); (2) substantive RICO acts, in violation of 18 U.S.C. § 1962(c) (1982); (3) conspiracy to commit extortion and twelve counts of extortion or attempted extortion, in violation of 18 U.S.C. § 1951(a) (1982); and (4) aiding and abetting six labor bribery violations, in violation of 29 U.S.C. § 186(b)(1) (Supp. IV 1986) and 18 U.S.C. § 2 (1982). Id. at 527-28.[2]

On January 13, 1987, Judge Owen sentenced the defendants in the Commission case. (Transcript of Jan. 13, 1987 Sentencing Hearing ("Sentencing Tr."), attached as Ex. A to Gov't's Mem. of Law in Opp'n to Carmine Persico's Mot.). As a preliminary matter, Judge Owen stated that he was not relying on the government's sentencing memorandum in determining any of the defendants' sentences. (Id. at 14:20-24). Prior to sentencing Persico, Judge Owen explained that there was "overwhelming evidence" that Persico was a member of the Commission and that the Commission "lives, succeeds on murder, violence and threats of murder and violence." (Id. at 23:25-24:2; 25:1-2). Judge

---

[2] Judge Owen denied defendants' motions for a new trial. See United States v. Salerno, No. SSS 85 CR. 139 (RO), 1987 WL 9693 (S.D.N.Y. Apr. 15, 1987).

Owen also noted that "[a]ccording to Mr. DeChristopher, [Persico] sanctioned the use of killing for appropriate circumstances, although in the case of Mr. Galante [Persico] apparently voted against it according to what [he] told Mr. DeChristopher." (Id. at 24:18-21). Judge Owen then sentenced Persico to consecutive twenty year sentences on five counts – a total of 100 years' imprisonment – and ordered the sentences on all other counts to run concurrently.[3] (Id. at 25:4-19).

On direct appeal, the Second Circuit affirmed Persico's conviction and sentence. Salerno, 868 F.2d at 543. Among other things, the Second Circuit rejected defendants' claim that the government violated its Brady obligations by failing to disclose reports suggesting that Philip Rastelli, not Carmine Galante, was the boss of the Bonanno family, because the undisclosed reports were not material. Id. at 541. The Second Circuit also rejected defendants' challenges to their sentences, finding that "[w]hile [the court] admit[s] that the one-hundred year sentences have a certain symbolic quality, [the court] cannot say that Judge Owen relied so heavily on abstract considerations of deterrence and so little on considerations of individual

---

[3] Later in the sentencing hearing, Judge Owen gave Persico an opportunity to raise objections to the presentence report. Persico stated that he objected to the "bulk of the presentence report" but his only specific objection was to the word "compound." (Sentencing Tr. at 27:23-28:16).

**A.7**

circumstances as to amount to an abuse of his wide discretion in sentencing." <u>Id.</u> at 543. The convictions in the Commission case became final on October 2, 1989, when the Supreme Court denied the petitions for writs of certiorari. 493 U.S. 811 (1989).

On April 16, 1991, Judge Owen denied Persico's motion to vacate his conviction pursuant to 28 U.S.C. § 2255. Judge Owen rejected Persico's claim that his conviction in the Commission case violated his double jeopardy rights under <u>Grady v. Corbin</u>, 495 U.S. 508 (1990), as a result of Persico's prior conviction in the <u>Persico</u> case. The Second Circuit affirmed Judge Owen's denial in <u>United States v. Salerno</u>, 964 F.2d 172, 180 (2d Cir. 1992).

On July 13, 2015, Persico filed a motion to vacate his 100-year sentence pursuant to former Federal Rule of Criminal Procedure 35(a) (1985) ("former Rule 35").[4] Persico contends that his sentence is substantively unreasonable under the Sixth Amendment, illegal under the Due Process Clause of the Fifth Amendment, and "constitutionally defective" as a result of the

---

[4] The following abbreviations are used herein for the parties' memoranda of law: Memorandum of Law in Support of Carmine Persico's Motion Pursuant to Fed. R. Crim. P. 35(a) ("Def. Br.") (Dkt. No. 359); Government's Memorandum of Law in Opposition to Carmine Persico's Motion Pursuant to Fed. R. Crim. P. 35(a) ("Gov't Br."); and Defendant's Reply Memorandum ("Reply Br.") (Dkt. No. 363).

government's alleged failure to disclose exculpatory information.  (<u>See</u> Def. Br. 1).  The government filed a memorandum of law in opposition to the Motion on September 8, 2015, and the Motion was fully briefed when Persico submitted his reply on September 16, 2015.  Persico also filed a letter, dated March 15, 2016, requesting a status conference.  (Dkt. No. 364).

## II.  Discussion

### A. Applicable Legal Standard

Persico seeks relief pursuant to former Federal Rule of Criminal Procedure 35(a), which is applicable to offenses committed before November 1, 1987.  Persico was indicted on June 25, 1985, so he is covered by former Rule 35.  <u>See</u> <u>United States</u> <u>v. Blackmer</u>, 909 F.2d 66, 67 (2d Cir. 1990), <u>vacated on other</u> <u>grounds</u>, 499 U.S. 944 (1991).  Former Rule 35 provided:

> (a)  Correction of Sentence.  The Court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence.
>
> (b)  Reduction of Sentence.  A motion to reduce a sentence may be made, or the court may reduce a sentence without motion, within 120 days after the sentence is imposed or probation is revoked, or within 120 days after receipt by the court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court denying review of, or having the effect of upholding, a

**A.9**

> judgment of conviction or probation revocation
> . . . .

Fed. R. Crim. P. 35 (1985).[5]

"[A]s the Rule's language and history make clear, the narrow function of [former] Rule 35 is to permit correction at any time of an illegal sentence, not to re-examine errors occurring at the trial or other proceedings prior to the imposition of sentence." Hill v. United States, 368 U.S. 424, 430 (1962). "Sentences subject to correction as 'illegal' under former Rule 35 are 'those that the judgment of conviction did not authorize.'" United States v. Lika, 344 F.3d 150, 153 (2d Cir. 2003) (per curiam) (citing United States v. Morgan, 346 U.S. 502, 506 (1954)). A sentence is not illegal under former Rule 35(a) if "[i]t is not 'in excess of a statutory provision or otherwise contrary to the applicable statute,' United States v. Huss, 520 F.2d 598, 602 (2d Cir. 1975), and its terms are not 'legally or constitutionally invalid in any other respect,'" Hill, 368 U.S. at 430. Id.

While former Rule 35 gave the court discretion to correct an illegal sentence or a sentence imposed in an illegal manner,

---

[5] Former Rule 35 was amended following the passage of the Sentencing Reform Act, 98 Stat. 1987, which abolished federal parole. Rule 35(a) now provides that "[w]ithin 14 days after sentencing, the court may correct a sentence that resulted from arithmetical, technical, or other clear error." Fed. R. Crim. P. 35(a).

**A.10**

it does not require that the court do so.  Shakur v. United
States, 44 F. Supp. 3d 466, 474 (S.D.N.Y. 2014); see also United
States v. Rivera, 376 F.3d 86, 91–92 (2d Cir. 2004) (noting that
the "wide latitude" offered by former Rule 35(a) was not
required by the Due Process Clause).  Under former Rule 35(a), a
court may correct an illegal sentence at any time, whereas a
sentence imposed in an illegal manner "can be reduced only
within 120 days of either the date of sentence or that of the
last appellate disposition having the effect of upholding or
denying review of the conviction."  United States v. DeLutro,
617 F.2d 316, 317 (2d Cir. 1980).

### B. Analysis

#### 1. The Court Will Not Alter Persico's Sentence Under Former Rule 35

Persico argues that his 100-year sentence should be vacated
pursuant to former Rule 35(a).  Under former Rule 35(a), "even
if a sentence may be arguably 'illegal,' modification by the
court is permissible (i.e., within the court's discretion), as
opposed to mandatory."  Shakur, 44 F. Supp. 3d at 475; see also
United States v. Finkielstain, 293 F. App'x 62, 63 (2d Cir.
2008) (summary order) (affirming district court's exercise of
its discretion not to review a sentence pursuant to former Rule
35(a) because approximately eighteen years had elapsed); Rivera,
376 F.3d at 91–92.

A.11

Under the circumstances of this case, the Court exercises its discretion to decline to alter Persico's sentence pursuant to former Rule 35(a). The Second Circuit has affirmed Persico's conviction and sentence, which became final on October 2, 1989, as well as Judge Owen's denial of Persico's motion to vacate his conviction pursuant to 28 U.S.C. § 2255. Persico waited more than twenty three years to challenge the legality of his sentence. In light of this passage of time, "[p]rudential considerations" support the Court's decision not to alter Persico's sentence. Finkielstain, 293 F. App'x at 63; see also United States v. Woods, 986 F.2d 669, 674-75 (3d Cir. 1993) (noting that "[o]ur legal system has a strong interest in the finality of adjudication" and that courts "are free to apply reasonable and prudential limitations on the correction of illegal sentences" under former Rule 35); cf. Herrera v. Collins, 506 U.S. 390, 426 (1993) (O'Connor, J., concurring) ("At some point in time, the State's interest in finality must outweigh the prisoner's interest in yet another round of litigation. In this case, the point was well short of eight years."). Although our inquiry could end here, for the sake of completeness, I will address Persico's arguments, which are also unavailing.

**A.12**

### 2. Persico's Motion Also Fails on the Merits

Persico argues that his sentence is illegal, and thus may be corrected under former Rule 35(a), because his sentence is substantively unreasonable under the Sixth Amendment, illegal under the Due Process Clause of the Fifth Amendment, and "constitutionally defective" as a result of the government's alleged failure to disclose exculpatory information. (See Def. Br. 1). I must also conclude that there is no valid ground upon which to find Persico's sentence illegal under former Rule 35(a), which is an alternative basis for the Court's denial of this motion.

### i. Persico's Sentence Is Not Illegal Under the Sixth Amendment

Persico argues that his sentence is illegal under former Rule 35(a) because it depends on judge-found facts to survive substantive reasonableness review in violation of the Sixth Amendment. (See Def. Br. 49-50). Specifically, Persico asserts that judge-found facts relating to his involvement in violent crimes or murders (i.e. the Carmine Galante murder) formed the basis of his sentence. (Id. at 50-51). Persico concedes, however, that his sentence falls within the statutory range of penalties available for his convictions. (See id. at 51).

As an initial matter, substantive reasonableness review is inapplicable in cases where the defendant's offenses pre-dated

**A.13**

the Sentencing Guidelines.[6]  See United States v. Cruz, 543 F.
App'x 117, 118 (2d Cir. 2013), as amended (Dec. 2, 2013)
(summary order).  In Cruz, the Second Circuit rejected
defendant's argument that his pre-Guidelines sentence was
substantively and procedurally unreasonable, because the
appellate review standard of United States v. Booker, 543 U.S.
220 (2005), and its progeny is inapplicable in a pre-Guidelines
case.  Cruz, 543 F. App'x at 118; see also Guzman v. United
States, 404 F.3d 139, 141 (2d Cir. 2005) (holding that Booker
does not apply to cases on collateral review where the
defendant's conviction was final as of January 12, 2005).
Instead, in a pre-Guidelines case, the sentencing court has
"''wide discretion in imposing sentence, and . . . if a sentence
is within the permissible statutory limits and it does not
appear that the court took into account any improper factor, the
sentence may not be reviewed on appeal.''"  Cruz, 543 F. App'x

---

[6]  Persico's Sixth Amendment claim also fails because he relies
entirely on a dissent from a denial of certiorari that is not
the law.  Compare Jones v. United States, 135 S. Ct. 8 (2014)
(Mem) (Scalia, J., dissenting), with United States v. Jones, 744
F.3d 1362, 1369 (D.C. Cir.), cert. denied, 135 S. Ct. 8 (2014)
(finding that Justice Scalia's argument is not the law and "[n]o
Supreme Court majority has ever recognized the validity of such
challenges"); see also Alleyne v. United States, 133 S. Ct.
2151, 2161 n.2 (2013) (noting that the Sixth Amendment does not
govern factfinding used to guide judicial discretion in
selecting a punishment within limits fixed by law).

A.14

at 118 (citing <u>United States v. Ruggiero</u>, 928 F.2d 1289, 1306 (2d Cir. 1991) (citation omitted)).

As in <u>Cruz</u>, I find that substantive reasonableness review is inapplicable here, because Persico's offenses pre-dated the Sentencing Guidelines. <u>Id.</u> Under pre-Guidelines law, there is no basis to disturb Persico's sentence; Persico's sentence is within the statutory limits and it does not appear that the court took into account any improper factor. To the extent that Persico argues that Judge Owen improperly found that he engaged in uncharged criminal conduct, the record does not support his claim. Contrary to Persico's claim, Judge Owen did not find that Persico succeeded in being an upper member of the Commission by engaging in acts of violence and threats of murder. (Def. Br. 49-50 (quoting Sentencing Tr. at 24-25)). In contrast, Judge Owen stated, "for years you (Persico) have been profiting by being an upper member of this echelon, on the board of directors that lives, succeeds on murder, violence and threats of murder and violence . . . ." (Sentencing Tr. at 24:24-25:2). Also, Judge Owen – making no finding and placing no reliance on proof regarding the murder of Carmine Galante – described some of the evidence underlying the jury's verdict: "[a]ccording to Mr. DeChristopher, you (Persico) sanctioned the use of killing for appropriate circumstances, although in the

**A.15**

case of Mr. Galante you apparently voted against it according to what you told Mr. DeChristopher." (<u>Id.</u> at 24:18-21).

In a pre-Guidelines case, the sentencing court has "''wide discretion in imposing sentence.''" <u>Cruz</u>, 543 F. App'x at 118 (citations omitted). Persico previously challenged his sentence on direct appeal, and the Second Circuit upheld Persico's sentence, finding that Judge Owen did not abuse his "wide discretion" in sentencing Persico. <u>Salerno</u>, 868 F.2d at 543. I find no basis for this Court to revisit that conclusion. Accordingly, the previously imposed sentence was a proper exercise of the Court's ample discretion under pre-Guidelines law.

For these reasons, Persico's claim under former Rule 35(a) that his sentence is substantively unreasonable under the Sixth Amendment is unavailing and an evidentiary hearing on this claim is unnecessary.

### ii. Persico's Sentence Is Not Illegal Under the Due Process Clause of the Fifth Amendment

Persico argues that his sentence is illegal under former Rule 35(a) because the Court relied on false information concerning his involvement in a number of murders, which violated the Due Process Clause of the Fifth Amendment. (Def. Br. 55). Specifically, Persico contends that "the Court found that Mr. Persico was the boss of the Colombo family since 1972

A.16

and had participated in a number of uncharged acts of violence and murder, including partaking in a conspiracy with other 'Commission' members to kill Carmine Galante in 1979." (Id. at 51-52).

Former Rule 35(a) expressly distinguishes illegal sentences, which a court may correct at any time, and sentences imposed in an illegal manner, which a court may only correct within 120 days of either the date of sentence or the date the conviction became final. See DeLutro, 617 F.2d at 317. If more than 120 days has elapsed since the last triggering event, then the Court lacks jurisdiction to correct a sentence imposed in an illegal manner under former Rule 35(a). See Garvin v. United States, 882 F. Supp. 68, 70 (S.D.N.Y. 1995) (citing United States v. Addonizio, 442 U.S. 178, 189 (1979)). A claim under former Rule 35(a) that a sentence "violated the defendant's due process right not to be sentenced on the basis of inaccurate information" is a claim that the sentence was imposed in an illegal manner, which is subject to the 120-day limitation. United States v. Mescaine-Perez, 849 F.2d 53, 58 (2d Cir. 1988); see also DeLutro, 617 F.2d at 317-18 (affirming district court's decision that former Rule 35(a) claim that sentence was based on inaccurate information was time-barred because more than 120 days elapsed).

A.17

Persico's claim under former Rule 35(a) that the sentencing judge relied on inaccurate information in violation of the Due Process Clause is plainly a claim that his sentence was imposed in an illegal manner.  See Mescaine-Perez, 849 F.2d at 58. Under former Rule 35(a), this Court may only correct a sentence imposed in an illegal manner within 120 days of either the date of sentence or the date the conviction became final.  DeLutro, 617 F.2d at 317.  Because the 120-day period passed decades ago, Persico's due process claim under former Rule 35(a) is time-barred and this Court lacks jurisdiction to consider his claim. See Garvin, 882 F. Supp. at 70.

Even if Persico's due process claim was permissible under former Rule 35(a) (it is not), there is no basis to find that the sentencing judge relied on the disputed allegations.  "For a defendant to prove that his due process rights were violated by a sentencing court's reliance on false or unreliable information . . . the sentencing judge's reliance on the disputed information must affirmatively appear in the record."  United States v. Persico, No. S 84 CR. 809 (JFK), 1993 WL 385799, at *9 (S.D.N.Y. Sept. 29, 1993) (rejecting Persico's claim that the sentencing judge relied on false information in the government's sentencing memorandum because Persico did not point to anything in the record that supported his claim).  In this case, Judge Owen stated that he was not relying on the government's

A.18

sentencing memorandum in determining any of the defendants'
sentences.[7] (See Sentencing Tr. 14:20-24). Because there is no
indication in the record that Judge Owen relied on the disputed
allegations, Persico's due process claim fails.

For these reasons, Persico's claim under former Rule 35(a)
that the sentencing judge relied on inaccurate information in
violation of the Due Process Clause is unavailing and an
evidentiary hearing on this claim is unnecessary.

### iii. Persico's Sentence Is Not Illegal Under Brady and Its Progeny

Persico argues that his sentence is "constitutionally
defective" as a result of the government's failure to disclose
favorable information under Brady v. Maryland, 373 U.S. 83
(1963), and its progeny. (Def. Br. 1). According to Persico,
the purported Brady material demonstrates "his actual innocence
of the uncharged murders that were the predicate for his de
facto 100-year sentence," including the Carmine Galante murder,
and that "he was innocent of the pivotal allegation in the

---

[7] To the extent Persico argues that Judge Owen relied on
inaccurate information in the presentence report, Persico fails
to identify any information in the presentence report that Judge
Owen relied on. Furthermore, Persico waived any objection to
the presentence report at his sentencing. (See Sentencing Tr.
27:20-28:16; see also United States v. Helmsley, 941 F.2d 71, 98
(2d Cir. 1991) (finding that "if a defendant fails to object to
certain information in the presentence report, she is barred
from contesting the sentencing court's reliance on that
information, unless such reliance was plain error")).

A.19

'Commission Case' – that he was the 'boss' of the Colombo crime
family and a member of the Mafia's 'Commission' between 1972 to
1985." (Id. at 2; see also Def. Br. Exs. 1-44).  Specifically,
Persico asserts that the government "possessed, but failed to
disclose, highly exculpatory evidence proving that [] [he] was
never the 'boss' of the Colombo family; [] [he] did not
authorize others to act as 'boss' of the Colombo family; [] the
'Commission' had appointed another 'boss' of the Colombo family;
and [] [he] did not aid or abet his co-defendants . . . in any
charged RICO offenses." (Def. Br. 2).  Persico also claims that
the government "failed to disclose the identity of at least
three or more individuals identified in its reports that were
eyewitnesses to the charged RICO offenses." (Id. at 58).
Finally, Persico contends that the government "concealed
information relating to the credibility of its investigation and
key trial witnesses," including DeChristopher and Agent Pistone.
(Id. at 3).

    "It is well established that a motion under [former] Rule
35 can only be used to correct an illegal sentence, and not to
correct trial errors or errors in other pre-sentencing
proceedings."  United States v. Schiff, 876 F.2d 272, 274 (2d
Cir. 1989) (emphasis added); see also Hill, 368 U.S. at 430.
"Sentences subject to correction as 'illegal' under former Rule
35 are 'those that the judgment of conviction did not

**A.20**

authorize.'" Lika, 344 F.3d at 153 (citation omitted).
Therefore, it is improper to shoehorn claims that challenge the
underlying conviction, such as Brady claims, into a former Rule
35(a) motion.  See id. at 152 (finding that the court did not
need to reach the merits of substantive arguments in a former
Rule 35(a) motion that did not bear on the legality of
defendant's sentence); United States v. Peltier, 312 F.3d 938,
942-43 (8th Cir. 2002) (finding that claim under former Rule
35(a) concerning Brady violations failed because it did not
concern the legality of the sentence).  It is also "particularly
inappropriate" in a former Rule 35(a) motion to "[r]esort to
evidence outside the trial record."  United States v. Torres,
677 F. Supp. 2d 668, 671 n.3 (S.D.N.Y. 2009).

The law is clear that a former Rule 35(a) motion to correct
an illegal sentence is not the proper vehicle to assert Brady
violations.  See Hill, 368 U.S. at 430.  Persico's Brady claims
do not concern the legality of his sentence, which was plainly
authorized by the judgment of conviction.  See Lika, 344 F.3d at
152; Peltier, 312 F.3d at 942-43.  Instead, Persico's Brady
claims seek to introduce information outside the trial record
(Def. Br. Exs. 1-44) in order to mount a collateral attack on
the underlying judgment of conviction.  Because this is not a
proper subject of a former Rule 35(a) motion, I see no basis to
reopen Persico's conviction to address the merits of his Brady

claims.  See Lika, 344 F.3d at 152.  Under certain
circumstances, it may be appropriate to treat Persico's claims
brought pursuant to former Rule 35(a) as constituting a motion
under 28 U.S.C. § 2255.  However, Persico has already filed a
motion under § 2255, so in order to file a second § 2255 motion,
he must first request authorization from the Court of Appeals
pursuant to 28 U.S.C. § 2244(b)(3).  He has not done so.

Persico also argues that the government's failure to notify
him of the identity of certain sources not only violated Brady,
but "undercut [his] Sixth Amendment right to compulsory process
for obtaining witnesses in his favor at both trial and during
his sentencing hearing." (Def. Br. 59 n.32).  "To establish a
violation of that right, the 'defendant must demonstrate that he
was deprived of the opportunity to present a witness who would
have provided testimony that was 'both material and favorable to
his defense.''" United States v. Persico, 645 F.3d 85, 113 (2d
Cir. 2011) (citation omitted).  Persico's compulsory process
claim under former Rule 35(a) fails because the claim concerns
alleged violations which are not disclosed by the record and
which occurred, if at all, prior to sentencing.  See Lika, 344
F.3d at 152.  Further, Persico failed to make a "'plausible
showing'" that the witnesses' testimony would have been material
and favorable.  Persico, 645 F.3d at 113 (citation omitted).

A.22

Even if Persico's <u>Brady</u> claim was permissible under former
Rule 35(a) (it is not), there is no basis to find that the
government violated its <u>Brady</u> obligations.  Under <u>Brady</u>, "'the
Government has a constitutional duty to disclose favorable
evidence to the accused where such evidence is 'material' either
to guilt or to punishment.'"  <u>United States v. Cacace</u>, 796 F.3d
176, 183 (2d Cir. 2015) (per curiam) (citation omitted).
Evidence is material when "'there is a reasonable probability
that, had the evidence been disclosed to the defense, the result
of the proceeding would have been different.'"  <u>Strickler v.
Greene</u>, 527 U.S. 263, 280 (1999) (citations omitted).  "A
'reasonable probability' of a different result is accordingly
shown when the government's evidentiary suppression 'undermines
confidence in the outcome of the trial.'"  <u>Kyles v. Whitley</u>, 514
U.S. 419, 434 (1995) (citation omitted).  "[U]ndisclosed
impeachment evidence is not material in the <u>Brady</u> sense when,
although 'possibly useful to the defense,' it is 'not likely to
have changed the verdict.'"  <u>Persico</u>, 645 F.3d at 111 (citation
omitted).

After carefully reviewing Persico's purported <u>Brady</u>
material, which is primarily internal government reports and

memoranda[8] (see Def. Br. Exs. 1-2, 5-39, 41-42), I conclude that
the government did not breach its Brady obligations.  The
government had no Brady obligation to turn over the undisclosed
documents that were part of the FBI's investigatory work and
contained "'preliminary, challenged, or speculative
information.'"[9] United States v. Amiel, 95 F.3d 135, 145 (2d
Cir. 1996) (citation omitted); see also Moore v. Illinois, 408
U.S. 786, 795 (1972) (noting that there is "no constitutional
requirement that the prosecution make a complete and detailed
accounting to the defense of all police investigatory work on a
case").  I also find that the undisclosed documents, which
primarily reported uncorroborated information from informants,
were not "material" as there is no "reasonable probability" that
had the documents been disclosed to the defense, the result of
the trial would have been different.[10] Strickler, 527 U.S. at

---

[8] Persico states that in 2015, he received "some of the
undisclosed FBI reports through requests made pursuant to the
Freedom of Information Act (FOIA)."  (Reply Br. 3 n.1).

[9] Several of Persico's exhibits contain posttrial statements,
and the "government's Brady obligations do not cover such
statements." United States v. Santos, 486 F. App'x 133, 135 n.1
(2d Cir. 2012) (summary order) (citing Dist. Attorney's Office
for Third Judicial Dist. v. Osborne, 557 U.S. 52, 68-70 (2009)).

[10] In fact, several of the undisclosed documents that Persico
submitted to the Court contain reports that Persico is the boss
of the Colombo Family.  (See, e.g., Def. Br. Exs. 1, 32, 42 ("On
6/26/80, source advised that Thomas Di Bella is merely a
figurehead in the Colombo Family and the actual boss is Carmine
Persico")).

**A.24**

280.  Further, the purported impeachment evidence is "'not likely to have changed the verdict.'"  <u>Persico</u>, 645 F.3d at 111 (citation omitted).  The proper defendant was convicted by overwhelming evidence in a fair trial.  Nothing discovered since throws doubt upon this conclusion.

For these reasons, Persico's claim under former Rule 35(a) that his sentence is "constitutionally defective" as a result of the government's failure to disclose favorable information under <u>Brady</u> is unavailing.  There is also no basis to grant an evidentiary hearing on this claim, which would amount to a roving fishing expedition.

## Conclusion

For the foregoing reasons, Persico's motion is DENIED in all respects.  The Clerk of the Court is directed to close Docket No. 359.

**SO ORDERED.**

KEVIN THOMAS DUFFY
United States District Judge

Dated:    New York, New York
          June 24, 2016

**A.25**

MC/JFS:lq
9-2095A/1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

            - v -                           :        SSS 85 Cr. 139 (RO)

ANTHONY SALERNO,                            :
      a/k/a "Fat Tony,"
CARMINE PERSICO,                            :
      a/k/a "Junior,"
GENNARO LANGELLA,                           :
      a/k/a "Gerry Lang,"
ANTHONY CORALLO,                            :
      a/k/a "Tony Ducks,"
SALVATORE SANTORO,                          :
      a/k/a "Tom Mix,"
CHRISTOPHER FURNARI,                        :
      a/k/a "Christie Tick,"
RALPH SCOPO, and                            :
ANTHONY INDELICATO,
      a/k/a "Bruno,"                        :

                  Defendants.               :

- - - - - - - - - - - - - - - - - -x


                GOVERNMENT'S SENTENCING MEMORANDUM


                              RUDOLPH W. GIULIANI
                              United States Attorney for the
                              Southern District of New York
                              Attorney for the United States
                                    of America


MICHAEL CHERTOFF,
JOHN F. SAVARESE,
Assistant United States Attorneys

JOHN GILMORE CHILDERS
Special Assistant United States Attorney

      - Of Counsel -


                                                    **A.26**

MC/JFS:lq
9-2095A/1

## TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| Preliminary Statement | | 1 |
| Law Regarding Sentencing | | 2 |
| I. | The Government's Proof At Trial | 4 |
| | A. The Racketeering Enterprise | 4 |
| | B. The "Club" Extortion Scheme | 9 |
| | C. The Galante-Corallo-Turano Homicides | 13 |
| | D. The Loansharking Conspiracy | 15 |
| II. | Criminal Activities of the Defendants | 17 |
| | A. Anthony Salerno | 17 |
| | B. Carmine Persico | 19 |
| | C. Gennaro Langella | 25 |
| | D. Anthony Corallo | 30 |
| | E. Salvatore Santoro | 34 |
| | F. Christopher Furnari | 35 |
| | G. Ralph Scopo | 37 |
| | H. Anthony Indelicato | 43 |
| III. | The Need for Punishment and Deterrence | 47 |
| | A. Introduction | 47 |
| | 1. Cooperation | 47 |
| | 2. Culpability | 48 |
| | B. Incarceration | 49 |

- i -

MC/JFS:lq
9-2095A/1

TABLE OF CONTENTS    (Continued)

|  |  |  | PAGE |
|---|---|---|---|
| C. | Financial Penalties | | 52 |
|  | 1. | Fines | 52 |
|  | 2. | Costs of Prosecution | 53 |
|  | 3. | Restitution | 53 |
| CONCLUSION | | | 57 |

- ii -

A.28

MC/JFS:lq
9-2095A/1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                    :

         - v -                         :     SSS 85 Cr. 139 (RO)

ANTHONY SALERNO,                            :
    a/k/a "Fat Tony,"
CARMINE PERSICO,                            :
    a/k/a "Junior,"
GENNARO LANGELLA,                           :
    a/k/a "Gerry Lang,"
ANTHONY CORALLO,                            :
    a/k/a "Tony Ducks,"
SALVATORE SANTORO,                          :
    a/k/a "Tom Mix,"
CHRISTOPHER FURNARI,                        :
    a/k/a "Christie Tick,"
RALPH SCOPO, and                            :
ANTHONY INDELICATO,
    a/k/a "Bruno,"                          :

            Defendants.       :

- - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM

### Preliminary Statement

       The jury's verdict in this case was unquestionably
historic. For the first time, the very highest leaders of the
nationwide ruling council of La Cosa Nostra have been brought to
justice for the crimes that they directed and from which they
profited through their participation in the Commission enterprise.
As the proof at trial demonstrated, these defendants have devoted
their lives to running a vast criminal enterprise, including
extortion, labor bribery, loansharking, and murder. The imposi-
tion of sentence on these men provides an opportunity not only

**A.29**

MC/JFS:lq
9-2095A/1

to punish them for their predatory and lawless careers, but also
to send a message to other members of La Cosa Nostra and those
contemplating membership that this criminal organization can be
successfully investigated, publicly exposed, and appropriately
punished.

This Memorandum briefly outlines the criminal activities
of these defendants proved at trial. Second, it reviews other
criminal conduct in which these defendants have engaged and of
which the Government is aware. Finally, we review the various
considerations that, in the Government's view, dictate the impo-
sition of substantial terms of imprisonment.

### The Law Regarding Sentencing

The information presented here is relevant to the sen-
tences in this case even insofar as it does not constitute proof
of the specific crimes charged in the Indictment. It is presented
by the Government in accordance with its obligation to bring to
the Court's attention "relevant circumstances of the offense and
characteristics of the defendant which were not disclosed during
the guilt phase of the case." Standards Relating to Sentencing
Alternatives and Procedures, § 5.3(d) at 31-32 (ABA Approved
Draft 1968).

The Court may properly consider this information. As
the Supreme Court stated in Williams v. New York, 337 U.S. 241,
247 (1949) (footnote omitted):

- 2 -

**A.30**

MC/JFS:lq
9-2095A/1

> "[The sentencing judge's] task within fixed
> statutory or constitutional limits is to
> determine the type and extent of punishment
> after the issue of guilt has been deter-
> mined.  Highly relevant -- if not essential
> -- to his selection of an appropriate sen-
> tence is the possession of the fullest
> information possible concerning the defen-
> dant's life and characteristics."

This principle was recently reaffirmed by the Supreme Court in

United States v. Grayson, 438 U.S. 41, 49-50 (1978).  Thus, the

governing statute provides that

> "No limitation shall be placed on the infor-
> mation concerning the background, character,
> and conduct of a person convicted of an
> offense which a court of the United States
> may receive and consider for the purpose of
> imposing an appropriate sentence."

18 U.S.C § 3577 (to be renumbered § 3661 as of Nov. 1, 1987).

The Second Circuit has long recognized that a sentencing

court has "wide discretion to consider all circumstances that

shed light on a convicted person's background, history, and beha-

vior."  United States v. Pugliese, Docket No. 85-1460, slip op.

at 6592 (2d Cir. Nov. 21, 1986).  See e.g., United States v.

Charmer Industries, Inc., 711 F.2d 1164, 1170-71 (2d Cir. 1983)

(hearsay statements bearing no relationship to the crime charged

may be considered); United States v. Mennuti, 679 F.2d 1032,

1037 (2d Cir. 1982) (similar though uncharged crimes may be

considered); United States v. Rosner, 549 F.2d 259, 263 n.5 (2d

Cir.), cert. denied, 434 U.S. 826 (1977) (the sentencing judge

- 3 -

**A.31**

MC/JFS:lq
9-2095A/1

may consider hearsay and is not limited to facts upon which the

defendant was convicted); United States v. Hendrix, 505 F.2d

1233, 1235 (2d Cir. 1974), cert. denied, 423 U.S. 897 (1975)

("crimes on which there has been no conviction may be considered

as calling for increased punishment"); United States v. Needles,

472 F.2d 652, 654-5 (2d Cir. 1973); United States v. Sweig, 454

F.2d 181, 183-84 (2d Cir. 1972) (sentencing judge may consider

evidence introduced with respect to crimes for which defendant

was acquitted); United States v. Schipani, 435 F.2d 26, 27 (2d

Cir. 1970), cert. denied, 401 U.S. 983 (1971); United States v.

Doyle, 348 F.2d 715, 721 (2d Cir.), cert. denied, 382 U.S. 843

(1965). Indeed, in United States v. Fatico, 579 F.2d 707 (2d

Cir. 1978), and United States v. Fatico, 603 F.2d 1053 (2d Cir.

1979), the Second Circuit held that the sentencing judge may

consider hearsay information from an unidentified informant if

it is corroborated, as it is here, by testimony at trial, by the

nature of the crimes proved at trial, and by the multitude of

informants whose information is similar. United States v.

Fatico, supra, 603 F.2d at 1057.

I. THE GOVERNMENT'S PROOF AT TRIAL

A. The Racketeering Enterprise

The evidence established that the Commission is the

national ruling body of La Cosa Nostra or the Mafia in the United

States, and that it has been in existence since the 1930's. The

- 4 -

**A.32**

MC/JFS:lq
9-2095A/1

proof further showed that La Cosa Nostra is a nationwide, pro-
fessional criminal organization which operates in many of the
major metropolitan areas of the United States. In most American
cities, the criminal operations of La Cosa Nostra are directed
by the leadership of a single Family, but in New York City there
are Five Families -- the Genovese, Gambino, Lucchese, Colombo,
and Bonanno. The Commission was established to coordinate the
criminal activities of La Cosa Nostra, to resolve territorial
disputes that might arise between various Families, and to settle
leadership issues within particular Families. From time to time,
the Commission as a whole or certain of its members meet to
resolve conflicts, coordinate criminal activities, pass upon the
admission of new "made" members of La Cosa Nostra, and, on
occasion, order the execution of Family Bosses.

As the evidence established, each La Cosa Nostra Family
is run by a Boss with the assistance of two deputies known
respectively as an Underboss and Consigliere. Beneath these top
three men are Capos or Captains who direct crews of soldiers
(i.e. "made" men within La Cosa Nostra) and associates who carry
out the day-to-day business of committing crimes and who are
required to share their criminal proceeds with the Family leader-
ship. The Commission is generally composed of the Bosses of the
Five Families which operate in New York City; in the past,
influential Bosses from other cities such as Philadelphia and

- 5 -

**A.33**

MC/JFS:lq
9-2095A/1

Buffalo have also sat on the Commission.  In addition, when one of the Bosses is unable to attend a Commission meeting, he may designate one of his deputies to attend and represent his Family's interests.

From the late 1970's up to 1985, as the trial proof showed, the Commission was dominated by four men:  defendant Anthony Salerno, at first an Acting Boss and then undisputed Boss of the Genovese Family; Paul Castellano, the Boss of the Gambino Family;* defendant Anthony Corallo, the Boss of the Lucchese Family; and defendant Carmine Persico, the Boss of the Colombo Family.  Electronically surveilled conversations played at trial (GX 503) revealed that Phillip Rastelli, the Boss of the Bonanno Family, was permitted to run his own Family, but was not allowed to sit on the Commission because he had allowed "too many junk guys" (ie. narcotics dealers) into the Family and had thereby created too great a risk for the other Bosses of increased law enforcement scrutiny.**

---

*    Castellano was named as a defendant in the original Indictment filed on February 25, 1985; however, he was murdered in New York in December 1985, and subsequently an order nolle prosequi was entered dropping Castellano from the case.  Thereafter, he was named as an unindicted co-conspirator in superseding Indictments.

**    Rastelli was also named as a defendant in the original and superseding indictments; however, he was severed from the trial of this case because he was still on trial in the Eastern District of New York at the time this case went to trial in September 1986.  Rastelli was eventually convicted on racketeering charges.

- 6 -

**A.34**

MC/JFS:lq
9-2095A/1

The Government proved that after a long career as a
high-ranking member of the Genovese Family, Salerno succeeded
Frank ("Funzi") Tieri as Boss of that Family in approximately
1981. Electronically surveilled conversations reveal that
thereafter Salerno was an active, full-fledged member of the
Commission. He is heard repeatedly on tape discussing whether
Rastelli should be seated on the Commission (GX 503); ordering
that an intra-Family leadership dispute in Buffalo must be
settled because they "are dealing with the big boys now. . . the
Commission from New York" (GX 519); and calling for meetings of
the Four Bosses to resolve questions concerning a massive
Commission-directed extortion scheme in the concrete industry.
(GX 537).

With respect to the leadership of the Lucchese Family,
the proof established that, since at least the late-1970's,
defendants Anthony Corallo, Salvatore Santoro, and Christopher
Furnari were, respectively, the Boss, Underboss, and Consigliere
of that Family. Again, tape evidence reveals these men contin-
uously directing and supervising the criminal affairs of their
own Family and also considering how to handle inter-Family issues
before the Commission. Thus, Corallo is heard on tape discussing
the need to "make an example" to the members of the La Cosa
Nostra by killing anyone caught dealing in narcotics in viola-
tion of the Commission rule that drug trafficking is forbidden

- 7 -

**A.35**

MC/JFS:lq
9-2095A/1

because it brings too much law enforcement "heat".  Tape and
surveillance evidence also reveal Santoro's role in representing
his Boss Corallo's interests before the Commission by attending
a Commission meeting on May 15, 1984, with Salerno, Castellano,
and Langella, among others, concerning the massive Commission-
controlled extortion scheme in the concrete construction industry.
According to the evidence, Furnari also assisted Corallo and
Santoro in running the affairs of the Lucchese Family and in
handling Commission matters by meeting repeatedly with other
Bosses such as Salerno.

     The trial evidence showed that defendant Carmine Persico
has been Boss of the Colombo Family since approximately 1972,
following the shooting in June 1971 of Joseph Colombo in Columbus
Circle.  Although incarcerated twice since 1972, Persico remained
the Boss, but was assisted in managing his Family's affairs by
close subordinates who remained "out on the street."  These
surrogates included his brother Alphonse Persico -- now a fugi-
tive -- Thomas DiBella, and defendant Gennaro Langella.  Persico
was able to convey his views and transmit his votes on important
matters to the Commission through emissaries such as Langella,
who also served as the Underboss of the Colombo Family.  In GX
400, recorded on January 26, 1983, Langella reveals that he is
meeting regularly with other Commission Bosses and running his
Family's day-to-day criminal operations while Persico is away in

- 8 -

**A.36**

MC/JFS:lq
9-2095A/1

jail. But he also makes clear that whenever a matter of real
significance arises, he can always "make a direct move to Junior
[Persico]" through the various emissaries who communicate with
Persico. In addition, the trial proof established that defendant
Ralph Scopo was a made member or soldier within the Colombo
Family who reported directly to Persico and Langella. As the
President of the Cement and Concrete Workers District Council in
New York, Scopo provided the Commission and his Family with the
power to impose work stoppages and other labor problems on
concrete construction contractors and thereby to extort millions
of dollars from the contractors as the price for "labor peace."

Anthony Indelicato was proved to be a professional
killer who rose within the Bonanno Family as a reward for his
role in the 1979 triple homicide of then Bonanno Family Boss
Carmine ("Lilo") Galante, and two long-time associates: Leonard
Coppola and Giuseppe Turano. Although Indelicato's lower rank
did not entitle him to participate directly in Commission meet-
ings, he clearly associated himself with the enterprise by carry-
ing out the Galante homicide which was specifically authorized
by the Commission.

B.   The "Club Extortion Scheme in the
     Concrete Construction Industry

The proof at trial demonstrated that in the first half
of the 1980's the Commission directed a massive extortion and

A.37

MC/JFS:lq
9-2095A/1

labor bribery scheme involving the concrete construction industry in New York City. The power of the Four Families -- Genovese, Gambino, Lucchese, and Colombo -- whose Bosses sat as full voting members of the Commission in this period were combined and coordinated by the Commission in order to operate this scheme. Thus, defendants Salerno for the Genovese Family; Corallo, Santoro, and Furnari for the Lucchese Family; and Persico and Langella for the Colombo Family were responsible for directing and supervising the scheme. In addition, defendant Ralph Scopo, by virtue of his position as President of the laborers union that represents the City's concrete workers, was one of the lower-level La Cosa Nostra members designated by the Commission to carry out the day-to-day extortion operation.

The scheme was known as "The Club" and through it the Commission dominated the major concrete construction contractors in New York City, including XLO Concrete, Technical Concrete Construction Corp., Cedar Park Concrete Corp., Century-Maxim Concrete Corp., North Berry Concrete Corp., G & G Concrete, and S & A. In return for "labor peace," these contractors were forced to pay 2% of the contract price for all jobs over $2 million. In addition, each organized crime Family established an interest in one or more concrete superstructure contractors and -- through a coordinated bid-rigging scheme -- sought to expand the number of jobs peformed by that contractor. In that

A.38

MC/JFS:lq
9-2095A/1

way, each Family earned monies -- over and above the 2% --
through the profits earned by these companies.  The Bosses of
each of the Four La Cosa Nostra Families involved in the scheme
designated a Family member who was responsible for managing the
scheme.  These four subordinates -- one of whom was Ralph Scopo
-- met regularly to discuss which contractor would do upcoming
jobs, resolved disputes, collected the 2% extortion payments,
and passed these proceeds of the "Club" scheme back up to the
Commission.

          The key to organized crime's power over the contractors
was its control over corrupt union officials, such as Scopo,
whose union members worked in the concrete construction industry.
These unions included the Cement and Concrete Workers District
Council, whose members are the principal laborers engaged in
pouring concrete on the construction job sites; Teamsters Local
282, whose members drive the concrete mixing trucks that deliver
concrete from batching plants to the job sites; Masons Local
780, whose workers finish the concrete once it is poured; and,
finally, the carpenters union, whose members build the plywood
forms into which the concrete is poured.  In each case, tape
evidence revealed the defendants' extensive power over these
unions.  The Commission used this power to pressure the contract-
ors into paying hundreds of thousands of dollars in extortion
payoffs.  Through corrupt union officials like Scopo, the Commis-
sion had the power to stop deliveries of concrete to a job site,
pull workers off the job, or otherwise cause labor problems.

- 11 -

**A.39**

MC/JFS:lq
9-2095A/1

Two contractors testified that they made the demanded extortion payments because they feared Scopo's organized crime connections and/or his power to inflict economic injury on their companies. Tape and other evidence revealed Scopo reminding his victims of his underworld associations and the use of murder to enforce mob rule. Scopo also let the contractors know that failure to pay would assure economic ruin.

Recorded conversations also showed the active supervisory role played by Salerno, Corallo, Santoro, Furnari, Persico, and Langella in directing the "Club" scheme. These tapes reveal that each of the Four Bosses -- Salerno, Castellano, Corallo, and Persico -- and their trusted lieutenants -- including Santoro, Furnari, and Langella -- were fully aware of the Club scheme and either personally attended or sent delegates to meetings to resolve the conflicts which arose in managing this massive scheme. Thus, on May 15, 1984, Salerno, Castellano, Santoro (representing Corallo), and Langella (representing Persico) met together with Scopo and the other lower-ranking members who handled the "Club" scheme's daily operations to resolve disputes. And later in January 1985, taped conversations reveal Salerno calling for a meeting of the Four Bosses to determine how to continue the Club in light of certain unilateral actions taken by Castellano.

- 12 -

**A.40**

MC/JFS:lq
9-2095A/1

C.   The Galante-Coppola-Turano Homicides

The proof at trial also showed the Commission's use of
its unique power to order the murder of a Boss. As explained at
trial, a member of La Cosa Nostra may not kill the Boss of a
Family without the prior authorization of the Commission.  This
is one of the central ways in which the Commission preserves its
power and maintains discipline.

The evidence established that defendant Anthony
Indelicato, along with several coconspirators, participated in
the murder on July 12, 1979, of Carmine Galante, the Boss of the
Bonnano Family, and two of his long-time friends and associates,
Leonard Coppola and Giuseppe Turano.  The circumstances of this
triple homicide made clear that this was a professional, carefully
planned "hit".  Each of the victims received multiple gunshot
wounds form a variety of weapons fired at close range.

The eyewitness testimony and circumstantial proof --
including the palm-print of Indelicato on the get-away car, bal-
listics and medical forensic evidence -- showed that Indelicato,
along with 3 other men, arrived by car in front of Joe & Mary's
Restaurant on Knickerbocker Avenue in Brooklyn shortly before
3:00 p.m. on July 12, 1979.  All four men were armed and wore
ski masks.  The driver remained by the car warding off onlookers
with a rifle while Indelicato and the two other masked men entered
the restaurant.  At that time, Galante, Coppola and Turano were

- 13 -

**A.41**

finishing lunch on the restaurant's rear patio. They were also seated with two other members of the Bonanno Family: Cesar Bonventre and Baldo Amato. When Indelicato and the two other masked men stepped out onto the patio, they opened fire at point-blank range, killing Galante and Coppola instantly and fatally wounding Turano. Significantly, Bonventre and Amato were not injured, and ballistics and medical evidence indicated that they participated with Indelicato and the other masked gunmen in killing the three intended victims: Galante, Coppola and Turano.

Indelicato and his two masked accomplices then fled from the restaurant, got back into the car in which they had arrived, and drove away. This car was later abandoned. Indelicato immediately got into a separate vehicle and drove with his father, Sonny Red, his uncle, J.B., and Phillip Giaccone -- all members of the Bonnano Family -- to report to Stefano Canone -- then the Consigliere of the Bonnano Family -- and Aniello Dellacroce -- then the Gambino Family Underboss. Video-tape evidence shows Indelicato apparently being congratulated by Cannone at the Ravenite Social Club in Manhattan, a Gambino Family headquarters, just ½ hour after the murders were committed. Immediately afterward, Cannone is seen consulting privately with Dellacroce.

In addition, the evidence showed that the Commission expressly authorized these murders. Because the Government was

- 14 -

A.42

MC/JFS:lq
9-2095A/1

unable to establish the specific votes of each of the Bosses, no other defendants were charged in the murder predicates. However, surveillance of the pattern of visits at the Ravenite, including Indelicato reporting to Cannone immediately after the murder, indicates that high-ranking members of two Families -- Bonnano and Gambino -- were actively monitoring the plan to kill Galante. Testimony by FBI Agent Joseph Pistone, who had infiltrated the Bonnano Family, also showed that the Commission was directing the affairs and making decisions about the leadership of the Bonnano Family at the time of the murders. Another witness, Fred DeChristopher, learned from Persico that Persico had voted on the murder of Galante, although he voted against the hit.

At the time of the Galante, Turano and Coppola murders the other high-ranking defendants in this case -- Salerno, Corallo, Santoro, Furnari, Persico and Langella -- were all leaders of La Cosa Nostra and thus were well aware of the Mafia's rules, and the fact that murder is one of the ways in which the Mafia resolves its disputes and maintains a climate of fear.

D.    The Loansharking Conspiracy

In Racketeering Act 17 and Count 22, defendants Corallo and Santoro were charged with conspiracy to make extortionate extensions of credit. The proof showed that Corallo and Santoro -- acting in concert as leaders of the Lucchese Family -- entered

- 15 -

A.43

a conspiratorial agreement with the leadership of the Gambino
Family in June 1983 to resolve a territorial dispute in Staten
Island over the loansharking activities of John DiLeo. This was
yet another example of the Commission's power to resolve dis-
putes, coordinate inter-Family criminal activities, and thereby
make La Cosa Nostra's business of committing crime more efficient
and lucrative.

Tape recorded conversations revealed that a conflict
had arisen between the Luccheses and Gambino Families over the
criminal activities of John DiLeo, an associate of the Lucchese
Family and a relative of Corallo. To avoid further conflict,
Santoro met with Paul Castellano, the Gambino Family Boss, on
June 21, 1983, and they reached an agreement that DiLeo must be
sure to report all loansharking activities to Corallo and that
the Gambinos must always be notified about these activities by
one of their subordinates. As taped conversations revealed,
this agreement was ratified two days later by Corallo and commu-
nicated by him a week later to DiLeo. As Corallo says to DiLeo:
"From now on, you have to clear everything with me." (GX 329).
Other tape evidence demonstrated that Corallo and Santoro were
not strangers to the business of shylocking: they are heard
repeatedly discussing their role in resolving problems between
loansharks and their victims.

**A.44**

MC/JFS:lq
9-2095A/1

## II.  CRIMINAL ACTIVITIES OF THE DEFENDANTS

In the course of several years of gathering information about organized crime in New York, the Government has learned a considerable amount about the Commission of La Cosa Nostra and about the defendants awaiting sentencing. Despite the breadth of that evidence, it would be unrealistic to suggest that it reflects more than a fraction of the activities in which the defendants have engaged during their criminal careers. Indeed, unlike almost any other defendants who appear before the Court for sentencing, these defendants have devoted their entire lives to supporting their criminal society and to planning and commit-ting crimes. Accordingly, it is impossible to provide more than a partial picture of the other crimes these defendants have committed. What follows is neither a complete listing of the defendants' other crimes nor even a comprehensive collection of the evidence of those crimes in the Government's possession. Rather, it is a selection of the evidence we possess which we believe will most assist the Court in reaching a just decision with respect to sentencing.*

### A. Anthony Salerno

Anthony Salerno was born in New York in 1911, and rose by the 1970's to become one of the most powerful organized crime

---

*    Other information known to the Government which is either (1) so singular in nature that its disclosure would identify the informant providing it or (2) the subject of ongoing investiga-tions, has been excluded from this Memorandum.

- 17 -

A.45

Case 16-2361, Document 23, 10/11/2016, 1880537, Page48 of 309

figures in the United States.  As Salerno himself put it in a
1984 recorded conversation:  "Without me, there wouldn't be no
mob left.  I made all the guys."

From his base of operations in two East Harlem Social
Clubs, Salerno ran a vast criminal empire involving gambling,
loansharking, and extortion.  Electronically surveilled conver-
sations from the Palma Boy and First Avenue Social Clubs demon-
strate Salerno's power over a variety of New York City unions,
his authorization of beatings as a means to achieve his criminal
aims, and his supervision of the "Club" extortion scheme.  In
addition, taped conversations not played at trial reveal a host
of other criminal activities directed by Salerno, including an
enormously lucrative illegal gambling operation, bookmaking, and
extortions of other industries outside the concrete construction
area.  Moreover, a Government source, Aladena Fratianno, testi-
fied in other proceedings (United States v. Tieri, S.D.N.Y.
1980) that Salerno was present at a 1976 sit-down between
Fratianno, then the Acting Boss of the Los Angeles Family, and
the Genovese Family leadership in which Salerno voted with
others to murder Joseph Ullo as a result of a loansharking
dispute.

Although the taped conversations demonstrate Salerno's
control over an astonishing array of criminal activities, he has
largely escaped law enforcement scrutiny or punishment.  Thus, a

- 18 -

**A.46**

MC/JFS:lq
9-2095A/1

1970 arrest for interstate shipment of stolen securities and a
1973 arrest on loansharking charges both ended in the dismissal
of all charges against Salerno.  In May 1977, Salerno was
sentenced to 3 years' probation and a $5000 fine after pleading
guilty to operating an illegal gambling business.  That same
year, two trials on tax evasion charges resulted in hung
juries.  Finally, Salerno pleaded guilty here in the Southern
District of New York in 1978 to the same tax evasion charges,
and received six months' incarceration and a $25,000 fine.
Despite his career at the very highest levels of La Cosa Nostra,
therefore, Salerno has managed to escape detention.

The time has now come for Salerno to answer for his
life of crime.  His lavish lifestyle at his Rhinebeck horse farm
was made possible by successfully avoiding law enforcement
scrutiny.  But his own tape-recorded conversations played at
trial have revealed the true Salerno.  That record makes clear
that Salerno must be dealt a blow from which he cannot recover.

## B.  Carmine Persico

Carmine Persico was born in August, 1933, and committed
his first murder in 1951, before his eighteenth birthday.  His
mother ordered older brother Allie Boy, who was in the car with
Carmine at the time of the murder and was arrested with him, to
"take the rap," so Allie Boy pleaded guilty to the murder of

- 19 -

**A.47**

MC/JFS:lq
9-2095A/1

Carmine Bove and went to jail for the killing. Charges against
Carmine Persico were dismissed. He soon developed the reputation
that he could not beat you with his hands, but that he was deadly
with a gun or a pipe; these violent crimes earned the respect of
older Mafiosi, and Persico became a "made" man when others his
age were getting their first jobs. He boasted to Fred
DeChristopher of being one of the triggermen chosen by the
Commission to gun down boss Albert Anastasia in a Manhattan
barbershop in the mid-1950's.

In the early 1960's, Persico was a rising figure in
what was then called the Profaci Family. As Joseph Profaci
aged, maneuvering began over who would succeed the man who had
headed the Family since the 1930's. The so-called Gallo-Profaci
War broke out between those loyal to Profaci and those who
believed that Joseph "Crazy Joe" Gallo should succeed him.
Carmine Persico became the street leader of the Profaci forces.
In 1961, Persico shot Gallo associate Larry Carna, and was one
of the killers of Gallo adherent Salvatore DeSimone. In all,
at least nine Gallo group members were killed by Persico or at
his direction between 1960 and 1963. In addition, on August 20,
1961, Persico was one of three men who choked Larry Gallo nearly
to death in the Sahara Lounge in Brooklyn, before a chance visit
by two policemen ended the attempt. One of the policemen, Patrol-
man Melvin Blei, was shot in the face by the assailants as they

- 20 -

**A.48**

left.  The policemen, apparently fearing for their lives, did not identify the attackers.  Persico boasted about this incident to Fred DeChristopher, telling him that the way to react to policemen was not to run away from them, but to run at them with your gun drawn.  He also admitted to Mahlon Steward, while the two were in prison together in Marion, Illinois, that he had tried to murder Gallo at the Sahara.  Persico himself was shot by the Gallos on May 19, 1963, as he left a paramour's house. This incident occurred on the day before summations in his third trial on Federal hijacking charges and resulted in a mistrial for Persico.

In 1962, Joseph Profaci died.  His brother-in-law, Joseph "Sally the Sheik" Magliocco took over, but could not control the continued fighting between the factions.  He died in 1963.  At that time, with the Family split, the Commission of La Cosa Nostra appointed Joseph Colombo as head of the Family that then took his name.  Carmine Persico became a powerful capo under Colombo.

Carmine Persico's arrest record in the early 1960's includes assault and weapons charges.  One of these arrests was in connection with the vicious beating of Sidney Slater, a Gallo adherent, in the Copacabana nightclub on January 5, 1962. Persico carried out the beating with the help of Colombo colleagues Dominic Montemarano and Nicholas "Jiggs" Forlano.

- 21 -

**A.49**

Case 16-2361, Document 23, 10/11/2016, 1880537, Page52 of 309

Another assault charge related to kicking and beating policemen who raided an after-hours gambling club run by Persico. Persico was also arrested in 1961 with Hugh McIntosh for a truck hijacking. Only one truck was involved in the case, which resulted in five trials before Persico and McIntosh were imprisoned in 1972. Persico told Fred DeChristopher that if the Government had only known of the hundreds of trucks he and his crew had hijacked, he would have been given a lot more time in prison.

In February 1969, Persico and Dominic ("Donny Shacks") Montemarano were arrested for being the muscle behind a loan-sharking operation which operated from a fur shop in Manhattan since 1963. Montemarano pleaded guilty. Shortly afterward, on April 30, 1969, before Persico's scheduled trial, cooperating witness Samuel Lessner was lured into a car driven by Gennaro ("Gerry Lang") Langella and was never seen again. The trial, which was held in February, 1971, after a long fruitless hunt for Lessner by the District Attorney's Office, was closed to both press and public. Six other prosecution witnesses, besides Lessner, failed to appear and Persico was acquitted. Gennaro Langella was in the courtroom when the verdict was read.

In January 1970, Colombo member Salvatore D'Ambrosio, a/k/a "Sally D," was killed. Information from several sources agreed that Carmine Persico personally killed him over an intra-family dispute. In 1971, Joe Colombo was gunned down at Columbus

A.50

MC/JFS:lq
9-2095A/1

Circle at the direction of the rival Gallo faction, and, after a
short period, Carmine Persico became Boss of the Family, and, as
a result, became a full voting member of the Commission. Persico
participated in the planning of Joey Gallo's murder and, in
1972, Gallo was shot and killed by others in Persico's crew.
Also, in 1972, Persico finally went to prison on the hijacking
case and Thomas DiBella became Acting Boss, assisted by Consi-
gliere Alphonse Persico (who had been released in 1969 after
serving eighteen years for the murder committed by his brother).

Carmine Persico was released in 1979, and immediately
told DiBella to retire to Staten Island as Persico quickly re-
asserted full control over the Family. Among other things, he
put out a contract on "Shorty" Spero for disloyal activities
while Persico was in jail. The contract was carried out by
Gennaro Langella's crew. He also regained from other Families
control over rackets that had been lost while he was in jail.
After Persico's brother Alphonse fled in 1980 to avoid incarcera-
tion for his conviction in an Eastern District of New York loan-
sharking case, Alphonse's paramour, Mary Bari, threatened to
tell the police about the Colombo Family if she were not allowed
to go live with Alphonse. Carmine Persico ordered her killed,
and, on September 25, 1984, she was.

When Persico's renewed criminal activities were cut
short by the 1981 revocation of his parole following the acci-
dental discovery of a meeting at Vincent Regina's home among

A.51

him, his son Alphonse, Gennaro Langella, and other high-ranking
Colombo and DeCavalcante Family members, he took revenge.
"Johnny Irish" Matera, the Colombo capo in Florida whom FBI
agents followed to the Regina meeting, was murdered in the
summer of 1981 at Persico's order. He also ordered contracts
on the lives of Vincent and Anthony Regina, in whose house the
meeting had occurred and whom he suspected of being informants.
Gennaro Langella was given the contract and he in turn chose
the triggermen. In November, 1983, the Reginas' charred, bullet-
riddled bodies were found in a burned-out automobile.

In March of 1984, Persico was again released from
prison following concurrent service of his time on his parole
violation and his sentence for attempted bribery of an IRS agent.
He again took over active control of the Colombo Family from
Gennaro Langella, who had served as Acting Boss between 1981 and
1984. In the summer of 1984, Carmine Persico's son-in-law Steve
Piazza was murdered gangland-style following disputes with his
newly-released father-in-law over the nature of Piazza's criminal
activities. The Government has no specific information as to
who ordered this murder. But informants are certain that the
murder could not have been committed without Persico's explicit
approval.

In October 1984, Carmine Persico was indicted in
United States v. Persico, et al., S 84 Cr. 809 (JFK), and fled

- 24 -

**A.52**

to Fred DeChristopher's Wantagh home until arrested in February 1985. On June 13, 1986, after an eight-month trial before Judge Keenan, Persico was convicted of racketeering, extortion conspiracy, and bribery of prison officials arising out of his activities as Boss of the Colombo Family enterprise. On November 17, 1986, Judge Keenan sentenced Persico to a total of 39 years incarceration.

Because the sentence imposed on Persico by Judge Keenan represents punishment for crimes that have been found by the Second Circuit to be wholly separate from the charges in this case, see United States v. Langella, Dkt. No. 86-1294 (2d Cir. Sept. 8, 1986), the Government believes the sentence imposed in this case should be consecutive to the sentence in United States v. Persico.*

C. Gennaro Langella

Gennaro Langella was born on December 30, 1938. His criminal career began at least as early as 1961, when he was convicted of attempted robbery. He served about thirteen months in state prison. Thereafter, he was arrested numerous times, on

---

* Of course, the same information concerning Persico's additional criminal activities contained herein was provided to and was relied upon by Judge Keenan at the time of Persico's earlier sentencing. Nevertheless, the crimes for which Persico was convicted in this case are wholly separate from those proved in United States v. Persico, and, consequently, require separate punishment.

Case 16-2361, Document 23, 10/11/2016, 1880537, Page56 of 309

charges ranging from operating a gambling business to possessing a gun. For refusing to testify in connection with the gangland murder of Colombo renegade Joey Gallo, Langella was convicted of criminal contempt in 1973. In fact, Langella had assisted Persico in planning the murder of Gallo.

Information collected by the Government demonstrates that Gennaro Langella is deeply involved in countless crimes and criminal schemes. As Underboss of the Colombo Family and as representative of Persico's interests on the Commission, he wields enormous criminal power and helps control virtually every aspect of his Family's criminal business. His principal criminal specialties known to the Government include loansharking, gambling, and extortion and bid-rigging in the construction industry.

In addition, many years ago, early in his criminal career, Langella was in partnership with Carmine Persico and Colombo button Carmine DiBiase in a large drug-dealing business. As late as December 1984, Langella remained in the narcotics business with other made members of La Cosa Nostra. Many confidential sources have reported to the Government that Langella has an enormous loansharking and gambling business.

In early 1978, shortly after Aladena ("Jimmy the Weasel") Fratianno agreed to cooperate with the Government, Langella and Colombo Family Consigliere Alphonse "Big Allie"

- 26 -

**A.54**

Persico met to discuss the impact that Fratianno's cooperation
would have on the Family's operations. Langella then visited
Carmine Persico in prison to discuss the matter, and then he and
Alphonse Persico flew to Miami to meet with John "Johnny Irish"
Matera on the same subject. Apart from the concern about
Fratianno's "defection," Langella, Alphonse Persico, and Colombo
soldier Michael Bolino were known to have been travelling to
Florida on Colombo Family business every two to three weeks from
as early as January 1976. Although this pattern of travel was
rather expensive, neither Langella nor his travelling companions
had any legitimate means of support.

Langella was caught in the midst of a major mob "sit-
down" in May 1981, at the home of Vincent Regina in Brooklyn.
As described at trial, the U.S. Marshals and the FBI came upon
the meeting as a result of following "Johnny Irish" Matera and
others from Kennedy Airport to the Regina home. As noted above,
Carmine Persico, free from prison for only seventeen months,
presided over the meeting. As a result of being caught at the
meeting, Persico's parole was revoked, and he was sentenced to
an additional prison term of four and one-half years. Furious
at having to return to prison, Persico ordered that Matera be
murdered for leading the authorities to the meeting. Persico
designated Langella to handle the contract on Matera's life, and
Langella ordered Colombo soldiers in Florida to carry it out.

A.55

MC/JFS:lq
9-2095A/1

Matera was murdered in the summer of 1981. His body was never found.

Anthony and Vincent Regina did not escape responsibility for Persico's return to prison either. For failing to ensure that Persico would be safe from apprehension, the two Regina brothers were shot and killed in November 1983. Their bodies were then dumped into the back seat and trunk of a car and the car was set afire. Carmine Persico ordered their murders, and Gennaro Langella again carried out Persico's order.

In September 1980, one Sam Zahralban was seriously wounded by gunshots in an attempted murder. The contract was carried out by Langella. Carmine Persico approved the attempt to "hit" Zahralban. Zahralban survived the attack.

In 1977, the FBI executed a search warrant at the home of James Vincent Manzo. Manzo was then a close associate of and sometime driver for Langella, and had been Alphonse "Big Allie" Persico's bodyguard. The search revealed a powerful cache of weapons, including handguns, rifles, sawed-off shotguns, and one semi-automatic handgun with a silencer. Manzo was storing the weapons for his Colombo Family superiors for use in gang battles and other violent endeavors. Langella was reported to have been relieved that the search failed to turn up $60,000 in cash which Manzo also had concealed in his home for Langella and Carmine Persico.

- 28 -

**A.56**

MC/JFS:lq
9-2095A/1

Langella also has been involved in managing a large
gambling business on behalf of the Colombo Family. Between his
huge loansharking business and his managerial responsibility for
the Family's gambling business, Langella and his family frequently
had very large amounts of cash at their homes. Part of the
Colombo Family's numbers business utilized a group of Brooklyn
bakeries as the vehicles for collecting bets and numbers. Dozens
of delivery truck drivers delivered bread to customers in grocery
and similar stores and picked up numbers and money at the same
time. Each delivery route accounted for approximately $400 to
$500 a day in numbers bets. Langella and his brother "Jimmy
Lang" managed the gambling business for the Colombo Family.

In June 1984, Langella was indicted in the Eastern
District of New York on perjury charges arising out of an inves-
tigation of his role at the 1981 sitdown at Vincent Regina's
home. After receiving information about this impending indict-
ment, Langella went into hiding. Then, in October 1984,
Langella -- while still a fugitive -- was indicted in United
States v. Persico, et al., S 84 Cr. 809 (JFK), on racketeering,
extortion, labor bribery, and loansharking charges. Informant
information revealed Langella's whereabouts and he was arrested
early in the morning of October 24, 1984, at a Brooklyn apart-
ment. At that time, it became clear that Langella had taken
steps to alter his appearance while in hiding, including growing

- 29 -

**A.57**

MC/JFS:lq
9-2095A/1

a beard and longer hair. As Fred DeChristopher testified at
trial, Langella's fugitivity was also part of Persico's plan to
keep his trusted lieutenant out on the street if he (Persico)
were again imprisoned.

On June 13, 1986, Langella -- along with seven other
members of the Colombo Family -- was convicted for his role as
Underboss of the Colombo Family and his direction of that
Family's scheme to extort payments from small-scale concrete
construction companies doing jobs with a value of less than $2
million, extortions involving the hotel and restaurant unions in
New York City, and loansharking. On November 17, 1986, Judge
Keenan sentenced Langella to 65 years imprisonment. For the
same reasons that apply to Persico, the Government believes that
the sentence imposed on Langella in this case should be conse-
cutive to the sentence imposed by Judge Keenan.

### D. Anthony Corallo

As the proof at trial demonstrated, for years Anthony
Corallo has been Boss of the Lucchese Family, and has extended
his corrupt influence into virtually every important sector of
the economy of New York. In addition to his participation in
the concrete industry extortion scheme established at trial,
tapes received in evidence showed his control, through Salvatore
Avellino, of Teamsters Local 813, which governs employees of

- 30 -

**A.58**

MC/JFS:lq
9-2095A/1

waste carting firms, and his division of control over the
Garment Center with other Mafia leaders.

Corallo's position at the pinnacle of La Cosa Nostra
is the fruit of decades of wide-ranging criminal activity.  As
his lengthy criminal record shows, Corallo has literally dedi-
cated his life to crime:  His first of over a dozen arrests --
for grand larceny -- occurred in 1929.  Corallo has been con-
victed for selling drugs (1941), conspiracy to obstruct justice
(1961), and (twice) for the use of interstate facilities for the
purposes of bribery and extortion, in violation of 18 U.S.C.
§ 1952 (1969).

Corallo's last two convictions arose from his role in
two notorious political corruption scandals.  The first of these
involved the conspiracy to bribe James Marcus, New York City
Water Commissioner, to award a contract without public bidding
for the cleaning of the Jerome Park Reservoir.  The second arose
from Corallo's effort to extort money from Con Edison and to
bribe Marcus in connection with a permit application by Con
Edison to the City.  See United States v. Corallo, 309 F.Supp.
1282 (S.D.N.Y. 1970); United States v. De Sapio, 299 F.Supp. 436
(S.D.N.Y. 1969).  Corallo was sentenced to prison, but, as the
convictions in this case demonstrate, Corallo's punishments did
nothing to deter him from embarking on a new, even more pervasive
extortion scheme.  And Corallo is currently under indictment in

- 31 -

**A.59**

Suffolk County for coercion in connection with control of the
private sanitation industry in Suffolk County. (Indictment No.
1472-84).

Corallo's 1962 conviction for conspiracy to obstruct
justice also stemmed from his participation in an infamous
corruption scandal -- one which unfortunately touched the court
system. As detailed in the Court of Appeals' opinion in United
States v. Kahaner, 317 F.2d 459 (2d Cir. 1963), Corallo was at
the hub of an unsavory scheme to bribe an Assistant U.S. Attorney
for the Eastern District of New York and a New York State Judge
in an effort to avert a prison sentence for a defendant convicted
of fraud. As the Court of Appeals noted, that offense "strikes
at the very foundation of government." Id., at 467.

Corallo's criminal history is not confined to corrup-
tion, however. He is virtually legendary as a labor racketeer.
Robert F. Kennedy reported Corallo's control over the New York
Teamsters locals as long ago as the mid-1950's, when a Corallo-
backed candidate was maneuvered into office as President of
Teamsters Joint Council 16. Kennedy, The Enemy Within 80-81
(1960). Indeed, during the Congressional deliberations over the
RICO legislation in 1970, Senator John L. McClellan explained
that Corallo was

> "[o]ne of the worst gangsters we uncovered
> in my years as chairman of the Senate labor-
> rackets investigations . . . . Our hearing
> record showed how Corallo helped Jimmy Hoffa

- 32 -

A.60

> gain control of New York City's 140,000
> Teamsters by bringing in 40 hoodlums . . .
> to intimidate the rank-and-file membership."

Hearings Before Subcommittee No. 5 of the Committee on the Judi-
ciary, U.S. House of Representatives, 91st Cong., 2d Sess., Ser.
No. 27, p. 112-13. And Senator McClellan specifically noted
that Corallo's power as a labor racketeer was able to continue
because Corallo's sentences were merely "short leave[s] of
absence" from his "criminal empire." Id., at 113.

The evidence at trial demonstrated that in recent
years Corallo has continued to maintain and expand his "criminal
empire." The jury verdicts established Corallo's activities at
the hub of the massive "Club" extortion scheme, and as a loan-
shark. But the tapes also revealed Corallo's shakedown of
thousands of dollars from the carpenter's union (GX 305), his
dominance over Teamsters Local 813 (GX 327) (AVELLINO: "it's
our fuckin' union."), and his control over the Garment Center
(GX 529) ("Aneill [Dellacroce] says, 'Well, you got the whole
Garment Center.'"). Even more chillingly, the tapes also showed
that Corallo would not hesitate to order people killed in order
to protect himself or advance his interests. (GX 528, p. 5; GX
331).

Anthony Corallo's entire life has been dedicated to
systematic criminal activity of the most menacing and corrupting
sort. Nothing is beyond the pale for this defendant: murder,

- 33 -

**A.61**

extortion, bribery, and obstruction of justice are the tools of
his trade. For decades, Corallo has been one of the most
dangerous enemies of lawful society -- a criminal who has
corrupted labor leaders, public officials, and even a federal
prosecutor and state judge. (United States v. Kahaner, supra).

From the standpoint of society, there are no redeeming
or mitigating factors in Corallo's favor. He must be removed
from society -- and from the levers of his power -- permanently.

### E.   Salvatore Santoro

Salvatore Santoro was born in 1915, and was convicted
of his first crime in 1934. His principal early career was as a
major drug trafficker. Santoro's criminal record includes
a narcotics conspiracy conviction in 1942, another in 1952, and
yet another in 1959. For the last of these, which involved
importation of at least 100 kilograms of heroin, Santoro received
a 20-year sentence. As this case demonstrates, Santoro's prison
experience has had no rehabilitative effect.

Santoro's pivotal role in the Mafia is best evidenced
by the tapes played during trial. With the rank of Underboss,
Santoro served as Corallo's alter ego on the Commission and at
the head of the Lucchese Family. Indeed, the tapes reveal his
involvement with all facts of criminal activity: extortion,
loansharking, and receiving stolen property. Santoro is currently
the subject of a New York State coercion indictment charging

- 34 -

**A.62**

that he, with Corallo, engaged in domination of the waste-carting industry in Long Island. He also remains under indictment in the Eastern District of New York for racketeering and extortion at Kennedy Airport. As a career extortionist and as a multiple recidivist Santoro is beyond rehabilitation and is entitled to no favorable consideration.

### F. Christopher Furnari

Christopher Furnari was born in Brooklyn in 1924 and began his criminal career at the age of 18. He was arrested once in late 1942 and again in early 1943 on robbery charges. By the age of 19 he had been arrested and convicted of sodomy, felonious assault, and attempted rape. Furnari, together with a group of men, had participated in the rape of a 16-year-old girl after she had attended a "Sweet Sixteen" birthday party. The girl had been left unconscious in a muddy road, and, according to reports, had nearly died before being discovered. Furnari was sentenced to a 15 to 30 year term of imprisonment. He was released in 1953 and was placed on parole until 1973.

In 1962, Furnari was again arrested and his parole was violated for associating with known criminals. At the time of this arrest, Furnari was carrying with him 34 NYPD photographs of the "Gallo gang." Informant information from the early 1960's shows that Furnari began his long association with the Lucchese Family in this period. Indeed, Frankie Hart Bellino,

A.63

a Lucchese button, had financially taken care of Furnari's wife
while Furnari was in jail serving his parole violation
sentence.   Government sources also noted at the time that
Furnari was involved with other Lucchese Family members in
bookmaking, loansharking and narcotics trafficking throughout
the early 1960's.  By 1965, Furnari was a rising figure within
the Family and was fast becoming one of the City's largest
bookmakers.

In this same period, Furnari became a hidden owner of
the "19th Hole" Bar and Social Club in Brooklyn, and this became
a frequent meeting place for organized crime figures.   In the
late 1960's, Furnari extended his New York bookmaking operations
into Las Vegas; indeed, Furnari traveled there in 1970 to ensure
that the Lucchese Family's interests were protected.  By that
time, Furnari had risen to become a Capo in the Family.  Some of
his illegal gambling operations earned him as much as $25,000
per day.  As Joseph Cantalupo testified at trial, by the mid-
1970's, Furnari was a powerful Capo who frequently intervened
to settle disputes among loansharks associated with various
Families.

In approximately 1980, Furnari became the Consigliere
of the Lucchese Family and his power as a mediator of inter-
Family disputes grew.  As the proof at trial demonstrated,
Furnari also became involved from time to time in the 1980's in

- 36 -

**A.64**

MC/JFS:lq
9-2095A/1

supervising the Lucchese Family's stake in the Commission's massive 'Club' extortion scheme. Thus, despite a long prison term imposed early in his criminal career, Furnari remained undeterred. In this sense, he is a classic La Cosa Nosa product: wholly loyal to the Mafia's code of silence, and unflinchingly committed to earning his living solely through criminal means, even after long imprisonment.

### G.  Ralph Scopo

Ralph Scopo was born in 1929 and his early criminal record dates back to a 1945 arrest for attempted burglary and includes a 1948 arrest for felonious assault with a cleaver. Although for the next 35 years, Scopo's record is free of any arrests, this is not because he became a legitimate member of society.  Instead, he led a dual life: at one level Scopo worked in the concrete construction industry and rose to become a powerful union leader as President of the District Council of the Cement and Concrete Workers; beneath that facade of legitimacy, however, he pursued a parallel existence connected to organized crime, becoming a made member of the Colombo Family in approximately 1975.  Scopo's association with the Colombo Family is a longstanding one, as revealed through electronically surveilled conversations in which Scopo tells James Costigan of XLO Concrete of his involvement in the "Gallo Wars" in the 1960's.

- 37 -

**A.65**

MC/JFS:lq
9-2095A/1

that employment), these contractors were forced to make payoffs to the Colombo Family and to put "no-show" employees on their payrolls.*

Testimony at the <u>Persico</u> trial demonstrated that Scopo flaunted his organized crime ties in conversations with contractors. He told David Assalti of Daval Construction Company that "it is better to pay the money so you can sleep at night . . . being a family man, you're better off being able to sleep and having nothing to bother you on your mind." (<u>Persico</u> Tr. 3463-64). More pointedly, Scopo told Anthony Rivara of Pile Foundation that if Rivara did not pay the full amount that Scopo demanded, Rivara would have to "go downtown to a restaurant meeting in Little Italy to meet some of his [Scopo's] friends." (<u>Persico</u> Tr. 3692; <u>see</u> <u>also</u> <u>id</u>. 3693-94).

Also telling in this regard were the tapes played at the <u>Persico</u> trial of Scopo's conversations with contractors and organized crime figures. On those tapes Scopo himself was regularly overheard threatening to impose or imposing work stoppages on contractors who failed to meet the Colombo Family's extortion

---

\* The eight concrete companies from which the Colombo Family was proven in the <u>Persico</u> trial to have extorted monies through threats of labor problems from Local 6A and the District Council were the Pile Foundation Company, Retsam Contracting Corporation, Alicer Contracting Company, DeGaetano & Vozzi Construction Company, All-Boro Paving Company, Cedric Construction Company, Daval Construction Company and Technical Concrete Construction Corporation.

- 39 -

**A.66**

demands. For example, in a December 1983 conversation with Robert Sisto of Alicer Construction Company, Scopo, apparently angered by Sisto's failure to make the demanded payments, told Sisto: "Your job is closing tomorrow morning. And matter a fact I just finished talking to a delegate in the club to go there tomorrow morning and knock the men off the job.... I, I just finished telling my son Joey [Scopo, currently Local 6A's Vice-President and a District Council Executive Board member], 'Go on the job and stop that job tomorrow morning.'" Later in that same conversation, Sisto begged Scopo not to shut down his job and promised to meet Scopo the next morning to make the demanded payment. Scopo then immediately called the home of his son, Joseph Scopo, and left a message that Joseph Scopo was not to go shut down Sisto's job. On other tapes, Scopo was over-heard to say: "'If you don't do business with me, I'll stop that fuckin' job'"; and "he didn't have the money. So I went in and I stopped the fuckin' job one morning."

As this Court is aware from having presided over the trial in this case, the examples cited above of Scopo's tactics in running the Colombo Family scheme parallel his role in carry-ing out the Commission's larger "Club" extortion scheme. Again, the evidence overwhelmingly reveals a union leader ready and willing to threaten work stoppages or labor problems in order to exact tribute money from the contractors.

MC/JFS:lq
9-2095A/1

The evidence gathered as part of the ongoing civil RICO case against Local 6A, the District Council and its officers also shows Scopo's pervasive, and wholly corrupt power over the union. When Scopo announced his resignation as President and Business Manager of the District Council in March 1985, the unions' minutes refer only to his alleged "ill health" and, remarkably, make no mention whatsoever of the two federal RICO indictments that were then pending against him. Indeed, the union confirmed Scopo's hand-picked successor -- Louis Gaeta* -- as the new President. The union leadership also rewarded the twice-indicted Scopo with a special "severance payment" of $200,000; an almost brand-new Cadillac (which cost $30,000 to replace); a "retirement bonus" (which totalled approximately $20,000); an invitation to all future union conventions at union expense; and an appointment as the union's President Emeritus for life.

In giving Scopo these lavish "retirement" benefits, the union leadership made no attempt to determine whether Scopo had committed the crimes with which he was then charged. There was no internal investigation (as prescribed in the union's constitution) and the minutes of Local 6A and the District Council make no mention of Scopo's two outstanding indictments.

---

\*    Gaeta is a named defendant in the civil proceedings.

- 41 -

A.68

MC/JFS:lq
9-2095A/1

Thus, even after the Government's investigation had exposed
Scopo's vast criminal undertakings, his Mafia-derived power
remained so great that the union leadership ignored the
outrageous abuse of his union position and instead showered him
with gifts and honors.

Nor was Scopo's exercise of his power over the job
sites benign in any sense. His taste for brutality is chilling-
ly revealed in the following recorded conversation. In 1983
Raimondo Graziano, now a Local 6A officer, had a dispute with a
laborer, perhaps a foreman, who disparaged Graziano with ethnic
slurs. Ralph Scopo went to the job site, verbally berated the
laborer, and then closed down the project by pulling union
workers off the job. In a December 29, 1983 conversation at
Scopo's Social Club, Scopo said to Graziano:

> "But I told him off good. I was waiting for
> him to say somethin' to me . . . I would
> have got out of that fuckin' car. Louie
> Gaeta was right next to me. You should
> have hit him. You should have hit him.
> You got four or five guys there. What the
> fuck. There's John there, there's my
> nephew there, his son's there."

Graziano apologized: "I didn't talk. Usually I (overlapping
voices) sometimes, I talk more like Mafia." Scopo was not satis-
fied with the laborer's apology to Graziano.

> SCOPO:    I think you should have hit
>           him.
>
> GRAZIANO: I started feelin' real bad that
>           I, I didn't. I said that if
>           this guy makes one move . . .

- 42 -

**A.69**

> SCOPO: You should have hit him then.
> When he came to apologize, you
> should have hit him.

> GRAZIANO: I took the knife out and I
> said, "I'll fuckin' stick it
> right in his belly."

> SCOPO: You should have.

With the job resuming, Scopo advised Graziano that if the laborer
"gets fuckin' smart with you, whack him. . . . Throw him off
the fuckin' job." Graziano, a loyal Scopo henchman, was later
rewarded with a union officership.

The sentences to be imposed on Scopo must destroy his
ruthless abuse of union leadership forever, and also remind
society at large that the corruption of this City's unions by
gangsters such as Scopo can be policed and punished.

### H. Anthony Indelicato

Anthony ("Bruno") Indelicato was born in New York City
in 1947, and by the age of 18 he had been convicted of burglary
and was sentenced, as a youthful offender, to probation. Indeli-
cato's criminal career continued apace and by the age of 26, he
had become a professional contract killer who maintained an
arsenal of weapons in his residence. In April 1973, the FBI
received information from an informant that Indelicato had been
given a contract to murder a Special Agent of the Bureau of
Narcotics and Dangerous Drugs, and that he resided in a Manhattan
apartment and had two .357 magnum handguns with silencers on the

- 43 -

**A.70**

premises. Agents of the FBI executed a search warrant, issued

here in the Southern District of New York, for those premises on

April 25, 1973, and discovered an arsenal of 11 firearms (5 of

which were stolen) and 197 rounds of assorted ammunition. The

firearms included three .38 revolvers, two .357 magnum revolvers,

one .25 revolver, two .25 automatics (one loaded), and one .22

Hi Standard derringer (loaded). Two of the loaded pistols and a

large supply of ammunition were concealed behind a false wall in

the apartment. At the time the warrant was executed, Indelicato

was found with a fully loaded .38 Smith and Wesson revolver in

his waistband. Small quantities of cocaine, hashish and mari-

juana were also found.

After his arrest, Indelicato pleaded guilty to one

count (of a five-count indictment) of possession of firearms

stolen from interstate shipments, in violation of 18 U.S.C.

§ 922(j). He received a 3 year sentence and was released on

parole in August 1975. His parole ended October 1976.

Despite his firearms conviction and parole status,

Indelicato remained dedicated to a life of crime, becoming

associated with the Bonanno Family. Indeed, one Government

source who met Indelicato in the late 1970's learned from a

Bonanno Family associate that Indelicato was considered a pro-

fessional hit-man within La Cosa Nostra and had the reputation

that he was able to kill a man with just one shot. Of course,

**A.71**

that reputation was resoundingly confirmed by the jury's verdict
in this case, finding Indelicato responsible for the triple homi-
cide of Galante, Coppola, and Turano.

As the proof at trial showed, Indelicato rose in rank
within the Bonanno Family following the murder of Galante in
1979. He joined his father, Alphonse ("Sonny Red") Indelicato,
as a Capo in the Family, and his reputation for violence grew.
In the spring of 1981, another Government source, Vincent
DiPenta, was riding in an automobile with Anthony Indelicato and
his uncle while Indelicato dipped bullets in cyanide and
explained to Mr. DiPenta that that way when the bullet hits a
victim, it will be sure to kill him.

When the simmering factional dispute within the Bonanno
Family finally exploded with the murder in early May 1981 of
three Family Capos -- Alphonse Indelicato, Phillip Giaccone, and
Dominic Trinchera -- Anthony Indelicato was also slated for mur-
der by the triumphant faction within the Family. Thus, Agent
Joseph Pistone, then working as an undercover within the Bonanno
Family, learned from Capo Dominic ("Sonny Black") Napolitano
that Indelicato was to be killed, that he was always armed, and
that he was considered by the mob to be especially dangerous,
particularly because his heavy cocaine use made him violent and
unrestrained. Indelicato managed to escape detection by the
Mafia, and the contract on his life was eventually rescinded.

- 45 -

**A.72**

MC/JFS:lq
9-2095A/1

During this same period of time, the FBI was also look-
ing for Indelicato in order to serve him with a Grand Jury
subpoena as part of the investigation into the disappearance of
Indelicato's father and the two other murdered Capos. Indelicato
successfully evaded law enforcement authorities in this period,
and, in fact, when he was arrested in 1985 on new firearms
charges, he told the arresting agents that he had successfully
"ducked the FBI for three years."

Indelicato's complete contempt for law enforcement and
the judicial system is revealed by the conduct which led to his
1985 conviction for unlawful possession of a firearm by a pre-
viously convicted felon. Indelicato was initially stopped in
December 1984 near the George Washington Bridge after being
involved in a minor traffic accident. When Port Authority
police attempted to question Indelicato concerning the accident,
he acted evasively, seeking to conceal the fully loaded .357
magnum Colt Python revolver he had in his waistband. At the
time of his arrest, Indelicato offered two different aliases and
did not admit to his true identity until later. In addition, he
had a false driver's license in the name of Frank Lopinto and
$2975 in cash in his possession. Indelicato then went on to lie
to the magistrate who released him on bond by stating that he
would live with his mother on Long Island. He again lied to the
bail bondsman, stating that he would reside with his cousin,

- 46 -

A.73

MC/JFS:lq
9-2095A/1

Lucille Zeccardi, in Englewood Cliffs.  When Indelicato was
finally arrested again on federal charges he was carrying yet
another false driver's license.  After his conviction in April
1985 on the firearms charges, Indelicato was sentenced on May
13, 1985 to two years' imprisonment.

These facts demonstrate that Indelicato's cold-blooded,
professionally planned murder of Galante, Coppolla and Turano in
July 1979 was no isolated event, but rather was part of a larger
pattern of violence and criminality that he has chosen for his
way of life.  Indelicato's extensive history of narcotics abuse,
continual possession of firearms, and involvement in a gruesome
triple homicide reveal a man at war with law-abiding society.
This disclaim for the norms by which others live merits the most
severe punishment.  More important, society deserves to be
shielded from this killer for as long as the law allows.

III.  The Need for Punishment and Deterrence

A.  Introduction

1.  Cooperation:  By virtue of his position in the
hierarchy of La Cosa Nostra, each of the defendants in this
case possesses information about the activities of organized
crime throughout the country, including crimes of violence,
labor racketeering, loansharking and political corruption.
Communication of such information to the Government would be
of enormous benefit to law enforcement, and would serve as a

- 47 -

**A.74**

significant indication of rehabilitation and remorse.  To date,
none of these defendants has offered to cooperate with authori-
ties in any way.  By declining to cooperate, these defendants
continue to reject the basic obligations of law-abiding citizen-
ship.  The Government submits that this Court should consider
this failure to cooperate as a factor in the sentencing decision.
See United States v. Roberts, 445 U.S. 552, 558 (1980).

          2.   Culpability:  In the Government's view, there is
no distinction to be drawn among those defendants with regard to
degree of culpability.  No "small fries" were convicted in this
case.  Each defendant was a totally willing, active and important
participant in, and beneficiary of, the crimes charged.

          Six of the defendants -- Salerno, Persico, Langella,
Corallo, Santoro, and Furnari -- held the ranks of Boss,
Underboss or Consigliere in one of the Mafia Families.  These
gradations in rank are immaterial:  the proof at trial showed
that these men operated interchangeably in leadership roles.
Corallo, for example freely designated Santoro, his Underboss,
and Furnari, his Consigliere, to speak and act on his behalf.

          Two defendants -- Indelicato and Scopo -- held lesser
ranks in their respective Families.  These men played key roles,
however, in executing the Commission's order.  Without men like
Indelicato and Scopo to carry out the decisions of the other
defendants, the Commission could not operate.  Moreover, the

A.75

MC/JFS:lq
9-2095A/1

culpability of Indelicato and Scopo is aggravated by additional
factors. Indelicato's racketeering acts were deliberate, profes_ ,
sional homicides, and Scopo carried out his crimes through the
betrayal and perversion of his fiduciary obligations to the
members of his labor union.

Accordingly, we respectfully submit that none of the
defendants standing before the Court should be regarded as less
culpable than the others.

B.    Incarceration

It is impossible to overstate the magnitude of the
crimes of which the defendants are guilty. These men enlisted
in the cause of lawbreaking, and rose to direct a vicious and
supremely powerful nationwide criminal group which is virtually
synonymous with organized crime. Their convictions represent
the culmination of decades of law enforcement effort. The power
of these men must be broken.

The Government respectfully recommends that each of
these men be sentenced to terms of imprisonment that -- first
and foremost -- remove them from society permanently. As the
evidence in this case demonstrated, imprisonment does not
necessarily stop organized crime leaders from continuing to
guide criminal ventures. We believe, however, that one way to
block these defendants from exercising their control from prison
is to eliminate the possibility that they will ever emerge to

- 49 -

**A.76**

Case 16-2361, Document 23, 10/11/2016, 1880537, Page79 of 309

reestablish direct command of their Families. As Carmine Persico explained to Fred DeChristopher, when Persico left prison in 1979, his first task was to meet with other Bosses to reclaim profits which the Family had lost while Persico was incapacitated. It follows that the bonds of allegiance to these defendants will loosen only when it is clear that they are in prison to stay.*

In the case of Indelicato, there is an additional consideration. Since Indelicato's crimes and background involved numerous personal acts of violence, it is of the utmost importance that he be physically separated from society for as long as possible. In Indelicato's case his maximum exposure to imprisonment is 40 years.

These defendants deserve permanent incarceration. Their profound contempt for the law, as demonstrated by their criminal acts and membership in the Mafia, indicates that the prospect of their rehabilitation is nil. At the same time, their crimes cry out for extraordinary punishment. The defendants occupied the highest ranks of the Mafia, and their offenses were of the utmost magnitude. The sentences imposed, therefore, will be viewed as benchmarks, against which all other sentences will be measured. Indeed, this symbolic dimension of sentencing

---

\*    Of course, prison authorities are expected to take administrative steps to ensure that in the future these defendants will not be in a position to engage in crime from prison.

- 50 -

**A.77**

MC/JFS:lq
9-2095A/1

suggests that there is value in imposing prison terms that these
defendants will not be physically capable of completing.*

Finally, in considering terms of imprisonment, this
Court should take note of the effect of parole regulations on
actual time served. Under current procedures, defendants are
parole eligible at completion of approximately 1/3 of their
terms, and are generally subject to mandatory release after 2/3.
Moreover, defendants sentenced to 30 years or more always become
eligible for parole after 10 years, but their mandatory release
date remains at 2/3 of their total cumulative sentence. We
respectfully submit that this Court should bear in mind that
while a prison term over 30 years will not raise a defendant's
parole eligibility date, it will raise the mandatory release
date. And, of course, this Court may wish to recommend to the
Parole Commission that these defendants never be considered for
parole.**

None of these defendants can advance any factor call-
ing for mitigation or mercy at sentencing. The individual counts

---

*      In this regard, the Court will recall that Angelo Lonardo,
the former Underboss of the Cleveland Mafia Family, was sentenced
to life plus 103 years in prison.

**     Judge Kevin Duffy made a similar recommendation in the case
of two defendants convicted in United States v. Anthony Gaggi,
et al. SSS 84 Cr. 63 (KTD). See Borelli Sentencing, 4/9/86, Tr.
22; Rendini Sentencing, 4/9/86, Tr. 10.

- 51 -

A.78

of racketeering, extortion, loansharking and murder for which they have been convicted reflect separate and distinct crimes, for which consecutive punishment is appropriate. The Government respectfully submits that justice calls for the maximum prison sentence to be levied against each defendant.

  C. Financial Penalties

   In addition to prison sentences, we respectfully urge· the Court to consider the financial penalties detailed below.*

    1. Fines

   For the reasons stated above with respect to incar- ceration, we submit that maximum consecutive fines should be imposed upon each defendant. The maximum on each Count is:

| | | |
|---|---|---|
| Counts 1 & 2 | RICO | $25,000 per count |
| Counts 3, 4, 6, 8, 10, 12, 14, 16-21 | Extortion | $10,000 |
| Counts 5, 7, 9, 11, 13, 15 | Labor Bribery | $10,000 |
| Count 22 | Loansharking | $10,000 |

   Accordingly, maximum fines would be as follows:

| DEFENDANT | COUNTS | TOTAL FINES |
|---|---|---|
| SALERNO | 1-21 | $240,000 |
| PERSICO | 1-21 | $240,000 |

---

\* Forfeiture pursuant to 18 U.S.C. § 1963 is not an available punishment because no forfeitures were alleged in the Indictment. See Rules 7(c)(2) and 31, Federal Rules of Criminal Procedure, and Advisory Committee Notes thereto.

**A.79**

MC/JFS:lq
9-2095A/1

| DEFENDANT | COUNTS | TOTAL FINES |
|-----------|--------|-------------|
| LANGELLA | 1-21 | $240,000 |
| CORALLO | 1-22 | $250,000 |
| SANTORO | 1-22 | $250,000 |
| FURNARI | 1-21 | $240,000 |
| SCOPO | 1-21 | $240,000 |
| INDELICATO | 1, 2 | $ 50,000 |

### 2. Costs of Prosecution

Title 28 U.S.C. § 1918 provides that "Whenever any
conviction for any offense not capital is obtained in a district
court, the court may order that the defendant pay the costs of
prosecution." This Circuit has repeatedly upheld the assessment
of costs based on this provision on the theory that such
assessment merely deprives a financially able defendant of funds
more properly remitted to the public. United States v. Glover,
588 F.2d 876, 878-79 (2d Cir. 1978); see United States v. Tzakis,
736 F.2d 867, 873 (2d Cir. 1984).*

### 3. Restitution

Under the Victim and Witness Protection Act ("VWPA"),
18 U.S.C. § 3579 et seq., this Court has the authority to require
these defendants to make restitution to victims of their crimes.

---

\* If this Court orders payment of costs, the Government will
submit a Bill of Costs.

- 53 -

**A.80**

MC/JFS:lq
9-2095A/1

In this case the jury verdicts and the evidence at trial clearly
established that all defendants except Indelicato participated
in an extortion scheme which cost Technical Concrete and XLO
Concrete hundreds of thousands of dollars.*  Four of the specific
extortion counts arising from the Technical and XLO extortions
occurred in 1983 or 1984, after the January 1, 1983, effective
date of the VWPA.  As the trial testimony showed, XLO paid
$320,000 to the defendants in connection with the Rivergate job
(Count 6), and $25,000 as part payment in connection with the
York Avenue job (Count 8).  Technical paid $135,600 as extortion
sums for its two "Club" jobs (Counts 12 and 14).  Accordingly,
even the most conservative estimate of defendants' ill-gotten
gains from these crimes is $345,000 from XLO, and $135,600 from
Technical.

Under the law, XLO and Technical would be entitled to
receive these sums from the defendants.  The Government urges,
however, that these sums not be restored to XLO or Technical for
two reasons:  First, inasmuch as principals of each firm pled
guilty to misdemeanor labor bribery for making these payments,
neither XLO nor Technical have "clean hands" in an equitable
sense.  As a policy matter, it would be inappropriate to refund
their payments, the loss of which constitutes part of their
punishment.  Second, because XLO and Technical may have passed

---

\* As to the other extortion counts, the Government proceeded
to the jury on an attempted extortion theory.

- 54 -

**A.81**

costs along to the general contractors, who have incorporated those costs into housing prices in the City, paying the concrete companies restitution seems unfair, and may arguably run afoul of the statutory requirement that the "court shall not impose restitution with respect to a loss for which the victim has received. . . compensation." 18 U.S.C. § 3579(e)(1).

We do submit that there are other victims to whom these defendants' criminal profits should be restored: the citizens of New York. For when costs are passed on in any economic market, the ultimate consumer pays the price. Undeniably, the defendants' "Mafia tax" on the construction industry has raised the cost of housing for virtually everyone in New York, and has put it out of reach for some. To be sure, it is impossible to identify the specific New York residents who have paid the ultimate price of these crimes. Accordingly, we respectfully submit that the restitution by paid to the City of New York, with instructions that the sums be expended on the provision of housing and related services to those New Yorkers most in need (such as the homeless).

While the restitution order sought here is unprecedented, we believe that restitution directed to such a class of victims is wholly appropriate. Judicial decisions interpreting the VWPA have generally defined "victim" broadly, to include even "indirect" victims who are harmed as a result of the defendants'

- 55 -

crime.  See, e.g., United States v. Mounts, 793 F.2d 125 (6th

Cir. 1986); United States v. Durham, 755 F.2d 511, 513 (6th Cir.

1985); United States v. Richard, 738 F.2d 1120, 1123 (10th Cir.

1984); United States v. Allison, 599 F. Supp. 958 (N.D. Ala.

1985).  For example, the Court of Appeals in Richard held a bank

robber liable to the bank for money which he did not steal, but

which was stolen by someone else who took advantage of the

commotion caused by the robbery.  See generally, United States

v. Atkinson, 788 F.2d 900, 903 (2d Cir. 1986).

   The language of the VWPA statute and its legislative

history also supports a generous, practical application of the

restitution concept that is consistent in spirit with an order

requiring that the restitution be paid to New Yorkers at large.

In the case of a crime causing loss to property, Section

3579(a)(2) permits the Court to order that restitution be made

"to the owner of the property or someone designated by the

owner."  Section 3579(a)(4) further mandates that in any case

the Court may make restitution to a non-victim "person or organi-

zation designated by the victim. . . ."  And Section 3579(e)(1)

provides that restitution may be ordered to any third parties

who have previously compensated the victim.  See United States

v. Atkinson, supra, at 905.  All of these provisions reflect a

broad view of the class of restitution recipients, displaying

the overriding congressional concern that courts employ

**A.83**

"constructive, victim-oriented sentencing practices."  S. Rep. No. 97-532, p. 31, 97th Cong. 2d Sess., reprinted in 1982 U.S. Code Cong. & Admin. News vol. 3, p. 2515, 2537.

An order of restitution for the benefit of needy City residents will most fairly compensate the ultimate victims of the defendants' offenses.  Nor should the defendants' complaints be heard.  As the beneficiaries of criminal profits to which they have no right, the defendants are poorly situated to protest about which of their victims is recompensed.  Indeed, the "most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."  Bigelow v. RKO, 327 U.S. 251, 265 (1946).  Justice will be served best by an order requiring all defendants but Indelicato to pay $480,600 to the City of New York to serve the housing and related needs of the homeless and like-situated New Yorkers.*

## CONCLUSION

Because this case has exposed for the first time the inner workings of an extraordinarily ruthless and powerful criminal enterprise, it provides this Court with a unique opportunity.

---

*    In ordering restitution, this Court must consider the financial resources of the defendants.  18 U.S.C. § 3580.  The burden of showing inability to pay rests on the defendants, however. Id.  It is doubtful these defendants can carry that burden. For example, Salerno and Persico have properties in upstate New York; Corallo has a large house in Long Island and Santoro owns a beverage business.  More important, each of these defendants is merely being asked for disgorge proceeds that they previously obtained.

A.84

MC/JFS:lq
9-2095A/1

The sentences imposed on these defendants can have a doubly symbolic value: they can demonstrate that the greed, arrogance, and brutality of those who directed La Cosa Nostra will be severely punished; and at the same time, they can impress mobsters and would-be mobsters with the severity of the punishment that awaits them when their crimes are brought to light. The defendants who stand before this Court for sentence have shown through their lives of unrelenting criminality that they deserve no leniency and are beyond hope of rehabilitation. The Government respectfully recommends that this Court sentence them accordingly.

Dated:     New York, New York

December 22, 1986

Respectfully submitted,

RUDOLPH W. GIULIANI
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

By: _____
MICHAEL CHERTOFF
Assistant United States Attorney

_____
JOHN F. SAVARESE
Assistant United States Attorney

_____
JOHN GILMORE CHILDERS
Special Assistant United States
Attorney

- 58 -

A.85

INVESTIGATION
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| NAME & CASE # | COUNTS NAMED IN | CONVICTION STATUS | DISPOSITION |
|---|---|---|---|
| ANTHONY SALERNO a/k/a "Fat Tony" 76868/TAH | Cts. 1-21 of Redacted Ind. # SSS 85 CR 139. | Convicted on cts. 1-21. | |
| CARMINE PERSICO a/k/a "Junior" 76058/APO | Cts. 1-21 of Redacted Ind. # SSS 85 CR 139. | Convicted on cts. 1-21. | |
| GENNARO LANGELLA a/k/a "Gerry Lang" 76059/JPV | Cts. 1-21 of Redacted Ind. # SSS 85 CR 139. | Convicted on cts. 1-21. | |
| ANTHONY CORALLO a/k/a "Tony Ducks" 76463/DP | Cts. 1-22 of Redacted Ind. # SSS 85 CR 139. | Convicted on cts. 1-22. | |
| SALVATORE SANTORO a/k/a "Tom Mix" 76869/DJF | Cts. 1-22 of Redacted Ind. # SSS 85 CR 139. | Convicted on cts. 1-22. | |
| CHRISTOPHER FURNARI a/k/a "Christie Tick" 76871/JW | Cts. 1-21 of Redacted Ind. No. SSS 85 CR 139. | Convicted on cts. 1-21. | |

CENTRAL FILE

A.86 Ex1, fll

-2-

RALPH SCOPO                Cts. 1-21 of         Convicted on
76870/CAP                  Redacted             cts. 1-21.
                           Ind. No.
                           SSS 85 CR 139.


ANTHONY INDELICATO         Cts. 1 & 2           Convicted on
a/k/a "Bruno"              of Redacted          cts. 1 & 2.
76866/PBH                  Ind. No. SSS
                           85 CR 139.


Redacted Indictment:  SSS 85 CR 139(RO)

| COUNT | OFFENSE | PENALTY |
|-------|---------|---------|
| 1 | Racketeering Conspiracy<br>(18 USC 1962(d)) | 20 years and/or<br>$25,000 fine. |
| 2 | Racketeering<br>(18 USC 1962(c)) | 20 years and/or<br>$25,000 fine. |
| 3-4 | Extortion<br>(18 USC 1951) | 20 years and/or<br>$10,000 fine. |
| 5 | Payments to Employee<br>Representative<br>(29 USC 186(b)(1) &<br>18 USC 2) | 1 year and/or<br>$10,000 fine. |
| 6 | Extortion<br>(18 USC 1951) | 20 years and/or<br>$10,000 fine. |
| 7 | Payments to an<br>Employee Representative<br>(29 USC 186(b)(1) &<br>18 USC 2) | 1 year and/or<br>$10,000 fine. |

CENTRAL FILE

A.87  EX1, P12

-3-

| 8     | Extortion<br>(18 USC 1951)                                                           | 20 years and/or<br>$10,000 fine. |
|-------|--------------------------------------------------------------------------------------|----------------------------------|
| 9     | Payments to an<br>Employee Representative<br>(29 USC 186(b)(1) &<br>18 USC 2)         | 1 year and/or<br>$10,000 fine.   |
| 10    | Extortion<br>(18 USC 1951)                                                           | 20 years and/or<br>$10,000 fine. |
| 11    | Payments to an<br>Employee Representative<br>(29 USC 186(b)(1) &<br>18 USC 2)         | 1 year and/or<br>$10,000 fine.   |
| 12    | Extortion<br>(18 USC 1951)                                                           | 20 years and/or<br>$10,000 fine. |
| 13    | Payments to an<br>Employee Representative<br>(29 USC 186(b)(1) &<br>18 USC 2)         | 1 year and/or<br>$10,000 fine.   |
| 14    | Extortion<br>(18 USC 1951)                                                           | 20 years and/or<br>$10,000 fine. |
| 15    | Payments to an<br>Employee Representative<br>(29 USC 186(b)(1) &<br>18 USC 2)         | 1 year and/or<br>$10,000 fine.   |
| 16-21 | Extortion<br>(18 USC 1951)                                                           | 20 years and/or<br>$10,000 fine. |
| 22    | Extortionate Extension<br>of Credit<br>(18 USC 891 & 892)                            | 20 years and/or<br>$10,000 fine. |

**Count I** charges that at all times material to this Indictment, ANTHONY SALERNO, a/k/a "Fat Tony", CARMINE PERSICO, a/k/a "Junior", GENNARO LANGELLA, a/k/a "Gerry Lang", ANTHONY CORALLO, a/k/a "Tony Ducks", SALVATORE SANTORO, a/k/a "Tom Mix", CHRISTOPHER FURNARI, a/k/a "Christie Tick", RALPH SCOPO, and ANTHONY INDELICATO, a/k/a "Bruno" (hereinafter referred to by their proper names only) and others known and unknown to the Grand Jury, constituted an enterprise as defined by Title 18 USC 1961(4), which enterprise is often described as the "Commission" of La Cosa Nostra ("The Commission") and which operated in New York and other locations in the United States and other countries.

CENTRAL FILE

A.88 Ex1, P 15

-4-

## THE ENTERPRISE

There existed a nationwide criminal society known by various names, including "La Cosa Nostra," and "the Mafia," which society operated through entities known as "Families." Each such Family had as its leader a person known as "Boss," or "Father," or "Acting Boss," a deputy leader known as "Underboss," or "Second," and a high ranking official known as "Consigliere." Each Family further operated through the participation of officers known as "Capos" or "Group Leaders," members known as "Soldiers," and "Associates."

The Boss of each Family, with the assistance of the Underboss and Consigliere, supervised, promoted, and protected the criminal activities of the Capos, Soldiers and Associates of the Family, and, in return, received a part of the illegal earnings of those Capos, Soldiers and Associates.

Five of the La Cosa Nostra Families had their principal headquarters in New York City, although they operated throughout the United States and abroad. Each Family was often identified by the name of its Boss or of a former Boss. From 1931 up to and including the date of the filing of this Indictment, the succession of Bosses or Acting Bosses of the New York City La Cosa Nostra Families included the following individuals:

I (Genovese)

Vito Genovese

Frank Tieri
a/k/a "Funzi"

Anthony Salerno
a/k/a "Fat Tony"

II (Gambino)

Albert Anastasia

Carlos Gambino
a/k/a "Carl"

Paul Castellano
a/k/a "Paulie"

III (Colombo)

Joseph Profaci

Joseph Colombo

Carmine Persico
a/k/a "Junior"

Thomas DiBella (Acting)

Gennaro Langella (Acting)
a/k/a "Gerry Lang"

IV (Lucchese)

Thomas Lucchese
a/k/a "Tommy Brown"

Anthony Corallo
a/k/a "Tony Ducks"

V (Bonanno)

Joseph Bonanno

Carmine Galante

Philip Rastelli
a/k/a "Rusty"

A.89

-5-

Throughout this Indictment the five Families headquartered in New York will be described respectively as the Genovese Family, the Gambino Family, the Colombo Family, the Lucchese Family and the Bonanno Family.

Each La Cosa Nostra Family was a separate organization. Normally, the Boss and ruling officers of each Family possessed the full authority to supervise, regulate, and direct all illegal activities which involved or affected the interests of officers and members of the particular Family exclusively. However, illegal activities involving or affecting the interests of officers or members of two or more La Cosa Nostra Families exceeded the jurisdiction of any single Family. To avoid "wars" between Families, disputes between and among Families over the control of illegal activities had to be resolved by a supreme leader or body. In or about 1931, the Bosses of the New York and other La Cosa Nostra Families associated to form the "Commission" to serve as the council for La Cosa Nostra Families. From 1931 up to and including the date of the filing of this Indictment, the Commission had the power to resolve disputes and to regulate relations between and among La Cosa Nostra Families. Furthermore, from in or about the mid-1950's up to and including the filing of the Indictment, the Commission occasionally assumed the power to intervene in Family leadership disputes that could not be resolved within a particular Family.

The Commission was an enterprise distinct from the individual Families, but it was comprised of Bosses and Acting Bosses -- acting in concert with other high-ranking officers -- from the five La Cosa Nostra Families which had their headquarters in New York City. At different times the Commission also included influential Bosses from a number of La Cosa Nostra Families with their headquarters elsewhere in the United States, including, but not limited to, Families in Chicago, Illinois; Buffalo, New York; and Philadelphia, Pennsylvania.

The Commission reached decisions and issued orders through votes of all or some of the Commission members, or through the actions or decisions of an individual Commission member or members. From time to time, an individual Commission member or Commission members (or delegates) adjudicated disputes or acted as spokesman in authorizing action on behalf of the Commission.

### PURPOSES OF THE ENTERPRISE

The general purpose of the Commission enterprise was to regulate and facilitate the relationships between and among La Cosa Nostra Families. Specific purposes of the Commission included the following:

a. Promoting and carrying out joint ventures between and among La Cosa Nostra Families to obtain money through illegal activities. These Commission joint ventures included a joint venture among several La Cosa Nostra Families which controlled and dominated certain concrete contractors and allocated payoffs on certain concrete contracts in New York City;

b. Resolving actual and potential disputes and regulating among the several La Cosa Nostra Families regarding the operation, conduct, and control of illegal activities. These illegal activities included interference with interstate commerce through extortion; extortionate extensions of credit, commonly called "loansharking" or "shylocking"; gambling or "bookmaking"; infiltration and control of labor unions and labor organizations.

**CENTRAL FILE**

A.90

-6-

c.   Extending formal recognition to newly-elected Bosses of La Cosa Nostra Families, and, from time to time, resolving leadership disputes within a Family.

d.   Taking such steps as were necessary to preserve order in, between and among the La Cosa Nostra Families, including authorizing acts of murder of certain La Cosa Nostra Family members.

e.   Approving the initiation or "making" of new members or soldiers in the several La Cosa Nostra Families.

f.   Establishing certain rules governing the Families, officers and members of La Cosa Nostra.

g.   Keeping persons inside and outside La Cosa Nostra in fear of the Commission by identifying the Commission with threats, violence, and murder.

### MEANS & METHODS OF THE ENTERPRISE

Among the means and methods whereby the said defendants and others conducted and participated in the conduct of the enterprise's affairs at all times relevant to the Indictment were the following:

a.   The Commission established a "Club" of certain construction contractors who poured concrete. The Commission controlled the allocation of contracts to pour concrete on construction jobs where concrete costs exceeded two million dollars. The Commission and its co-conspirators and agents would designate which contractor would be permitted to make the successful bid on a particular contract. Often other concrete contractors would be directed to submit bids higher than that of the designated winner. The Commission enforced rules of the "Club" with the threat of punishing disobedient contractors, by causing the contractors' supplies of cement to be stopped, or by causing certain labor union leaders to create "labor problems" for the contractors. The Commission exploited its control over these concrete-pouring contracts in order to demand and receive payoffs from concrete contractors. Among the illegal ways in which the Commission implemented and exploited its control over these concrete-pouring contracts were the following:

1.   The defendants and their co-racketeers and agents would and did extort, and conspire and attempt to extort money and property from certain concrete contractors who sought to bid for, who bid for, and who obtained concrete-pouring contracts in connection with certain construction projects;

2.   The defendants and their co-racketeers and agents would and did exercise control over and influence the decisions of the District Council of Cement and Concrete Workers, Laborers International Union of North America, and would and did agree to the payment of bribes to an official thereof, to wit, defendant RALPH SCOPO.

b.   The Commission resolved a leadership dispute within the Bonanno Family, and between the Bonanno Family and other La Cosa Nostra Families, by authorizing the murders of Carmine Galante, a/k/a "Lilo," who was Boss of the Bonanno Family, and Leonard Coppola and Giuseppe Turano, his associates.

-7-

c.   The Commission authorized certain other murders.

d.   The Commission participated in the selection of a new Boss for the La Cosa Nostra Family in Buffalo, New York.

e.   The Commission approved the admission of new members to the La Cosa Nostra society of criminals.

f.   The Commission promoted and encouraged a climate of fear to enhance the ability of the Commission and its members to control La Cosa Nostra and to obstruct justice.

### ROLES OF THE DEFENDANTS

The defendants played the following roles, among others, in conducting and furthering the affairs of the enterprise:

a.   At all times relevant to this Indictment, ANTHONY SALERNO was Consigliere, Acting Boss and Boss of the Genovese Family, and was associated in fact with and was a member of the Commission.

b.   At times relevant to this Indictment, unindicted co-conspirator Paul Castellano, a/k/a "Paulie," was Acting Boss and Boss of the Gambino Family, and was associated in fact with and was a member of the Commission; and unindicted co-conspirator Aniello Dellacroce, a/k/a "Neil," a/k/a "O'Neill" was Underboss of the Gambino Family, was associated in fact with the Commission and from time to time was delegated to represent the Gambino Family to the Commission.

c.   At times relevant to this Indictment, CARMINE PERSICO was boss of the Colombo Family and was associated in fact with and was a member of the Commission; GENNARO LANGELLA was a Capo and Acting Boss of the Colombo Family, and was associated in fact and was a member of the Commission; and the defendant RALPH SCOPO was a member of the Colombo Family, was president and business manager of the District Council of Cement and Concrete Workers, Laborers International Union of North America ("Concrete Workers District Council"), and was associated in fact with the Commission.

d.   At times relevant to this Indictment, ANTHONY CORALLO was boss of the Lucchese Family, and was associated in fact with and was a member of the Commission; SALVATORE SANTORO, was Underboss of the Lucchese Family, was associated in fact with the Commission and from time to time was delegated to represent the Lucchese Family to the Commission; and CHRISTOPHER FURNARI was Consigliere of the Lucchese Family and was associated in fact with the Commission and from time to time was delegated to represent the Lucchese Family to the Commission.

e.   At times relevant to this Indictment ANTHONY INDELICATO was a Capo and soldier of the Bonanno Family and was associated in fact with the Commission.

CENTRAL FILE

A.92 Ex 1, P 17

-8-

    f.   ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO,
SALVATORE  SANTORO,  CHRISTOPHER FURNARI AND RALPH SCOPO obstructed, delayed
and affected and conspired and attempted to obstruct, delay and affect interstate
commerce through extortion from concrete contractors.

    g.   ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO,
SALVATORE  SANTORO,  and CHRISTOPHER FURNARI, aided and abetted the defendant
RALPH SCOPO, the officer of a labor organization, which organization represented
employees of  concrete contractors who were employed in interstate commerce,
in RALPH SCOPO's requests, demands, receipt and acceptance of payments of money
from concrete contractors.

    h.   ANTHONY INDELICATO solicited the murders of Carmine Galante, a/k/a
"Lilo," Leonard Coppola and Giuseppe Turano and ANTHONY INDELICATO committed
these murders.

### THE RACKETEERING CONSPIRACY

From in or about (1970) up to and including the date of the filing of this
Indictment, in the Southern District of New York and elsewhere, ANTHONY SALERNO,
CARMINE   PERSICO,   GENNARO  LANGELLA,   ANTHONY  CORALLO,   SALVATORE   SANTORO,
CHRISTOPHER FURNARI, RALPH SCOPO and ANTHONY INDELICATO, and others known and
unknown to the Grand Jury, being persons·in control of and associated with
the enterprise described above, which enterprise was engaged in, and the
activities of which affected interstate commerce, did conspire with each other
to conduct and participate, directly and indirectly in the conduct of the affairs
of the enterprise through a pattern of racketeering activity.

The defendants each participated in the conduct of the enterprise through the
commission of multiple racketeering acts as set forth below.

### PATTERN OF RACKETEERING

The pattern of racketeering activity as defined in Title 18 USC 1961(1) and
1961(5) consisted of the following acts:

                    Conspiracy to Extort Payoffs From
                    Certain Construction Companies

| Racketeering Act No. | Date | Participants | Victim |
|---|---|---|---|
| #1<br>(Extortion) | 1981 to<br>filing of<br>Indictment | Salerno, Persico,<br>Langella, Corallo,<br>Santoro, Furnari,<br>Scopo | Members of a<br>group called<br>"The Club" (NYC<br>area construction<br>companies in the<br>concrete pouring<br>business). |

A.93 EX1. P.15

-9-

## Construction Extortions

| Racketeering Act No. | Date | Participants | Victim |
|---|---|---|---|
| #2A<br>(Extortion) | 8/81 | Salerno, Persico,<br>Langella, Corallo,<br>Santoro, Furnari,<br>Scopo | XLO Concrete<br>Corporation<br>($136,000) |
| 2B<br>(Payments to an<br>Employee Rep.) | 8/81 | Scopo, Salerno,<br>Persico, Langella,<br>Corallo, Santoro,<br>Furnari | XLO Concrete<br>Corporation<br>($136,000) |
| 3A<br>(Extortion) | 5/83 | Salerno, Persico,<br>Langella, Corallo,<br>Santoro, Furnari,<br>Scopo | XLO Concrete<br>Corporation<br>($326,000) |
| 3B<br>(Payments to an<br>Employee Rep.) | 5/83 | Scopo, Salerno,<br>Persico, Langella,<br>Corallo, Santoro,<br>Furnari | XLO Concrete<br>Corporation<br>($326,000) |
| 4A<br>(Extortion) | 4/84 | Salerno, Persico,<br>Langella, Corallo,<br>Santoro, Furnari,<br>Scopo | XLO Concrete<br>Corporation<br>($157,000) |
| 4B<br>(Payments to an<br>Employee Rep.) | 4/84 | Scopo, Salerno,<br>Persico, Langella,<br>Corallo, Santoro,<br>Furnari | XLO Concrete<br>Corporation<br>($157,000) |
| 5A<br>(Extortion) | 3/84 | Salerno, Persico,<br>Langella, Corallo,<br>Santoro, Furnari,<br>Scopo | Century-Maxim<br>Construction<br>Corporation<br>($177,800) |
| 5B<br>(Payments to an<br>Employee Rep.) | 3/84 | Scopo, Salerno,<br>Persico, Langella,<br>Corallo, Santoro,<br>Furnari | Century-Maxim<br>Construction<br>Corporation<br>($177,800) |

CENTRAL FILE

A.94

-10-

| Racketeering Act No. | Date | Participants | Victim |
|---|---|---|---|
| 6A (Extortion) | 4/83 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | Technical Concrete Corporation ($70,600) |
| 6B (Payments to an Employee Rep.) | 4/83 | Scopo, Salerno, Persico, Langella, Corallo, Santoro, Furnari | Technical Concrete Corporation ($70,600) |
| 7A (Extortion) | 4/84 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | Technical Concrete Corporation ($65,000) |
| 7B (Payments to an Employee Rep.) | 4/84 | Scopo, Salerno, Persico, Langella, Corallo, Santoro, Furnari | Technical Concrete Corporation ($65,000) |
| 8 (Extortion) | 3/82 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | Cedar Park Concrete Construction ($73,000) |
| 9 (Extortion) | 4/82 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | North Berry Concrete Construction ($134,000) |
| 10 (Extortion) | 9/82 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | G & G Concrete Construction ($117,000) |
| 11 (Extortion) | 5/84 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | S & A Concrete Company, Inc. ($95,000) |

CENTRAL FILE

A.95

-11-

| Racketeering Act No. | Date | Participants | Victim |
|---|---|---|---|
| 12<br>(Extortion) | 8/84 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | S & A Construction Company, Inc. ($84,000) |
| 13<br>(Extortion) | 5/84 | Salerno, Persico, Langella, Corallo, Santoro, Furnari, Scopo | S & A Concrete Company, Inc. ($67,000) |

### Murders

| | | | |
|---|---|---|---|
| 14<br>(Murder) | 9/78 -<br>7/31/79 | Indelicato | Carmine Galante |
| 15<br>(Murder) | 9/78 -<br>7/31/79 | Indelicato | Leonard Coppola |
| 15<br>(Murder) | 9/78 -<br>7/31/79 | Indelicato | Giuseppi Turrano |

### Loansharking

| | | | |
|---|---|---|---|
| 17<br>(Conspiracy) | 5/83 -<br>Filing | Corallo, Santoro | |

**Count 2** charges that from in or about 1970 up to and including the date of the filing of this Indictment, in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and ANTHONY INDELICATO, and others known and unknown to the Grand Jury, being persons in control of and associated with the enterprise described in count 1 did conduct and participate in the conduct of the affairs of that enterprise, which was engaged in and the activities of which affected interstate commerce, through a pattern of racketeering activity, to wit, the racketeering acts set forth in count 1 of this Indictment as racketeering acts 1 through 17 in violation of Title 18 USC 1962(c)).

**Count 3** charges that from in or about 1981 up to the filing of this Indictment in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others to the Grand Jury known and unknown, would

-12-

and did conspire to obstruct, delay, and affect commerce by extortion, in that they would and did conspire with each other to obtain property, to wit, sums of money, from and with the consent of certain New York City area construction companies in the concrete-pouring business, to wit, members of the "Club" and others, and their officers, employees and representatives, which consent had been induced by the defendant's wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 4 charges that in or about August, 1981 in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury would and did obstruct, delay and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain property, to wit, money in the approximate amount of $136,000 from and with the consent of the X.L.O. Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 5 charges that in or about August, 1981 in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the X.L.O. Concrete Corporation, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury would and did request and receive and accept the payment of money in the approximate amount of $136,000 from the X.L.O. Concrete Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

Count 6 charges that in or about May of 1983 in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury would and did obstruct, delay and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain money in the approximate amount of $326,000, from and with the consent of the X.L.O. Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 7 charges that in or about May, 1983 in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the X.L.O. Concrete Corporation, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury, would and did request, and agree to receive and accept the payment of money in the approximate amount of $326,000 from the X.L.O. Concrete Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

CENTRAL FILE

A.97

-13-

Count 8 charges that in or about April of 1984, in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury, would and did obstruct and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain money in the approximate amount of $157,000 from and with the consent of the X.L.O. Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 9 charges that in or about April, 1984, in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the X.L.O. Concrete Corporation, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury, would and did request and agree to receive and accept the payment of money in the approximate amount of $157,000 from X.L.O. Concrete Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

Count 10 charges that in or about March of 1984 in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury would and did attempt to obstruct and affect commerce by extortion in that they would and did attempt to obtain money in the approximate amount of $177,800, from and with the consent of the Century-Maxim Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 11 charges that in or about March of 1984 in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Century-Maxim Construction Company, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury would and did request, demand, receive and accept, and agree to receive and accept the payment of money in the approximate amount of $177,800 from the Century-Maxim Construction Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

Count 12 charges that in or about April, 1983 in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury would and did obstruct and affect commerce by

CENTRAL FILE

A.98

-14-

extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain money in the amount of $70,600 from and with the consent of the Technical Concrete Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 13 charges that in or about April, 1983, in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Technical Concrete Construction Corporation, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury, would and did request, demand, receive and accept and agree to receive and accept the payment of money in the approximate amount of $70,600 from the Technical Concrete Construction Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

Count 14 charges that in or about April of 1984, in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury, would and did obstruct and affect commerce by extortion and would and did attempt to do so, in that they would and did obtain and attempt to obtain money in the approximate amount of $65,000 from and with the consent of the Technical Concrete Construction Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

Count 15 charges that in or about April 1984 in the Southern District of New York and elsewhere, RALPH SCOPO, president and business manager of the Concrete Workers District Council, being a representative of, and being an officer of a labor organization which represents and would admit to membership the employees of the Technical Concrete Construction Corporation, who are employed in an industry affecting commerce, aided and abetted by ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, and others known and unknown to the Grand Jury, would and did request, receive and accept and agree to receive and accept the payment of money in the approximate amount of $65,000 from the Technical Concrete Construction Corporation in violation of Title 29 USC 186(b)(1) and Title 18 USC 2.

Count 16 charges that in or about March of 1982, in the Southern District of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA, ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others known and unknown to the Grand Jury would and did attempt to obstruct, delay and affect commerce by extortion, in that they would and did attempt to obtain money in the approximate amount of $73,000, from and with the consent of the Cedar Park Concrete Corporation and its officers, employees and representatives, which consent had been induced by the defendants' wrongful use of actual and threatened force, violence and fear of economic loss in violation of Title 18 USC 1951.

**CENTRAL FILE**

A.99

Case 16-2501, Document 23, 10/11/2016, 1880537, Page102 of 309

-15-

Count 17 charges that in or about April, 1982, in the Southern District of
New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA,
ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO and others
known and unknown to the Grand Jury and did attempt to obstruct, delay
and affect commerce by extortion, in that they would and did attempt to obtain
money in the approximate amount of $134,000, from and with the consent of the
North Berry Concrete Corporation and its officers, employees and representatives,
which consent had been induced by the defendants' wrongful use of actual and
threatened force, violence and fear of economic loss in violation of Title
18 USC 1951.

Count 18 charges that in or about September, 1982, in the Southern District
of New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA,
ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO and others
known and unknown to the Grand Jury would and did attempt to obstruct and affect
commerce by extortion in that they would and did attempt to obtain money in
the approximate amount of $117,000, from and with the consent of the G & G
Concrete Corporation and its officers, employees and representatives, which
consent had been induced by the defendants' wrongful use of actual and threatened
force, violence, and fear of economic loss in violation of Title 18 USC 1951.

Count 19 charges that in or about May of 1984, in the Southern District of
New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA,
ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO and others
known and unknown to the Grand Jury, would and did attempt to obstruct, delay
and affect commerce by extortion in that they would and did attempt to obtain
money in the approximate amount of $95,000, from and with the consent of the
S & A Concrete Company, Inc., a/k/a "S & A Structures, Inc." and its officers,
employees and representatives, which consent had been induced by the defendants'
wrongful use of actual and threatened force, violence and fear of economic
loss in violation of Title 18 USC 1951.

Count 20 charges that in or about August of 1984 in the Southern District of
New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA,
ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others
known and unknown to the Grand Jury, would and did attempt to obstruct, delay
and affect commerce by extortion, in that they would and did attempt to obtain
property, to wit, money in the approximate amount of $84,000, from and with
the consent of the S & A Concrete Company, Inc. and its officers, employees
and representatives, which consent had been induced by the defendants' wrongful
use of actual and threatened force, violence, and fear of economic loss in
violation of Title 18 USC 1951.

Count 21 charges that in or about May of 1984, in the Southern District of
New York and elsewhere, ANTHONY SALERNO, CARMINE PERSICO, GENNARO LANGELLA,
ANTHONY CORALLO, SALVATORE SANTORO, CHRISTOPHER FURNARI, RALPH SCOPO, and others
known and unknown to the Grand Jury would and did attempt to obstruct, delay
and affect commerce by extortion, in that they would and did attempt to obtain
money in the approximate amount of $67,000 from and with the consent of the
S & A Concrete Company, Inc. and its officers, employees and representatives,
which consent had been induced by the defendants' wrongful use of actual and
threatened force, violence and fear of economic loss in violation of Title
18 USC 1951.

CENTRAL FILE

A.100 Ex 1. P35

@018

16

Count 22 charges that from in or about May of 1983, up to the date of the filing of this Indictment, in the Southern District of New York and elsewhere, ANTHONY CORALLO, SALVATORE SANTORO, and others known and unknown to the Grand Jury, did conspire with each other to make extortionate extensions of credit, as that term is defined in Title 18 USC 892 in violation of Title 18 USC 891 and 892.

## PROSECUTION'S VERSION:

The Prosecution's Version (which begins on page 17) was prepared in its entirety by Assistant U.S. Attorneys Michael Chertoff and John F. Savarese.

CENTRAL FILE

A.101

MC/JFS:1q
JW-4110/1

-17-

United States v. Anthony Salerno, et al.
SSS 85 Cr. 139 (RO)

Government's Version of the Offense:

As outlined above, the redacted, twenty-two count Indictment submitted to the jury in this case charged all eight defendants with membership in or association with a racketeering enterprise known as the "Commission" of La Cosa Nostra, and with committing a pattern of racketeering acts, including extortion, labor bribery, murder, and loansharking, as part of their association with or participation in the affairs of the Commission enterprise. During the eleven-week trial, the jury heard testimony from approximately 85 witnesses, listened to approximately 150 electronic surveillance tapes, and saw over 500 surveillance photographs or videotapes. On November 19, 1986, the jury found all eight defendants guilty as charged on all counts and determined that all seventeen of the charged racketeering acts had been proved against all defendants named in the acts.

The Racketeering Enterprise

The proof at trial established that the Commission of Las Cosa Nostra -- the racketeering enterprise charged in the Indictment -- is the national ruling body of La Cosa Nostra or the Mafia in the United States, and that it has been in existence since the 1930's. The evidence further showed that La Cosa

CENTRAL FILE

A.102

Nostra is a nationwide, professional criminal organization which
operates in many of the major metropolitan areas of the United
States.   In most American cities, the criminal operations of La
Cosa Nostra are directed by the leadership of a single Family,
but in New York City there are Five Families -- the Genovese,
Gambino, Lucchese, Colombo, and Bonanno.   The Commission was
established to coordinate the criminal activities of La Cosa
Nostra, to resolve territorial disputes that arise between
various Families, and to settle leadership issues within parti-
cular Families.   From time to time, the Commission as a whole,
or certain of its members, meet to resolve conflicts, coordinate
criminal activities, pass upon the admission of new "made"
members of La Cosa Nostra, and, on occasion, order the execution
of Family Bosses.

As the evidence established, each La Cosa Nostra Family
is run by a Boss with the assistance of two deputies known
respectively as an Underboss and Consigliere.   Beneath these top
three men are Capos or Captains who direct crews of soldiers
(i.e. "made" men within La Cosa Nostra) and associates who carry
out the day-to-day business of committing crimes and who are
required to share their criminal proceeds with the Family leader-
ship.   The Commission is generally composed of the Bosses of the
Five Families which operate in New York City; in the past,
influential Bosses from other cities such as Philadelphia and

**CENTRAL FILE**

A.103
P.28

Case 16-2361, Document 23, 10/11/2016, 1886937, Page106 of 309

Buffalo have also sat on the Commission.  In addition, when one
of the Bosses is unable to attend a Commission meeting, he may
designate one of his deputies to attend and represent his
Family's interests.

From the late 1970's up through 1985, as the trial
proof showed, the Commission was dominated by four men:  defen-
dant ANTHONY SALERNO, at first an Acting Boss and then undisputed
Boss of the Genovese Family; Paul Castellano, the Boss of the
Gambino Family;* defendant ANTHONY CORALLO, the Boss of the
Lucchese Family; and defendant CARMINE PERSICO, the Boss of the
Colombo Family.  Electronically surveilled conversations played
at trial (GX 503) revealed that Phillip Rastelli, the Boss of
the Bonanno Family, was permitted to run his own Family, but was
not allowed to sit as a voting member on the Commission because
he had allowed "too many junk guys" (ie. narcotics dealers) into
the Family and had thereby created too great a risk for the other
Bosses of increased law enforcement scrutiny.**

---

\*    Castellano was named as a defendant in the original Indict-
ment filed on February 25, 1985; however, he was murdered in
New York in December 1985, and subsequently an order nolle
prosequi was entered dropping Castellano from the case.
Thereafter, he was named as an unindicted-coconspirator in
superseding Indictments.

\**   Rastelli was also a named defendant in the original and
superseding indictments; however, he was severed from the trial
of this case by the Court because he was still on trial in the
Eastern District of New York at the time this case went to trial
in September 1986.  Rastelli was eventually convicted in October
1986 on racketeering charges.

CENTRAL FILE

A.104

1.     The Government proved that after a long career as a high-ranking member of the Genovese Family, SALERNO succeeded Frank ("Funzi") Tieri as Boss of that Family in approximately 1981. Electronically surveilled conversations reveal that thereafter SALERNO was an active, full-fledged member of the Commission. He is heard repeatedly on tape discussing whether Rastelli should be seated on the Commission (GX 503); instructing the consiglieres of the Cleveland and Buffalo Families that an intra-Family dispute in Buffalo will be resolved by "the big boys now. . . the Commission from New York" (GX 519); and calling for meetings of the Commission Bosses to resolve questions concerning a massive Commission-directed extortion scheme in the concrete industry (GX 537).

2.     With respect to the leadership of the Lucchese Family, the proof established that, since at least the late-1970's, defendants ANTHONY CORALLO, SALVATORE SANTORO, and CHRISTOPHER FURNARI were, respectively, the Boss, Underboss, and Consigliere of that Family. Again, tape evidence revealed these men continuously directing and supervising both the criminal affairs of their own Family and also considering how to handle inter-Family issues before the Commission. Thus, CORALLO is heard on tape discussing the need to "make an example" to the members of La Cosa Nostra by killing anyone caught dealing in narcotics in violation of the Bosses' rule that drug trafficking

CENTRAL FILE

A.105

03/30/98    11:09    ☎30149. 3516                PAROLE COMM.                                    ⑳023
MC/JFS:lq
JW-4110/1                                -21-

is forbidden because it brings too much law enforcement "heat".

Tape and surveillance evidence also revealed SANTORO's role in

representing his Boss CORALLO's interests before the Commission

by attending a Commission meeting on May 15, 1984, with SALERNO,

Castellano, and LANGELLA, among others, concerning the Commission-

controlled extortion scheme in the concrete construction industry.

FURNARI also assisted CORALLO and SANTORO in running the affairs

of the Lucchese Family and in handling Commission matters by

meeting repeatedly with other Bosses such as SALERNO.

          3.    Defendant CARMINE PERSICO has been Boss of the

Colombo Family since approximately 1972 following the shooting

in June 1971 of Joseph Colombo in Colombus Circle.  Although

incarcerated twice since 1972, Persico remained the Boss, but

was assisted in managing his Family's affairs by close subordi-

nates who remained out on the street.  These surrogates included

his brother Alphonse Persico -- now a fugitive -- Thomas DiBella,

and defendant GENNARO LANGELLA.  PERSICO was able to convey his

views and transmit his votes on important matters to the Commis-

sion through emissaries such as LANGELLA, who also served as the

Underboss of the Colombo Family.  In GX 400, recorded on January

26, 1983 LANGELLA reveals that he is meeting regularly with

other Commission Bosses and running his Family's day-to-day

criminal operations while PERSICO is away in jail.  But he also

makes clear that whenever a matter of real significance arises,

A.106

☑024

he can always "make a direct move to Junior [Persico]" through
the various emissaries who communicate with PERSICO.  In addition,
the trial proof established that defendant RALPH SCOPO was a
made member or soldier within the Colombo Family who reported
directly to PERSICO and LANGELLA.  As the President of the Cement
and Concrete Workers District Council in New York, SCOPO provided
the Commission and his Family with the power to impose work
stoppages and other labor problems on concrete construction
contractors and thereby to extort millions of dollars from the
contractors as the price for "labor peace."

4.    ANTHONY INDELICATO was proved to be a professional
killer who rose within the Bonanno Family as a reward for his
role in the 1979 triple homicide of then Bonanno Family Boss
Carmine ("Lilo") Galante, and two long-time associates:  Leonard
Coppola and Giuseppe Turano.  Although INDELICATO's lower rank
did not entitle him to participate directly in Commission meet-
ings, he clearly associated himself with the enterprise by carry-
ing out the Galante homicide which was specifically authorized
by the Commission.

### The "Club Extortion Scheme in the Concrete Construction Industry

The proof at trial demonstrated that in the first half
of the 1980's the Commission directed an enormous extortion and
labor bribery scheme involving the concrete construction industry

CENTRAL FILE

A.107 Ex 1, P.32

in New York City.  The power of the Four Families -- Genovese,
Gambino, Lucchese, and Colombo -- whose Bosses sat as full voting
members of the Commission in this period -- were combined and
coordinated by the Commission in order to operate this scheme.
Thus, defendants SALERNO for the Genovese Family; CORALLO,
SANTORO, and FURNARI for the Lucchese Family; and PERSICO and
LANGELLA for the Colombo Family were responsible for directing
and supervising the scheme.  In addition, defendant RALPH SCOPO,
by virtue of his position as President of the laborers union
that represents the City's concrete workers, was one of the
lower-level La Cosa Nostra members designated by the Commission
to carry out the day-to-day extortion operation.

        The scheme was known as "The Club" and through it the
Commission dominated the major concrete construction contractors
in New York City, including XLO Concrete, Technical Concrete
Construction Corp., Cedar Park Concrete Corp., Century-Maxim
Concrete Corp., North Berry Concrete Corp., G.& G. Concrete, and
S. & A.  In return for "labor peace," these contractors were
forced to pay 2% of the contract price for all jobs over $2
million.  In addition, the Commission determined which concrete
construction project a particular contractor would perform.  The
Bosses of each of the Four La Cosa Nostra Families involved in
the scheme designated a Family member who was responsible for
managing the scheme.  These four subordinates -- one of whom was

03/30/98   11:11   ☎301491  316                                    ☒026
                                        PAROLE COMM.

MC/JFS:lq
JW-4110/1                          -24-


RALPH SCOPO -- met regularly to allocate jobs to the contractors,
communicated the Commission's decisions to the contractors,
collected the extortion payments, and passed the proceeds of the
"Club" scheme back up to the Commission.

        The key to the Commission's power over the contractors
was its control over corrupt union officials, such as SCOPO,
whose union members worked in the concrete construction industry.
These unions included the Cement and Concrete Workers District
Council, whose members are the principal laborers engaged in
pouring concrete on the construction job sites; Teamsters Local
282, whose members drive the concrete mixing trucks that deliver
concrete from batching plants to the job sites; Masons Local
780, whose workers finish the concrete once it is poured; and,
finally, the Carpenters union, whose members build the plywood
forms into which the concrete is poured.  In each case, tape
evidence revealed the defendants' extensive control over these
unions.  The evidence established that the Commission used this
power to pressure the contractors into becoming members of "The
Club," submitting to Commission control over the jobs they could
do, and paying millions of dollars in extortion payoffs.  Through
corrupt union officials like SCOPO, the Commission had the power
to stop deliveries of concrete to a job site, pull workers off
the job, or otherwise cause labor problems.  And, of course, the
Mafia's reputation for violence was communicated to the

contractors as a reminder of what might befall a contractor if
he failed to pay.

Two contractors testified that they made the demanded
extortion payments because they feared SCOPO's organized crime
connections and his power to inflict economic injury on their
companies. Tape and other evidence revealed SCOPO's reminding
his victims of his underworld associations and the use of murder
to enforce mob rule. For example, as SCOPO told one contractor,
the only reason the Mafia had chosen not to murder Joe DiPaola --
the principal of Dic Underhill Concrete Corp. -- for failing to
pay was because DiPaola decided to go out of business and there-
fore it was not worth it to the mob to kill him. SCOPO also
let the contractors know that failure to pay would assure economic
ruin.

Recorded conversations also showed the active super-
visory role played by SALERNO, CORALLO, SANTORO, FURNARI,
PERSICO, and LANGELLA in directing the "Club" scheme. These
tapes reveal that each of the four Bosses at the time --
SALERNO, Castellano, CORALLO and PERSICO -- and their trusted
lieutenants -- including SANTORO, FURNARI, and LANGELLA -- were
fully aware of the Club scheme and either personally attended or
sent delegates to meetings to resolve the conflicts which arose
in managing this massive scheme. Thus, on May 15, 1984, SALERNO,

CENTRAL FILE

A.110 α\\ ρ 35

MC/JFS:lq
JW-4110/1                                    -26-

Castellano, SANTORO (representing CORALLO), and LANGELLA (repre-
senting PERSICO) met together with SCOPO and the other lower-
ranking members who handled the "Club" scheme's daily operations
to resolve disputes. And later in January 1985, taped conver-
sations show SALERNO calling for a meeting of the four Bosses to
determine how to continue the scheme once Castellano took
certain unilateral steps that displeased SALERNO.

### The Galante-Coppola-Turano Homicides

The proof at trial also showed the Commission's use of
its unique power to order the murder of a Boss. As explained at
trial, a member of La Cosa Nostra may not kill the Boss of a
Family without the prior authorization of the Commission. This
is one of the central ways in which the Commission preserves its
power and maintains discipline.

The evidence established that defendant ANTHONY
INDELICATO, along with several coconspirators, participated in
the murder on July 12, 1979, of Carmine Galante, the Boss at
that time of the Bonnano Family, and two of his long-time friends
and associates, Leonard Coppola and Giuseppe Turano. The circum-
stances of this triple homicide made clear that this was a
professional, carefully planned "hit". Each of the victims
received multiple gunshot wounds from a variety of weapons fired
at close range.

The eyewitness testimony and circumstantial proof --
including the palm-print of INDELICATO on the get-away car,
ballistics and medical forensic evidence -- showed that
INDELICATO, along with three other men, arrived by car in front
of Joe & Mary's Restaurant on Knickerbocker Avenue in Brooklyn
shortly before 3:00 p.m. on July 12, 1979. All four men were
armed and wore ski masks. The driver remained by the car warding
off onlookers with a rifle while INDELICATO and the two other
masked men entered the restaurant. At that time, Galante,
Coppola and Turano were finishing lunch on the restaurant's rear
patio. They were also seated with two other members of the
Bonanno Family: Cesar Bonventre and Baldo Amato. When
INDELICATO and the two other masked men stepped out onto the
patio, they opened fire at point-blank range, killing Galante
and Coppola instantly and fatally wounding Turano. Signifi-
cantly, Bonventre and Amato were not injured, and ballistics and
medical evidence indicated that they participated with INDELICATO
and the masked gunmen in killing the three intended victims:
Galante, Coppola and Turano.

INDELICATO and his two masked accomplices then fled
from the restaurant, got back into the car in which they had
arrived, and drove away. This car was later abandoned.
INDELICATO then got into a separate vehicle and drove with his
father, uncle, and Phillip Giaccone -- all members of the Bonnano

A.112

Family -- to report to Stefano Canone -- then the Consigliere of
the Bonnano Family -- and Aniello Dellacroce -- then the Gambino
Family Underboss.  Videotape evidence showed INDELICATO
apparently being congratulated by Canone at the Ravenite Social
Club in Manhattan, a Gambino Family headquarters, just ½ hour
after the murders were committed.

        In addition, the evidence showed that the Commission
expressly authorized these murders.  Although it was clear that
INDELICATO's participation in these murders was done with the
prior authority of the Commission, the Government was unable to
establish the specific votes of all of the Bosses, and therefore
no other defendants were charged.  But a series of surveillances,
including that of INDELICATO reporting at the Ravenite, showed
that high-ranking members of two Families - Bonnano and Gambino -
were actively monitoring the plan to kill Galante.  Testimony
by FBI Agent Joseph Pistone, who had infiltrated the Bonnano
Family, revealed that the Commission was directing the affairs
and making decisions about the leadership of the Bonnano Family
at the time of the murders.  And another witness, Fred
DeChristopher, learned from PERSICO that PERSICO had voted on
the murder of Galante, though he voted against the hit.

        At the time of these murders, of course, the other
high-ranking defendants in this case -- SALERNO, CORALLO,
SANTORO, FURNARI, PERSICO and LANGELLA -- were all top leaders

CENTRAL FILE

A.113 EXH. P-35

of La Cosa Nostra and thus were well aware of its rules and its power to order the murder of a Boss. Accordingly, they knew full well that murder was one of the standard means by which La Cosa Nostra resolves its disputes and maintains a climate of fear.

### The Loansharking Conspiracy

In Racketeering Act 17 and Count 22, defendants CORALLO and SANTORO were charged with conspiracy to make extortionate extensions of credit. The proof showed that CORALLO and SANTORO -- acting in concert as leaders of the Lucchese Family -- entered a conspiratorial agreement with the leadership of the Gambino Family in June 1983 to resolve a territorial dispute in Staten Island over, among other things, the loansharking activities of John DiLeo. This was yet another example of the Commission's power to resolve disputes, coordinate inter-Family criminal activities, and thereby make La Cosa Nostra's business of committing crime more efficient and lucrative.

Tape recorded conversations revealed that a conflict had arisen between the Lucheses and Gambinos over the criminal activities of John DiLeo, an associate of the Luchese Family and a relative of CORALLO. To avoid further conflict, SANTORO met with Paul Castellano, the Gambino Family Boss, on June 21, 1983, and they reached an agreement that DiLeo must be sure to report all loansharking activities to CORALLO and that the Gambinos

CENTRAL FILE

A.114 Ex 1, p 39

03/30/98   11:14   ☎30143  6516          PAROLE COMM.                    ☒032
JW-4110/1                                -30-

must always be notified about these activities through one of
their subordinates.  As taped conversations revealed, this agree-
ment was ratified two days later by CORALLO and communicated by
him a week later to DiLeo.  As CORALLO says to DiLeo:  "From
now on, you have to clear everything with me."  (GX 329).  Other
tape evidence demonstrated that CORALLO and Santoro were no
strangers to the business of shylocking:  they are heard
repeatedly discussing their role in resolving problems between
loansharks and their victims.


The above Prosecution's Version was prepared in its entirety by Assistant U.S.
Attorneys Michael Chertoff and John F. Savarese.

### VICTIM IMPACT STATEMENT:

The identifiable victims include, Carmine Galante, Leonard Coppola and Giuseppe
Turano (the murder victims) along with the concrete construction contractors
in New York City including XLO Concrete, Technical Concrete Construction Corp.,
Cedar Park Concrete Corp., Century-Maxim Concrete Corp., North Berry Concrete
Corp., G & G Concrete and S & A.  These contractors were forced to pay 2% of
the contract price for all contracts over $2 million.  The trial proved that
$480,600 was paid by the various contractors.


                              Respectfully submitted,

                              MICHAEL J. LUCIANO
                              Chief U.S. Probation Officer


                              THOMAS A. HENRY
                              U.S. Probation Officer
                              (7-1086)

TAH:md
1/5/86

Reviewed by: I. Stoecker
             SUSPO


CENTRAL FILE                                      A.115

mjd                                                              1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------x

3    UNITED STATES OF AMERICA

4              v.                    SSS 85 Cr. 139 (RO)

5    ANTHONY SALERNO, et al.,

6              Defendants.

7    --------------------------------x

8                                    January 13, 1987
                                     10:00 a.m.
9

10   Before:

11          HON. RICHARD OWEN,

12                              District Judge

13
                   APPEARANCES
14
     RUDOLPH W. GIULIANI,
15        United States Attorney for the
          Southern District of New York,
16   MICHAEL CHERTOFF
     JOHN F. SAVARESE,
17        Assistant United States Attorneys

18   ANTHONY CARDINALE
          Attorney for defendant Salerno
19
     CARMINE PERSICO
20        Pro Se with Stanley M. Meyer

21   FRANK LOPEZ
          Attorney for defendant Langella
22
     SAMUEL N. DAWSON
23        Attorney for defendant Santoro

24

25        (Appearances cont'd on next page)

mjd                                                                          2

```
 1
 2   BARRY M. FALLICK
         Attorney for defendant Furnari

 3   JOHN H. JACOBS
         Attorney for defendant Scopo
 4
     ROBERT BLOSSNER
 5       Attorney for defendant Indelicato

 6

 7             (Open court; case called)

 8             MR. CHERTOFF:  The government is ready.

 9             MR. CARDINALE:  Ready.

10             MR. PERSICO:  Your Honor, I am ready subject to

11   your decision on my motion.

12             THE COURT:  Yes, well I am not going to hear the

13   motion today, so I take it subject to that you are ready?

14             MR. PERSICO:  I'm sorry?

15             THE COURT:  I say other than that you are ready?

16             MR. PERSICO:  Yes, your Honor.

17             MR. LOPEZ:  Your Honor, we are ready subject of

18   course to the application that has been made to the court

19   for adjournment in view of the letters and motions that

20   have been filed.

21             THE COURT:  I will consider issues raised by

22   those hereafter.

23             MR. GAUDELLI:  Your Honor, I submitted two

24   applications for postponement.  One had to do with respect

25   to a further medical examination, if your Honor recalls,
```

1    and the other had to do with respect to the issues that

2    were raised by Mr. Persico's motion which I intend to join

3    this morning.  And thirdly, your Honor, I raised some

4    objections to the probation report as to its content, the

5    accuracy and truth of same.

6            THE COURT:  I can deal with the latter and in

7    due course which I will.

8            MR. GAUDELLI:  Subject to those three items we

9    are ready.

10           THE COURT:  As to the your joining in Mr.

11   Persico's motion, I will deal similarly with that.

12           MR. GAUDELLI:  My point, notwithstanding Mr.

13   Persico's motion, I think it is incumbent upon counsel to

14   make a throw investigation of those allegations before

15   submitting motion papers, and for that reason I did not

16   submit motion papers.  I sent a letter to the court setting

17   forth what I thought the issues where and why I thought a

18   further investigation and supporting affidavits might be

19   necessary.

20           THE COURT:  I have before me only hearsay

21   letters and affidavits on these issues at this point.

22           MR. GAUDELLI:  I think with respect to the

23   letters, your Honor, that they aren't hearsay.  My letter

24   wasn't hearsay.  It was based upon my being --

25           THE COURT:  This is having to do with Mr.

mjd

4

1     LaRossa and various aspects.  I have nothing other than

2     hearsay as to him, and given that I will take those issues

3     up hereafter.

4          MR. GAUDELLI:  I would ask the court to rule

5     specifically as to my request for two postponements of

6     sentence pursuant to my letters.

7          THE COURT: I am denying the postponement based

8     upon your joining in Mr. Persico's motion and as to your

9     client's application for a postponement because of the

10    health situations, I am perfectly aware that many of the

11    people in this room at the back table are far from in the

12    best of health.  I have neither a medical affidavit nor do

13    I have sufficient grounds to conclude that one cannot

14    sentence and deal with health problems hereafter.

15         So on that issue I deny the application for an

16    adjournment based upon health reasons.

17         THE CLERK:  Salvatore Santoro?

18         MR. DAWSON:  Ready.

19         MR. FALLICK:  Ready subject to substitution.

20         THE COURT: Okay.

21         MR. LaROSSA:  I move to be relieved as counsel

22    for Mr. Furnari.  Mr. Fallick is apparently ready to take

23    my place.

24         THE COURT:  Mr. Furnari, I got a letter from Mr.

25    Fallick about, seven, eight, nine days ago, somewhere along

```
 1    in there that Mr. Fallick was going to come in as your
 2    lawyer.  And I take it this is your desire at this point,
 3    that he represent you from that point forward?
 4              MR. FURNARI:  Yes, your Honor.
 5              THE COURT:  All right, and needless to say,
 6    coming at the time it did there was a substantial number of
 7    days here where you had a chance, I am sure, for Mr.
 8    Fallick to look at the record and to confer with Mr.
 9    LaRossa to the extent of dealing with sentence issues and,
10    Mr. Furnari, you recognize that you have a right to counsel
11    of your choice but it comes with some conditions and that
12    is that under these circumstances I take it you are
13    prepared to proceed with Mr. Fallick today other than
14    perhaps joining in Mr. Persico's motion, is that true?
15              MR. FURNARI:  Yes, your Honor.
16              THE COURT:  Did you get that on the record?
17              THE REPORTER:  Yes.
18              THE COURT:  Subject to that you are ready, and,
19    Mr. Fallick, you are therefore substituted with the consent
20    of Mr. Furnari.  And, Mr. LaRossa, you are now excused.
21              MR. LaROSSA:  Thank you, your Honor.
22              THE CLERK:  Ralph Scopo?
23              MR. JACOBS:  Your Honor, I have a application
24    pending under 4205(c) for a study.  Your Honor addressed
25    the issue previously with me the other day without Mr.
```

mjd

6

1   Scopo being present and your Honor suggested that we take

2   this up this morning.  I don't know if your Honor wishes

3   for me to be heard briefly on the matter?

4           THE COURT:  Sure, go ahead.

5           MR. JACOBS:  Your Honor has been aware of the

6   extensive medical problems concerning Mr. Scopo.  The

7   government had Mr. Scopo examined by Dr. Weld  --  who I

8   have a serious objection to since Dr. Weld's brother is in

9   charge of the criminal division of the Department of

10  Justice.  In effect, Dr. Weld's brother is a supervisor of

11  the Organized Crime Strike Force of which this case is a

12  part of.

13          On December 5, 1986, I received a letter from

14  Mr. Chertoff indicating that the Metropolitan Correctional

15  Center had problems dealing with Mr. Scopo's complaints and

16  and that these complaints would be better addressed at

17  Sprinfield, Missouri.  Pursuant to the court's order the

18  defendant Scopo was sent out to Springfield, Missouri, to

19  address his complaints.  I spoke to Dr. Nelson the other

20  day at Sprinfield, who is Mr. Scopo's physician out there

21  at the Bureau of Prisons hospitals.  I asked Dr. Nelson

22  could he perhaps have a report so he could we could deal

23  with it today.

24          Dr. Nelson indicated he had not completed Mr.

25  Scopo's evaluation that Mr. Scopo needed an angiogram,

mjd

7

1  which he wanted to do as soon as possible as soon as Mr.

2  Scopo arrived back out at Springfield.  He indicated to me

3  the only reason why Mr. Scopo was coming back to New York

4  was for the sentence.

5          The doctor that examined Mr. Scopo, our Dr.

6  Ravelli indicated that he believed that a more intense

7  medical evaluation was necessary before even he could have

8  an opinion as to whether Mr. -- how he would adjust to the

9  Bureau of Prisons key conditions and what treatment or what

10 his condition would be if he had to go to jail for a

11 lengthy period of time.

12         THE COURT:  Is this the letter?

13         MR. JACOBS:  This is a letter that your Honor

14 has and government has.  I sent it to your Honor on

15 December 17.  Dr. Ravelli's letter.  Did you want to see it?

16         THE COURT:  Please.

17         (Handing)

18         MR. JACOBS:  Specifically, judge, the next to

19 last paragraph is Dr. Ravelli's summary.

20         THE COURT:  Okay.  Based on that your

21 application is what?

22         MR. JACOBS:  Your Honor, I have an application,

23 with Mr. Scopo's consent obviously, that he be sentenced to

24 a study under 4205(c).  I explained to Mr. Scopo that he

25 gets the maximum number sentence that he could possibly be

mjd                                                                                          8

1    faced with, I guess over 200 years and after a 90 day

2    period the Bureau of Prisons reports back your Honor and to

3    the government and to myself what his condition is.

4            In light of the fact that Dr. Nelson hasn't

5    completed his evaluation, Mr. Scopo's own physician would

6    like a further evaluation by the Bureau of Prisons. I

7    certainly feel it is a prudent course. I can't properly

8    tell this court what I think Mr. Scopo's condition is right

9    now. I don't want to quarrel with Dr. Weld on the merits

10   of this point, but I am certainly willing to go along with

11   what the Bureau of Prisons presents from Sprinfield in 90

12   days and then I can make an intelligent evaluation.

13           I can show Dr. Ravelli the Sprinfield medical

14   reports and I think have a better handle on what Mr. Scopo's

15   condition is. The government certainty isn't prejudiced by

16   giving Mr. Scopo the maximum sentence today and waiting the

17   90 days for the report. We are asking for a 4205(c)

18   sentence. I am not asking for an adjournment.

19           THE COURT: Let me lightly correct one threshold

20   set of the facts and that is the Metropolitan Correction

21   Center when this started to emerge did not feel that it was

22   necessary to transfer Mr. Scopo anywhere, notwithstanding

23   his conditions. I told you all this the other day.

24           MR. JACOBS: Your Honor, I have Mr. Chertoff's

25   letters and I will quote. December 5, addressed to your

mjd

1    Honor:

2         "Dr. Basta suggested that Mr. Scopo's complaints

3    can be better addressed at prison facilities such as the

4    correctional institute at Springfield, Missouri." I will

5    stand on what Mr. Chertoff indicated to me, that Dr. Basta,

6    whatever the difficulty was, thought they could be better

7    addressed at Springfield.

8         THE COURT: They did feel that given all of this

9    it would be a more prudent course if he were there. And

10   based on that, I would certainly agree that it might be a

11   more prudent course if he were there and I ordered him to

12   be transferred there. He was not transferred there because

13   of medical problems, quote, as problems. He was

14   transferred there in order to avail to him the best

15   facilities that Federal institutions could give him should

16   the need occasion itself.

17        I am not aware of any medical reason, nor do I

18   have any medical proof before me justifying other than

19   going forward in the normal course this morning with this

20   sentence.

21        MR. JACOBS: Your Honor has Dr. Ravelli's report

22   indicating --

23        THE COURT: He would like to know more, that's

24   what he says.

25        MR. JACOBS: Obviously, so would Dr. Nelson who

1   is his treating physician at Springfield. I can't get a

2   medical conclusion from Dr. Nelson as to what his situation

3   is at the moment to report intelligently to the court. I

4   called up --

5           THE COURT: That doesn't affect what the

6   sentence should be. That may affect what is done in terms

7   of management of him hereafter.

8           MR. JACOBS: I would respectfully disagree with

9   the court.

10          THE COURT: You see, your 4205(c) specifically

11  says that it is to be used if the court desires more

12  detailed information as a basis for determining the

13  sentence.

14          Using the words of the statute, I do not desire

15  more detailed information as the basis of determining the

16  sentence, and therefore there is no reason in my opinion to

17  invoke 4025(c).

18          MR. JACOBS: It is my obligation that I am not

19  prepared to present to this court a proper picture of Mr.

20  Scopo's medical condition. I don't think the court has

21  sufficient facts to sentence Mr. Scopo to a lengthy prison

22  sentence where the Bureau of Prisons is not prepared to

23  state what its conclusions are at that moment.

24          THE COURT: It hasn't given me the conclusion

25  that it is inappropriate and neither have you.

1          MR. JACOBS:  I disagree.  I think Mr. Chertoff's

2     letter indicates there were problems with Mr. Scopo.  He

3     was sent to Springfield, Missouri, and we are in a

4     situation where I can't tell the court what his prognosis

5     is over the next few years.  I don't think I should be

6     required to rely on Dr. Weld's letter at this point.  I am

7     not suggesting an adjournment.  We were willing to take the

8     200-year sentence this morning and report back to the court

9     in 90 days.  I don't think the government is prejudiced or

10    the court is prejudiced by taking the 200-year sentence now

11    and reporting back to the court in 90 days.

12          I am not prepared to tell this court what Mr.

13    Scopo's condition is over the next several years and I

14    don't see why we can't wait 90 days for the Bureau of

15    Prisons to tell this court and the government and tell me

16    what his situation is.  The man needs an angiogram and  --

17          THE COURT:  I don't gather that he needs one but

18    the doctor would like to give one.

19          MR. SAVARESE:  We would oppose the 4205(c)

20    application for the ground essentially that your Honor has

21    already outlined.  Mr. Scopo's medical condition has been a

22    subject of study and examination by several doctors over

23    the last six months.  All of those doctors have made their

24    views known to you.  You are therefore in a position as

25    4205(c) contemplates to have before you all the information

1   you need to frame the sentence, and the government asserts

2   that none of the information that has been brought to light

3   so far suggests in any way that Mr. Scopo's condition is

4   one that can't be handled post-sentence by the medical

5   facilities that are available within the Bureau of Prisons

6   system.

7            THE COURT:  Or that it is such that it is

8   inappropriate to sentence today which is the bottom line.

9            MR. JACOBS:  I don't consider one doctor's

10  report from Dr. Weld to be an adequate evaluation for the

11  court.  I think this is a classic situation where  a study

12  would help the court.  I can't think why the court wouldn't

13  want to see a report from the Bureau of Prisons as to what

14  Mr. Scopo's condition is.  It baffles me that at this stage

15  where he has already been severed from one trial where the

16  court doesn't want to see a study from the Buereau of

17  Prisons before giving the man a 100 year sentence.

18           THE COURT:  I know he was severed but he

19  attended every day of this trial.  So you put those two

20  together.

21           MR. JACOBS:  I would like to know why the

22  government  --

23           THE COURT:  Let's put a end to this.  I am going

24  to deny the application.

25           THE CLERK:  Anthony Indelicato,  ready for

mjd

13

1    sentence?

2                    MR. BLOSSNER:   Ready for sentence, your Honor.

3

4

5                    (continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

mjd

1          THE COURT:  I am going down the order of the

2     indictment.

3          Does the government have anything it wants to

4     add on the record to  --  let me first touch base here.

5          Mr. Salerno, you had a chance to read this

6     presentence report in this case, have you?

7          MR. CARDINALE:  Yes, he has.

8          THE COURT:  Are there any things you want to

9     call to my attention about it by way of modification or

10    objection of any kind?

11         MR. SALERNO:  No.

12         THE COURT:  Does the government have anything it

13    wants to add on the record before Mr. Cardinale begins?

14         MR. SAVARESE:  No, your Honor.  We have reviewed

15    the presentence investigation report with respect to Mr.

16    Salerno.  We have nothing to add to that and your Honor

17    already has our sentencing memorandum which was submitted

18    given to counsel and we have nothing more to add with

19    respect to that.

20         THE COURT:  As everybody in the room knows, I am

21    placing no reliance indeed, barely absorbed the narrative

22    form that the government gave.  I am not relying on that in

23    in any in sentence so you need not deal with anything that

24    is in there.  All right.

25         MR. CARDINALE:  Your Honor, very briefly.  On

mjd

1  behalf of my client, Mr. Salerno, I could stand up today

2  and tell you that there are a myriad number of people in

3  this neighborhood who would be willing to come in here

4  today and testify or submit letters attesting to the fact

5  that he has in his lifetime been charitable with them, has

6  been protective and helpful and a good neighbor.  I won't

7  do that -- I haven't done that -- unless the government

8  points to the court that his ability to do that was only

9  because people were either fearful of him or his

10  willingness to do such charitable acts was on his part to

11  ingratiate himself with the population or insulate himself.

12          I won't tell you that.  I won't tell you whether

13  that be a widow with children whose home burned down that

14  Mr. Salerno replaced, or any of the acts that he has done,

15  again, by way of charity with churches in the neighborhoods

16  or for his neighbors.  Again either in Little Italy or East

17  Harlem.

18          As the court is aware, Mr. Salerno is a 76 year

19  old man in ill health but he doesn't ask the court to

20  consider that either in formulating the sentence.  He

21  prefers rather to put his faith and hope in whatever

22  appellate rights he has and, as I said before, he is a man

23  and he is willing to accept whatever punishment the court

24  metes out at this point.  I have nothing further to say.

25          THE COURT:  Mr. Salerno, do you have anything

**A.130**

1  you would like to say personally at this point?

2          MR. SALERNO:  No.

3          THE COURT:  You do not.  Well, you know we had a

4  day here in November of 1986, which I suppose could be

5  colloquially described as a sort of a never-before day.

6  You and those of you found to be co-conspirators in this

7  enterprise that day had all been, in one way or another,

8  prosecuted before for various and specific crimes,

9  sometimes successfully and sometimes unsuccessfully.  But

10  on that day, on a charge that you and others in this room

11  as heads of the major organized crime families in New York,

12  and thus the country, were found guilty by a jury

13  collectively of running an organization, being on the board

14  of directors of that organization, ran organized crime

15  whose members number in thousands, stretch across the

16  country, families that worked together.  We heard tapes of

17  you saying:  Tell somebody from out of town you are talking

18  to the Commission now, you are talking to the big boys.

19          We heard tapes of people specifically talking

20  about infiltration of construction unions and extortion of

21  the construction industry and we heard peripheral stuff

22  from I think Avellino of garbage collection infiltration

23  and heard from somebody else about the garment center

24  infiltration.

25          You know, no law professor ever dictated a

1    better book on takeovers than Avellino and did it without

2    benefit of a secretary and informally into a bug in a car.

3    You laid out just how you do it, and once the thing is

4    infiltrated there's murder and violence and threats of

5    murder and violence; withdrawal of laborers to enforce this.

6         We all  --  you are heard on tape saying with

7    regard to some union, I think the Teamsters "It's my union.

8    What are they talking about?" Given all of this, through

9    this commission with underlings picking up the payoffs, you

10   then, incredibly, like Mr. Persico's son, go shopping with

11   your wife in between one meeting and somebody else's

12   meeting.  It's a business, absolute business.  It was a

13   chilling picture.  When it's all over and you go back to

14   your estate in Rhinebeck to complain if you have to leave

15   on a Friday because you never leave your estate on a Friday,

16   you never come here.

17        Mr. Corallo goes to his estate in Oyster Bay and

18   Mr. Persico, when circumstances permit, goes to his farm,

19   if you want to call it that, up in Saugerties.  "Compound"

20   is a pretty fair word but I heard objection to that word.

21   in chauffeured Jaguers, I might observe.

22        There's a tape with you on it saying you made

23   the mob.  "If it wasn't for me today there wouldn't be

24   anything left."  On the tape of Mr. Langella saying "Their

25   money, that's the only honor.

mjd                                                                                      18

1              Yes, I agree there are various things of a

2      charitable nature I suppose you could call to my attention

3      if you wanted to, but the fact remains that you've really

4      spent your life feeding on this community, based on

5      killings and beatings and threats not deterred by the

6      arrests of others around you and not deterred by the arrest

7      of yourself. So on that day in November we had a

8      culmination of joint effort of millions of dollars of law

9      enforcement money, thousands and thousands of hours and

10     time on behalf of state, Federal, local officials, putting

11     things together, the happy advance of electronic science

12     which we didn't have 25 years ago, so bugs can go in cars

13     and walls and social clubs and restaurants, houses, and we

14     had a jury, a absolutely ordinary cross-section of this

15     community come in and say guilty on all counts, after

16     several days of orderly considered determination giving

17     your sentence exposure of some 300 years.

18             I recognize the fact that you are in your 70's

19     and not well. I guess that happens to all of us. It's

20     happened to a number of people in this room, and in fashioning

21     a sentence generally one starts off with sentencing the man.

22     In this case I have to go beyond that because what has to

23     be sentenced here to is the overall crime. And I have to

24     fashion something that fits that. I have to fashion

25     something that is a statement to those out there, some of

mjd                                                                    19

1    whose names on probably on these tapes but were not in this

2    courtroom who are undoubtedly thinking about taking over

3    the reins from hands that have to may let them drop,

4    assuming they have let them drop already. Maybe they have,

5    maybe they haven't. But the sentence has to be in a

6    fashion that speaks to them.

7            I've talked much too long here but I do observe

8    that you, sir, in my opinion, in the opinion of this jury,

9    based on everything in this trial record and in the

10   presentence report, you have essentially spent a lifetime

11   terrorizing this community to your financial advantage, and

12   a sentence would be wholly inappropriate that did not

13   respond to that.

14           I am going to sentence you to a sentence that

15   ends up accumulating 100 years.

16           I am sentencing go you on Counts 1, 2, 4, 12, 14

17   to 20 years a piece.  Those sentences are to be consecutive.

18           On Counts 3, 6, 8, 10 and 16 I am sentencing you

19   to 20 years each on those counts and those counts are to

20   run consecutively with each other and collectively concurrently

21   with the sentences on Counts 1, 2, 4, 12 and 14.

22           On counts 17, 18, 19, I am sentencing you to 20

23   years.  On 21 I am sentencing you to 14 years and on 5, 7,

24   9, 11, 13 and 15 I am sentencing you to one year on each of

25   those.  The counts on 17, 18, 19, 20, 21, 5, 7, 9, 11, 13

1    and 15 are consecutive with each other to accumulate 100

2    years and are concurrent to the sentences on 1, 2, 4, 12

3    and 14 and also concurrent with the sentences on 3, 6, 8,

4    10 and 16.

5              I am fining you $25,000 on each of Counts 1, and

6    2 --

7              MR. CARDINALE:  Could you repeat that?

8              THE COURT:  $25,000 on each of Counts 1 and 2;

9    $10,000 on Counts 3 through 21.  Each of those 3 to 21 for

10   cumulative fines of $240,000 under Title 28 Section 19.  I

11   am assessing against you jointly and severally with others

12   as will be revealed hereafter the costs of prosecution as

13   that section of the code provides.

14             We are all aware you are eligible for parole

15   after ten years of any sentence.  I am making it the

16   court's recommendation that parole not be considered for

17   you on the sentences that I have imposed.

18             Under the law I am obliged to observe to you

19   that you have a right to appeal and have ten days to file a

20   notice of appeal.  I am also obliged to observe to you that

21   if you are unable to afford an attorney for appeal one will

22   be provided you upon due application to the court and in

23   receipt of an affidavit.

24             There's an assessment of $50, is there?

25             MR. CHERTOFF:  That's correct.

mjd                                                                 21

1          THE COURT:  On which?

2          MR. CHERTOFF:  I believe it would be on all of

3     the felony counts.

4          THE COURT:  They are all felony counts, are they

5     not?

6          MR. CHERTOFF:  I think everything except for the

7     labor briberies are felony counts, your Honor.

8          THE COURT:  We will get to the trivia.  $50

9     assessment on Counts 1, 2, 3, 4, 6, 8, 10, 12, 14 and 16

10    through 21.

11         MR. CARDINALE:  I think we can take care of that

12    today, your Honor.

13         THE COURT:  I will observe that one of the

14    remedies that was available to the court was restitution.

15    I declined to involve the court in restitution because it

16    appeared from the testimony on trial that the million or so

17    dollars that was in evidence on this trial as being

18    obtained from extortion was doubtless passed along by the

19    contractors involved in the buildings that they built and

20    therefore to make proper restitution to someone who is

21    entitled to it was almost an impossible task which the

22    court declines to get into.  So I specifically did not

23    sentence with that in mind.

24         Anything else?

25         MR. CHERTOFF:  Your Honor, to descend perhaps

mjd

1   even more into the trivial, with respect to the misdemeanor

2   counts, I think the court is obliged to impose $25 special

3   assessments on the labor briberies.

4          THE COURT:  Counts 5, 7, 9, 11 and 13 and 15, $25

5   apiece.  Anything else that you understand?

6          MR. CHERTOFF:  I think that covers everything.

7          THE COURT:  Marshals, as we finish here, Mr.

8   Salerno is remanded.

9          THE COURT:  Does the government have anything to

10  say as to Mr. Persico?

11         MR. CHERTOFF:  Your Honor, with respect to Mr.

12  Persico, the government would rely upon the record of this

13  trial as well as a conviction recently obtained against Mr.

14  Persico in this courthouse in a case known as United States

15  v. Persico, also a racketeering case, as well as the rest

16  of Mr. Persico's criminal record.  That speaks for itself.

17         THE COURT:  Mr. Persico?

18         MR. PERSICO:  Yes, your Honor.

19         MR. PERSICO:  Do I have anything to say?

20         THE COURT:  Yes.

21         MR. PERSICO:  Yes, your Honor.  As I said before,

22  on November 17 was the first, a never day  --

23         THE COURT:  Never-before day.

24         MR. PERSICO:  Never-before day.  There was a lot

25  of never-before days in this trial, your Honor.  The days

mjd                                                                    23

1    of arrest, the days of Mr. Giuliani's TV appearances and

2    spectaculars that he showed on the TV.  This case was

3    prejudiced from the very first day.  This case and the

4    attitude of the prosecutors and the court itself is in

5    conformance with this mass hysteria, this Mafia mania that

6    was flying around and he deprived everyone of us in this

7    courtroom of our rights to a fair and impartial trial by

8    all the spectaculars that youse made of this case.

9           I believe right now there is a very important

10   motion pending before this court and I don't believe the

11   court can sentence us until that motion is decided before

12   of very serious charges that strikes at the heart of the

13   justice system that a prosecutor and attorneys have got

14   together to deprive us of our rights.

15          I feel that the prosecutor should be put on the

16   stand, asked questions, cross examined and find out what

17   went on in this courtroom, not just to you sitting up there

18   and satisfy the public that he's sending Mafia people to

19   jail for a hundred years and kill them in jail.

20          There's a lot of never-happened days.  There

21   will probably be a lot more after that.  I have nothing

22   further to say.

23          THE COURT:  I don't have an awful lot to say

24   either because I said the vast bulk of it in connection

25   with Mr. Salerno.  This jury has found you guilty, in my

1     judgment, on overwhelming evidence, that being a member of

2     The Commission, operating through it, and you were in

3     prison during some of the time that this was going on and

4     so it was perfectly apparent that although the lines of

5     communication may not have been as free as otherwise, you

6     were still running your operation.

7            We have a tape of Gerry Langella, who one would

8     assume was your trusted boss, in which he is heard saying

9     with regard to some question, he is going do have to talk

10     to you about it, he is going to send Allie Boy or going to

11     send somebody else; I think Russo was going to get in touch

12     with you on how to do things.

13            Mr. Scopo was a member of your family under your

14     control. We not only saw that through the tapes and the

15     pictures, but you heard him. You heard Mr. DeChristopher

16     tell about him being one of your boys. No question that

17     you were a Commission member either up there or by proxy,

18     using its services. According to Mr. DeChristopher, you

19     sanctioned the use of killing for appropriate circumstances,

20     although in the case of Mr. Galante you apparently voted

21     against it according to what you told Mr. DeChristopher.

22            There isn't the slightest question in the

23     court's mind, as I say, on that never-before day when the

24     jury came in, that for years you have been profiting by

25     being an upper member of this echelon, on the board of

mjd

1    directors that lives, succeeds on murder, violence and

2    threats of murder and violence and retiring, as I say, when

3    circumstances permit, to the estate at Saugerties.

4           I am sentencing you accordingly to the same term

5    that I sentenced Mr. Salerno to. You were both members of

6    the board of directors and Counts 1, 2, 4, 12 and 14

7    sentencing 20 years on each of those five counts to run

8    consecutively for a total of 100 years. On Counts 3, 6, 8,

9    10 and 16, I am sentencing you to 20 years on each of those

10   counts to run consecutively with each other. On those five

11   counts, the 100 years on those counts to run concurrently

12   with the 100 years on Counts 1, 2, 4, 12 and 14.

13          On counts 17, 18, 19, 20 and 21 and 5, 7, 9, 11,

14   13 and 15, I am sentencing you to 20 years on 17, 18, 19

15   and 20, 14 years on 21 and 1 year on 5, 7, 9, 11 and 13 and

16   15 each. There are six of those, for a total of 100 -- the

17   sentences on those counts are consecutive with each other

18   to run concurrently with the sentences on 3, 6, 8, 10 and

19   16, and with the sentences on 1, 2, 4, 12 and 14.

20          I will assess $25 assessments on 5, 7, 9, 11, 13

21   and 15 under the Witness and Victim Protection Act and $50

22   assessments on 1, 2, 3, 4, 6, 8, 10, 12, 14, 16, 17, 18, 19,

23   20 and 21, the felony counts.

24          I am imposing fines of $240,000, being $25,000

25   on Count 1, $25,000 on Count 2, $10,000 on Counts 3 through

mjd

26

1   21 which accumulate to $190,000, together with $50,000 make

2   $240,000.  I will assess costs of prosecution pursuant to

3   the statute individually and severally and I am

4   recommending that there be no parole.

5           Anything else?

6           MR. CHERTOFF:  Two matters.  One is to make sure

7   that Mr. Persico is advised of his right to appeal.

8           THE COURT: Yes, you have a right to appeal.  A

9   notice of appeal should be filed within ten days.  An

10  attorney will be provided you free of charge if there is

11  need and you file a suitable affidavit of indigency.

12          MR. CHERTOFF:  Secondly, Mr. Persico is already

13  under I believe a 39-year sentence from his previous case

14  in this courthouse and the court needs to determine whether

15  the terms of imprisonment imposed in this case are

16  consecutive or concurrent.

17          THE COURT:  They are concurrent.  I am not

18  making this in addition to any other sentence.  This stands

19  on its own.

20          MR. PERSICO:  I have an order for the court to

21  sign.  I would like the court to accept this.  I have one

22  for Mr. Chertoff and one for you.

23          (Handing)

24          THE COURT:  Have you had a chance to look at

25  this?

1          MR. CHERTOFF:  I have.  The  government

2   vigorously opposes this application.

3          THE COURT:  I will hear you on this at some

4   point hereafter.

5          MR. PERSICO:  We also have a matter about the

6   other motion that you said you would discuss later on.

7          THE COURT:  Mr. Persico is not to be transferred

8   from the MCC without the court being advised but I will

9   take this proposed order of yours under advisement.  He is

10  remanded.

11         THE COURT:  On Mr. Langella, does the government

12  have anything to add?

13         MR. SAVARESE:  No, your Honor.

14         THE COURT:  Mr. Lopez?

15         MR. LOPEZ:  Your Honor, I would alert the court

16  to the fact that Mr. Langella is 48 years of age.  He has

17  seen his presentence report.  He does not contest that

18  presentence report and he is guided by the court's ruling

19  to the effect   --

20         THE COURT:  Would you bring Mr. Persico back.  I

21  did not ask him that question.  Just wait a minute.  I

22  neglected to ask that.

23         THE COURT:  Mr. Persico, I didn't ask you, but

24  you didn't make anything of it.  In that presentence

25  report is there anything you objected to that you want to

1    take issue on?

2              MR. PERSICO:  Yes, the "compound", your Honor,

3    but you seem to accept that word.

4              THE COURT:  That's the only thing?

5              MR. PERSICO:  Yes.

6              THE COURT:  You don't object to anything else in

7    the presentence report?

8              MR. PERSICO:  I object to the bulk of the

9    presentence report.

10             THE COURT: But you don't specifically urge some

11   part on me?

12             MR. PERSICO:  No.  The only thing is that

13   presentence memorandum is not to follow me to any

14   institution.

15             THE COURT:  As you and I and the government

16   discussed the other day.

17             MR. LOPEZ:  Of course, Mr. Langella has seen

18   that presentence report and I have read it also.  Your

19   Honor, as your Honor has just ruled what our objection

20   really is was to the government's memorandum as to

21   sentencing and your Honor just ruled that as far as Mr.

22   Persico, I take it as far as all the defendants  --

23             THE COURT:  I told you, I told Mr. Persico that,

24   and I am sure you were told on Friday.

25             MR. LOPEZ:  Yes, I was told and I am happy about

mjd

1    that. Mr. Langella is 48 years of age. He is under

2    sentence in two courts, serving 65 years in this court by a

3    sentence imposed by one of your colleagues, Judge Keenan,

4    and ten years with regard for a case in the Eastern

5    District. He is very much like Patrick Henry, just not

6    much left to give to his country as far as the service of

7    sentence is concerned in this matter. So I would only

8    hopefully ask that you take those factors into

9    consideration.

10          Your Honor made a comment which did appear

11   during the course of the tape recordings where Mr. Langella

12   participates in a conversation where he says "their only

13   honor is money." But when Mr. Langella said it he was

14   being critical and he was criticizing the construction

15   industry at that time. So when the statement was "their

16   only honor is money," he was being critical of that fact

17   and that he was not accepting it as a fait accomplis.

18          THE COURT: Are you sure you want to push that

19   point? I've got the quote in front of he me.

20          MR. LOPEZ: That's the way I interpret it. It's

21   a question of interpretation. That their only honor was

22   money. Their statement came after.

23          THE COURT: He said " Where's the honor? " And

24   your client said " There's the honor. Money, yeah, that's

25   it, there's your honor.

mjd

1          MR. LOPEZ:  Don't --

2          THE COURT:  I didn't hear a word about about the

3      construction business.

4          MR. LOPEZ:  They hate the construction business,

5      that's all they talk about.  It's a matter of

6      interpretation.  All right, your Honor.

7          But in any event, your Honor, I would ask that

8      with respect to Mr. Langella you consider the fact of the

9      question that he is under service of sentence at the

10      present time and I have nothing else to say.

11          THE COURT:  Mr. Langella, do you want to say

12      anything at this time?

13          MR. LANGELLA:  No, your Honor.

14          THE COURT:  You have a right to.  You have a

15      right to speak, you know.

16          MR. LANGELLA:  I heard you.  No, I don't want to

17      speak.

18          THE COURT:  Okay.

19          Well, you know, you were Mr. Persico's

20      right-hand man, according to this record.  That when he's

21      in prison and you get instructions or you don't get

22      instructions, you go to the Commission meets, you deal with

23      Mr. Scopo if you need to, or you talk to Junior, according

24      to the tapes, and you've been doing this all your life.  We

25      have tapes which bear it out and the testimony which bears

mjd

31

1     it out.

2               There's a conversation where you and Scopo are

3     talking about somebody being threatened to pay and if he

4     doesn't pay you don't know what's going to happen to him

5     because he's a guy with a home and a family. One tape you

6     say to Junior in prison "I'm the boss." We have a picture

7     of you coming out of the house in Staten Island with

8     Salerno -- I think it's Santoro, if I am not mistaken --

9     and Mr. Scopo and Mr. Castellano. God, people were in the

10    right place at the right time with cameras. And the jury

11    has found that you are a member of the criminal conspiracy

12    that I have described twice already in detail and am not

13    going to do it again, and I am going to sentence you just

14    as I sentenced Mr. Persico, to the identical sentence,

15    100 years total, not to be consecutive to any other

16    sentences you are serving. On Counts 1, 2, 4, 12 and 14,

17    it is 20 years on each of those counts to run consecutively

18    for a total of 100. On 3, 6, 8, 10 and 16 it is 20 years

19    on each consecutively for a total of 100. Those on 3, 6, 8,

20    10 and 16 to be running concurrently with those on 1, 2, 4,

21    8 and 14.

22               On 17, 18, 19 and 20, it is 20 years on each.

23    21 is 14 years. Counts 5, 7, 89, 11, 13 and 15 it is one

24    year on each. Those sentences run consecutively for a

25    total of 100 and that hundred is concurrent with the

mjd                                                                    32

1    hundred on 3, 6, 8, 10 and 16, and the hundred on 1, 2, 4,

2    12 and 14.  The fine is assessed of $25,000 on 1 and 2; $10,000

3    on 3 and 21 for a cumulative of 240,000, together with the

4    costs of prosecution.  The court recommends an absence of

5    parole and the $25 assessment under the Witness and Victim

6    Protection Act on Counts 5, 7, 9, 11, 13 and 15 and $50 on

7    Counts 1 through 4, 6, 8, 10, 12 and 14 and 16 through 21.

8            You have a right to appeal based upon notice, an

9    attorney will be provided free of charge if you are unable

10   to afford one and you provide a suitable affidavit.

11   Anything else?

12           The defendant is remanded.

13           I am going to take a recess for about five

14   minutes.

15           (Recess)

16

17

18

19

20

21

22

23

24

25

mjd

33

1

2          THE COURT:  Mr. Corallo, does the government

3  have anything they wish to add to the record on Mr. Corallo?

4          MR. CHERTOFF:  Again, your Honor, the government

5  would rely only upon the facts of this case and the

6  criminal record of Mr. Corallo which includes his

7  convictions for previous corruption crimes in this very

8  district in the 1960's as well as, oddly enough, a prior

9  narcotics offense which the government points out only

10 because it is ironic in view of some of the comments he

11 made on the tapes.

12         THE COURT:  That was not lost on me.

13         Mr. Gaudelli.

14         MR. GAUDELLI:  Yes.  Your Honor, I have

15 submitted to the court a letter and a list of the

16 exceptions that I had to the probation report.  I don't

17 know if your Honor wants to treat of those at this time.

18         THE COURT:  I take it your client has read the

19 presentence report?

20         MR. GAUDELLI:  We are ready for sentence.

21         THE COURT: You have read the presentence report?

22         MR. GAUDELLI:  Yes.

23         THE COURT:  What do you object to?

24         MR. GAUDELLI:  I think your Honor covered the

25 first exception which had to do with the government version

1   of the offenses. You indicated you wouldn't take that as a

2   factual basis, is that correct, when Mr. Salerno was

3   sentenced, you wouldn't take the government's conclusions

4   or opinions?

5           THE COURT: That's correct.

6           MR. GAUDELLI: That will take care of the first

7   portion of it. With respect to the body of the report,

8   that is the second series of pages numbered 1 and so forth,

9   page 2, it reflects prior records of prior arrests of the

10  defendant. There were some eleven entries there which

11  there was a dismissal of all charges, yet the probation

12  department saw fit to include in it a factual recitation of

13  allegations, probably at best hearsay and probably  --

14          THE COURT: Don't worry about those.

15          MR. GAUDELLI: Triple hearsay. I would like

16  them excised from the report because I think a dismissal of

17  of charges does not mean anything with respect to those

18  reports.

19          THE COURT: I think you are entitled to that and

20  I will direct that.

21          MR GAUDELLI; With respect to the convictions,

22  Mr. Corallo admits that he was convicted on two prior

23  occasions but still professes that he had absolutely

24  nothing to do with any of the activity alleged in those

25  respective charges. He took his appeal and still maintains

mjd

1    his innocence on those charges.  That's on page 4 and page

2    5.

3            Those were arrested of 12/18/76 and 12/23 of

4    '68.  Lastly  --

5            THE COURT:  I must observe, Mr. Gaudelli, though,

6    that while  --  and I think this is a fair inference -- you

7    can draw the conclusion if a man is arrested and arrested

8    and arrested and arrested, even though the charges are

9    dismissed, that he has awareness of the fact that the

10   criminal system is out there and makes no effort to avoid

11   its potential impact.

12           MR. CAUDELLI:  Judge, a series of minor arrests

13   that end in 1945, when the defendant is still a young man

14   and not to have been involved again with the law until 1961,

15   I don't think there's any inference to be drawn from those

16   series of arrests.

17           THE COURT:  No --

18           MR. GAUDELLI:  You are talking about 20 years,

19   20 years of good conduct should be disregarded and then

20   minor arrests that have all been dismissed when a man is a

21   young man should be considered.  I don't feel that's fair.

22           THE COURT:  I know, but let me observe this and

23   I may have been hasty in striking the charges.  For example,

24   in 1932 he is charged with a holdup of five men in a  --

25           MR. GAUDELLI:  That was a dismissed case.  I

36

1    object to the court bringing that -- reading that aloud.

2            THE COURT:  That was not a minor arrest.  It's

3    on robbery.

4            MR. GAUDELLI: But the case is dismissed.  When

5    is a person --

6            THE COURT:  I understand, these are not

7    pilfering from Woolworth and therefore if a person has been

8    arrested for an armed robbery and the charges are dismissed

9    --

10           MR. GAUDELLI:  That's an allegation.  That's why

11   I would like a hearing on that allegation.

12           THE COURT: -- and they are dismissed  --  please,

13   sir, let me conclude -- it seems to me, at least the court

14   may conclude from that, that once having had a brush with

15   the law over an armed robbery, he might be inclined in the

16   future to stay away from brushes with the law.  And

17   therefore that goes to his state of mind in the intervening

18   years up to today.  That is a reasonable inference.

19           MR. GAUDELLI:  Judge, judge, if your Honor was

20   correct in that assumption how can you explain ten or 12

21   dismissals like this?  Clearly the defendant was being

22   harassed by law enforcement.  I have been around awhile, I

23   have had some experiences on both sides of the aisle and I

24   would submit to the court that this type of arrest system

25   where you see a series of cases, case after case being

mjd

1    dismissed, clearly it's some form of law enforcement

2    harassment and it is 40 years ago.

3          THE COURT:  I understand.  I am not going to

4    consider that more than exhibit an awareness that the

5    defendant has been brushing with the law for 40 years.

6          MR. CAUDELLI:  40 years ago.

7          THE COURT:  Sure, okay.

8          MR. CAUDELLI:  With respect to the grand jury --

9          THE COURT:  It seems to me that makes it worse.

10         MR. CAUDELLI:  With respect to the grand jury

11   situation, Mr. Corallo was subpoenaed, testified, right

12   -- testified in 1978.  This is a matter that I am

13   personally familiar with.  He cooperated fully,.  When I

14   say cooperated fully, he did what the law insisted that he

15   do:  He complied with the law.  He never violated any law.

16   He was excused from that grand jury.

17         Subsequently, the U.S. Attorney sought another

18   subpoena for him.  But instead of notifying counsel or

19   attempting to serve him personally, they obtained a

20   material witness order and located him in Florida and

21   arrested him without any prior notice.  I submit the

22   recitation of facts concerning that are totally inaccurate

23   and untrue and they present to this court an improper  --

24   facts sufficient to make an improper inference where no

25   such inference should be made in those particular instances.

mjd                                                                    38

1    And I ask that that be excised from the report.  Because

2    when Mr. Corallo became aware of the situation, when he

3    became aware of the situation  --

4              THE COURT:  Where are you talking about?

5              MR. GAUDELLI:  Page 5, the last series of pages

6    numbered through, I think, 11.  It's an incident of August

7    3, 1978.

8              THE COURT:  I don't see any problem with leaving

9    that in.  What does it mean?

10             MR. GAUDELLI:  Judge, it is total's inaccurate.

11   It indicates there that he refused  -- was avoiding

12   process, when in fact prior to the execution of that

13   process he had already been before the grand jury and

14   testified.  There is nothing relating to that fact in that

15   report with respect to that incident.  And when he did find

16   out that the government wanted him back before the grand

17   jury he posted a nominal bail in Florida and returned

18   voluntarily of his own accord.

19             THE COURT:  This is the paragraph on the bottom

20   of 5 and the top of of 6?

21             MR. GAUDELLI:  I don't have the report in front

22   of me, I only have my notes which I made quickly.  It has

23   got to do with the incident of August 3, 1978.

24             THE COURT:  This is utterly innocuous and I

25   decline that.

1              MR. CAUDELLI:  If it is innocuous then it should

2     be out.

3              THE COURT:  It just said he was arrested and

4     served with a subpoena and the case was dismissed.

5              MR. CAUDELLI:  I have nothing further to say

6     except on many points reasonable men differ and your Honor

7     has heard certain tapes during the course of this trial and

8     your Honor is going to make certain inferences, make

9     certain conclusions based upon those tapes.  I point, bring

10    to your Honor's attention the one tape -- and your Honor

11    indicated during a number of side bar conferences that you

12    were aware of it and you actually indicated a opinion at

13    that time and that had to do with a statement that Mr.

14    Corallo made in general conversation that he thought all

15    drug dealers should be shot or killed.

16              The only thing I point out is that's a statement

17    that's very easily subject to a misinterpretation.  When a

18    mayor of a city or the president of a country endorses the

19    death penalty for all drug dealers everyone considers that

20    to be in the public interest.  But merely because a man is

21    the target of an investigation that has nothing to do with

22    narcotics, when he makes that kind of a statement, the

23    court infers from that some violence, and I think that's

24    wrong.

25              I ask the court to be very cautious in making

1    misinterpretations of that type when you evaluate the facts

2    as you found them in this case.

3         Other than that I have nothing further to say on

4    behalf of my client except he is here and ready for

5    sentence. Your Honor is aware of his physical condition

6    and his background as set forth in the presentence report.

7         THE COURT: Given what you said, I am observing

8    from some tape where your client says "Imagine that, and

9    didn't get enough money. Ha, 25, $25,000 he even tried to

10   get, to the last minute, to get the other other ten

11   thousand. I wouldn't see that guy kill him. I'd kill him.

12   Kill the blank. If you don't kill him " -- and then the

13   rest of the sentence is indecipherable.

14        MR. GAUDELLI: There's no such crime in the

15   indictment.

16        THE COURT: I am talking about a state of mind.

17   You don't come up with what you want. Come on.

18        MR. GAUDELLI: State of mind, judge, that's

19   precisely the misinterpretation I asked this court --

20        THE COURT: Then he complains at one point. He

21   said, "The Commission? What commission? The Commission

22   was him when he okay'd the guy to be killed and nobody come

23   and told Tom and me a thing about it." I take it Tom is

24   his partner Mr. Santoro. They killed somebody and didn't

25   even tell us. That's even worse.

1          MR. GAUDELLI: Not knowing about a murder is

2     worse than committing it?

3          THE COURT: Being a member of The Commission and

4     not being told that you are killing somebody. That was a

5     violation, that they were supposed to be told. I know,

6     this gets sillier and sillier if you go at it that way.

7          Mr. Corallo, do you want to say anything at this

8     point?

9          MR. CORALLO: Nothing.

10          THE COURT: Well, you've -- I don't have the

11     dates because we don't have elections to office in this

12     kind of a corporate structure but you have been boss of the

13     Lucchese family for, I gather, a long, long, long time with

14     an attitude -- I gather also in the garment district, that

15     I seem to pick up through some of these tapes, an attitude

16     of the use of unions to enforce extortion, an attitude of

17     being prepared to kill somebody if they get in your way,

18     seriously get in your way. There's a long series of

19     charges demonstrated against you on which the jury

20     convicted you. As I recall the money was passed back and

21     forth in a Howard Johnson's lot or something like that and

22     next week we'll have another lot, maybe McDonald's.

23          From some of these tapes you are obviously close

24     to Mr. Salerno. One of the tapes has you discussing how to

25     enforce something. Salerno is telling you "When I do send

mjd

1   word down to give that guy a beating, what kind of, what

2   kind of stuff? " And you said:  "Does he reason with him?

3   No.  Did you reason with him?"  And then Mr. Salerno says

4   to you:  "Listen, Tony, if it wasn't for me there wouldn't

5   be no mob left.  I made all the guys and everybody's a good

6   guy."

7           No, there isn't the slightest question, both

8   jury convicted you on this but the record fully supports

9   that you were an equal participant in the conspiracy, the

10  enterprise with everybody else and with one exception which

11  is a matter of the counts, I am sentencing you similarly to

12  100 years maximum on Counts 1, 2, 4, 12 and 22 which is the

13  loansharking count.  I am sentencing you on each of those

14  to 20 years to run consecutively.

15          On 3, 6, 8, 10 and 16 I am sentencing you to 20

16  years on each of those to run consecutively with each other,

17  a hundred years on those five to run concurrently with the

18  hundred years on 1, 2, 4, 12 and 14.

19          On Counts 14 and 17 I am sentencing you to ten

20  years; on counts 18, 19 -- excuse me, on 18, 19, 20 and

21  21 I am sentencing you to 20 years on each of those  --  I

22  am wrong.  10 years on 14, 10 years on 17, 20 on 18, 20 on

23  19, 20 on 20 and 14 on 21 and one year each on 5, 7, 9, 11,

24  13 and 15, for a total of 100.  The sentences on 14, 17, 18,

25  19, 20, 21 and 5, 7, 9, 11, 13 and 15 are consecutive to

mjd

43

1     each other and the hundred years so made consecutive as

2     concurrent to the sentences on 3, 6, 8, 10, 16 and the

3     sentences on 1, 2, 4, 12 and 14.

4         You are convicted on one more count than the

5     prior defendants and the fines accordingly are $25,000 on

6     Counts 1 and 2 and $10,000 on Counts 3 through 22.   3

7     through 22 accumulates to $200,000 plus the $50,000 of 1

8     and 2 for a total of $250,000.  These are committed fines,

9     incidentally, and you are assessed the costs of prosecution.

10     The court makes a recommendation of no parole and assesses

11     a fee under the Witness and Victim Protection Act on Counts

12     1, 2, 3, 4, 6, 8, 10, 12, 14, 16 through 22 of $50 on each

13     count and on 5, 7, 9, 11, 13 and 15 of $25 on each count.

14         I advise you that you have a right to appeal.

15     You have ten days to file a notice of appeal and if you

16     cannot afford an attorney, an attorney will be appointed

17     for you he free of charge.  Anything else?

18         MR. CHERTOFF:  Your Honor, it wasn't totally

19     aware that Mr. Corallo himself indicated that he read the

20     presentence report.

21         THE COURT:  I assume he had but I will make that

22     specific.  Mr. Corallo, you read the presentence report,

23     have you not?

24         MR. CORALLO:  I didn't hear you.

25         THE COURT:  You have read the presentence report?

44

1          MR. CORALLO:  Some of it.

2          THE COURT:  Well, did you discuss  --  did you

3    go over it with your lawyer?

4          MR. CORALLO:  I did discuss it with my lawyer.

5          THE COURT:  You were there and had a full

6    opportunity.  Mr. Caudelli, you and your client went there

7    and had the report before you, did you not?

8          MR. CAUDELLI:  That's correct.  I went over the

9    entire report with him.  My client declined to sign it.

10         THE COURT:  I see.  All right, the defendant is

11   remanded.

12         THE COURT:  We turn to Mr. Santoro.  Does the

13   government have anything to add?

14         MR. SAVARESE:  As with respect to Mr. Santoro we

15   rely on the trial record and also on his prior criminal

16   record which is outlined in detail in the presentence

17   report.

18         THE COURT:  Mr. Dawson?

19         MR. DAWSON:  Good morning, your Honor.  Judge,

20   having listened now to about I think four sentences in

21   these proceedings, it's apparent to this observer at least

22   that while the court can point and glean from the record,

23   can point to some individual bits and pieces that pertain

24   just to a particular defendant, and even to certain

25   characteristics in one's background that may be unique,

1    nevertheless, despite those differences that the court has

2    at least spread on the record this morning, the court has

3    come out apparently, if these four sentences are any guide,

4    with the rather fixed or immutable sentence regimen that it

5    intends to impose, and I understand that. But that's just

6    what strikes this observer.

7            Nevertheless, to paraphrase one of our circuit

8    Court of Appeals judges in another context:  sometimes

9    lawyers must sail into the wind nevertheless. And so with

10   that, I have just a few remarks to make.  That on the off

11   chance they fall on a receptive ear may in some small

12   measure somewhere in this calculation make a bit of

13   difference.

14           I will be very brief, just two ironies I wish to

15   point out to the court, ironies at least to me in my

16   familiarity with this case and other matters that are going

17   on.

18           One irony has to do with the position of the

19   government, as found by the jury, that this was at the

20   heart of the case an extortion case of several contractors,

21   two of whom testified, and a large number of companies, no

22   one testified by the government from those companies.

23           We said in our position to the jury that this

24   was not a scheme to extract monies from contractors by

25   threats or force or violence or fear of economic harm.  In

1   fact, we said quite frankly in our opening that this was a

2   bid rigging scheme, with the contractors rather than being

3   extorted or extortion victims willing participants for

4   their own agreed and the like.  I won't bore the court with

5   the rest of it.  But the irony to me is that in another

6   courtroom in this very building before another district

7   court judge this same government, this same prosecution

8   office, using in large part the same evidence, tapes and

9   otherwise, will come before another jury and say, ladies

10  and gentlemen, this case is a bid rigging case, and no

11  claim will be made that it is an extortion case.  I find

12  that to be  --

13          THE COURT:  I don't understand what you are

14  saying.

15          MR. DAWSON:  What I am saying is you are going

16  to sentence the defendants presumably on the charges that

17  the jury found and that the government presented to it that

18  it was extortion, and if the defendant was guilty of that

19  he should be punished accordinglyly.

20          On the other hand, the same government that

21  urges you to do that in this courtroom will be saying to

22  another jury this wasn't extortion, this was extortion with

23  --

24          THE COURT:  Who said it?  Where do you get the

25  fact that's happening?

1    MR. SAVARESE: I think what Mr. Dawson is

2    alluding to is the proceeding before Judge Lowe in United

3    States v. Salerno, a separate prosecution from this one, in

4    which some of the charges there are that certain

5    contractors participated with members of Mr. Salerno's

6    family, the Genovese family, in what amounted to a bid

7    rigging or mail fraud scheme in connection with the

8    construction industry.

9            What I should point out quickly is that there is

10   nothing inconsistent between the position taken by the

11   government in that case and the position taken by the

12   government here. Here before the jury the government

13   admitted that there was bid rigging, that there was

14   allocation of jobs. Moreover, that witnesses for the

15   government in the construction area of this case who

16   testified had already pleaded guilty to Taft-Hartley's in

17   that they made bribes in order to gain favor with union

18   officials, to wit, Ralph Scopo.

19           So there is no inconsistency here; it is plain

20   to anyone who listens to the tapes that the contractors are

21   getting jobs decided for by them. That's the basis of the

22   charges over there.

23           THE COURT: I know, but it seems to me the answer

24   is even simpler. I have this case before me. If you have

25   a claim hereafter that there is some inequity by reason of

1   double jeopardy, res judicata, collateral estoppel,

2   whatever, it seems to me that is to be·asserted hereafter

3   and I don't understand how that bears on matters for today.

4           MR. DAWSON:  If the court is ready to continue

5   to hear me, before I was interrupted I was saying  --

6           THE COURT:  I was trying to find out what was

7   behind all this.

8           MR. DAWSON:  I was prepared to answer before the

9   government gave its view.  My point is not a res judicata

10  or collateral estoppel or anything else but one of irony,

11  that in one courtroom the government takes one view of the

12  same set of the facts and holds certain people up to be

13  victims and in another courtroom those supposed victims

14  here for which you are going to punish this man for that

15  conduct are viewed as willing participants in this whole

16  other set of conduct coming off the same evidence.  That's

17  my point, just one of irony.  I say perhaps it is sailing

18  in the wind.

19          THE COURT:  I am sorry to say that irony escapes

20  me because what I heard here was Ralph Scopo saying you

21  better pay the money because you got a family at home and

22  you never know what's going to happen to them.  Whatever

23  irony that leaves one with there you are.

24          MR. DAWSON:  I am not going to rehash my

25  summation here, but you certainly didn't hear Mr. Santoro

1    on tape or otherwise from a live witness or otherwise

2    saying anything of that sort.  But I point it out for

3    whatever the court wishes to do with it in its equation of

4    this hundred year  --

5           THE COURT:  Except I see him in a Commission

6    meeting with Ralph Scopo where I take it the Club business

7    was thrashed out.

8           MR. DAWSON:  We don't know what was said.

9           THE COURT:  We can conclude.

10          MR. DAWSON:  There's nothing in the record, we

11   just don't know.

12          The second thing I wanted to point out to the

13   court that I consider to be ironic in light of the court's

14   earlier statement when Mr. Salerno was being sentenced

15   about a message  --  I don't recall the exact phraseology

16   but I think the court remembers what I am alluding to --

17   and it is very brief.  I wish we all could have been in the

18   courtroom in Cleveland, Ohio, when the government got up in

19   front of the judge there and urged the life sentence on Mr.

20   Lonardo to be followed by whatever that maximum was, a

21   hundred and some odd years after the life sentence, for

22   being this kingpin in this narcotics enterprise or whatever

23   it was over there and told the judge all sorts of things

24   and the judge there said he probably wanted to send a

25   message too.

1    I don't think the government got the message

2    because sometime thereafter the government, even after the

3    conviction was affirmed on appeal, after the affirmance,

4    the government was able to persuade the district court

5    judge that sentenced the man to vacate the conviction on

6    the life without parole drug conviction and to entertain

7    this Rule 35 which perhaps will lead to the reduction,

8    substantially, of this hundred some-odd year sentence that

9    remains.  And as always because, and the government will

10   say, unlike all the defendants in this case, Mr. Lonardo

11   came forward and cooperated.

12       The short and simple answer to that is he

13   contacted the agents or they contacted him and he was told

14   in effect he could get out from that prison and the court

15   would entertain, be asked to entertain this reduction and

16   dismissal motions and the like if he would cooperate and

17   testify, and Mr. Lonardo said from that witness stand, I

18   think in response to a question by Mr. Cardinale, in words

19   or substance, with that kind of stuff dangling in front of

20   him he would testify against his brother.

21       So one judge gave a message.  That message was

22   then withdrawn or retracted or modified for a fellow who

23   the government, no doubt on a day just like today, said all

24   sorts of things about and the judge said all sorts of thing

25   about him.  And when messages like that go back and forth

51

1    the community gets no message whatsoever.  Because what

2    they get is a government willing to go in and dismiss,

3    after a conviction is upheld, a life sentence for a man who

4    says he is prepared to say whatever is necessary even if it

5    is against his own brother.

6          That me strike me is an irony.  As I started

7    these remarks I will end them, as lawyer just sailing into

8    the wind perhaps not changing one whit the hundred year

9    regimen that you decided to impose, but nevertheless I

10   think in light of the messages that were discussed earlier

11   those things deserve to be said.

12         THE COURT:  I can't really say that anything I

13   heard you say even touches on the issue here.  So I gather

14   Mr. Santoro, you have, I take it, gone over this presentece

15   report with your lawyer?

16         MR. DAWSON:  We have, your Honor.

17         THE COURT:  Okay.  Do you have anything you want

18   to say?

19         MR. SANTORO:  Yes, I do.  Mr. Persico wanted me

20   to relay a message to you, if I may.  I'd like to give you

21   the message that Mr. Persico told me to tell you, is that

22   all right?

23         THE COURT:  Even though it's hearsay I will

24   overrule the objection.

25         MR. SANTORO:  But in your court hearsay is

mjs                                                                    52

1    permissible.

2                THE COURT:   In this case I will accept the

3    hearsay.

4                MR. SANTORO:   The message Mr. Persico told me to

5    relate that the government spent close to $4 million to get

6    all them drug dealers, murders, call them what you want,

7    and bought this case.   That's it.   You are in the driver's

8    seat.   Let's go.

9                MR. CHERTOFF:   I always thought, your Honor, Mr.

10   Persico had a little difficulty speaking for himself.

11               MR. SANTORO:   You are in the driver's seat, your

12   Honor.

13               THE COURT:   As the courts have done since time

14   immemorial, it's a question of weight you give to certain

15   matters that are placed before you.   I am sure that amount

16   of money probably was spent on this case.

17               MR. SANTORO:   Sure.   To buy the testimony, your

18   Honor, to buy it.   It was spent to buy it.

19               THE COURT:   There I part company with you.

20               MR. SANTORO:   To buy it.

21               THE COURT:   They didn't buy the tapes, Mr.

22   Santoro.   The tapes are you.

23               MR. SANTORO:   The tapes is one thing.

24               THE COURT:   The tapes are you people.

25               MR. SANTORO:   The rest of it they bought to

mjd                                                              53

1    coincide with the tapes.

2              THE COURT:  They didn't buy the tapes or you.

3              MR. SANTORO:  All right, have it your way.

4              THE COURT:  That's my job, all right.

5              MR. SANTORO:  And, of course, it's your job and

6    you are doing a good job, if you know what I mean.

7              THE COURT:  Needless to say the jury found you

8    guilty.

9              MR. SANTORO:  Give me the hundred years and get

10   it over with.  Put it on the record and I will go inside.

11             THE COURT:  I am about to do that.  Just stay

12   for a minute, just keep your chair for a minute.

13             I am going to sentence you to a hundred years

14   because I find you and Mr. Corallo to have been  --

15             MR. SANTORO:  It's all right.

16             THE COURT: -- to have been partners for years in

17   loansharking, conspiracy to murder, authorizing murder,

18   violence  --

19             MR. SANTORO:  Yeah, yeah.

20             THE COURT:  On Counts 1, 2, 4, 12, 14, I

21   sentence you to 20 years on each of those to run

22   consecutively for a total  --  I'm sorry.  1, 2, 4, 12 and

23   22, not 14.  1, 2, 4, 12 and 22, 20 years each count

24   running consecutively for one hundred.  On 3, 6, 8, 10 and

25   16, 20 years on each, consecutively, for a total of one

mjd

54

1   hundred.  The sentences on those counts to run concurrently

2   with the hundred on 1, 2, 4, 12 and 22.

3             On 14 and 17 I sentence you to 10 years on each.

4   On 18, 19 and 20 I sentence you to 20 years on each of

5   those three.  On 21 I sentence you to 14 years and on 5, 7,

6   9, 11, 13 and 15 I sentence you to a year on each count.

7             The sentences on 1, 4, 18, 19, 20, 21, 5, 7, 9,

8   11 and 13 accumulating a hundred years are to run

9   consecutively with each other and concurrently with the

10  sentence on 3, 6, 8, 10 and 16 and concurrently with the

11  sentence on 1, 2, 4, 12 and 22.

12            I'll fine you $250,000 being $25,000 on 1, $25,000

13  on 2, $10,000 on 3 through 22 for an accumulated committed

14  fine of $250,000.  I assess the Witness and Victim

15  Protection Act fee of $25 on 5, 7, 9, 11, 13 and 15 and $50

16  on 1, 2, 3, 4, 6, 8, 10, 12, 114, 16 through 22.

17            I assess upon you the costs of prosecution

18  jointly and severally with other defendants.  I make a

19  recommendation of no parole.

20            I observe to you that you have ten days within

21  which to appeal and if you cannot afford an attorney one

22  will be provided to you free of charge.  If you want to

23  leave now you can leave now.

24            MR. DAWSON:  One other matter.  As the court is

25  aware, Mr. Santoro has a case in the Eastern District of

mjd                                                                55

1    New York. I have been in communication with Judge

2    McLaughlin's chambersers and Mr. Block who is a member of

3    the Strike Force and Mr. Block advises that he has brought

4    the matter to the knowledge of Mr. Chertoff that there is a

5    status conference scheduled there Friday before Judge

6    McLaughlin. I understand from the Eastern District, Judge

7    McLaughlin's chambers that he would ask this court to order

8    that the defendant be held here at least until the

9    conclusion of that conference. It may well be that Monday

10   is a more convenient date to do it.

11              MR. CHERTOFF: That's fine with the government.

12              THE COURT: I so direct. The defendant is

13   remanded.

14              THE COURT: Mr. Furnari, does the government

15   have anything to add?

16              MR. CHERTOFF: The government relies on the

17   evidence at the trial and the defendant's record and the

18   other matters in the presentence report.

19              THE COURT: Mr. Fallick? Has your client read

20   this presentence report?

21              MR. FALLICK: We have both read the presentence

22   report. Your Honor, we are going to place our faith in the

23   appellate process here and raise on appeal the conflict

24   issue that has been the subject of my letter to your Honor

25   dated January 8 which is also the subject of a pretrial

mjd

1  hearing, and in that light, Mr. Furnari is ready for

2  sentence.

3  　　　　THE COURT:  This is the matter that you have

4  raised before me merely by way of a letter of yours,

5  correct?

6  　　　　MR. FALLICK:  That's correct, your Honor.  I

7  asked for an adjournment to file that motion.

8  　　　　THE COURT:  All right, and you do not wish to

9  speak further on behalf of your client?

10  　　　　MR. FALLICK:  I do not, your Honor.

11  　　　　THE COURT:  Mr. Furnari, you understand your

12  lawyer has a right to address the court further if you want

13  to bring matters to his attention.  Do you understand that?

14  　　　　MR. FURNARI:  (Nodding)

15  　　　　THE COURT:  You nodded your head, all right.  Do

16  you wish to say anything to me at this time?

17  　　　　MR. FURNARI:  No, sir.

18  　　　　THE COURT:  Well, you know according to the

19  evidence in this case and in the terminology of the

20  families, I gather you are the consigliere of the Lucchese

21  family which, if you take the hierarchy of these things is

22  sort of, if not the equivalent of, the underboss,

23  practically the equivalent of the underboss.  You figure in

24  a great number of these tapes, fully knowledgeable of the

25  enterprise, the Commisson's doings, fully knowledgeable of

mjd

1  the way the whole thing operates, the use of murder,

2  violence, threats of murder and violence to extort money in

3  various fields, and it's perfectly clear from the jury's

4  verdict that being at the top echelon of your family and

5  participating in the Commission, as the jury has found you

6  did and as the record amply supports, that you are an equal

7  participant with all the others.

8       As a consequence I am going to sentence you, as

9  I said at the outset with Mr. Salerno, I am sentencing both

10  you and the crime and as a statement to those who might be

11  thinking about coming after you, and as a response to what

12  is obviously a lifetime of terrorizing the community for

13  your personal aggrandizement as well as those of your

14  colleagues.

15       You are not convicted on Count 22, so I am

16  sentencing you on Counts 1, 2, 4, 12 and 14 to 20 years

17  each to run consecutively with each other for a total of

18  100.  I sentence you on 3, 6, 8, 10 and 16 to 20 years on

19  each of those counts to run consecutively with each other

20  for a total of 100.  The sentences on 3, 6, 8, 10 and 16 to

21  run concurrently with those imposed on 1, 2, 4, 12 and 14.

22       On 17, 18, 19 and 20 I sentence you to 20 years

23  on each.  On 21 I sentence you to 14.  On 5, 7, 9, 11 and

24  13 and 15 I sentence you to one year on each of those

25  counts.  The sentences on 17, 18, 19, 20, 21, 5, 7, 9, 11,

1   13 and 15 accumulate a hundred years.  Those are

2   consecutive with each other to accumulate 100 years.  That

3   hundred years is to run concurrently with the sentences

4   imposed on 3, 6, 8, 10 and 16 and concurrently with the

5   sentences imposed on 1, 2, 4, 12 and 14.

6          I fine you the sum of $240,000, committed fine:

7   $25,000 on 1, $25,000 on 2, $20,000 on 3 to 21 for a total

8   of $240,000 of committed fine.  I impose upon you the costs

9   of prosecution under the statute as earlier mentioned

10  individually and collectively and make a recommendation of

11  no parole and I impose a $25 assessment under the statute

12  on 5, 7, 9, 11, 13 and 15 and a $50 assessment on 1, 2, 3,

13  4, 6, 8, 10 and 12, 14, 16 through 21 each.

14         You have ten days to appeal, and if you are

15  unable to afford a lawyer a lawyer will be appointed for

16  you free of charge upon a proper showing of indigency.

17  Anything else?

18         MR. FALLICK:  Yes.  In light of my recent

19  substitution in this case, I would ask that Mr. Furnari not

20  be transferred until I have had a time to further discuss

21  with him the appeal and this conflict issue.

22         THE COURT:  Sure.

23         MR. FALLICK:  I understand from Mr. Chertoff

24  that he would have no problem.

25         MR. CHERTOFF:  No objection.

1          THE COURT:  Do you want two weeks?

2          MR. FALLICK:  Yes.

3          THE COURT:  Mr. Furnari will be kept here two

4    weeks before any transfer.  The defendant is remanded.

5          THE COURT:  Mr. Scopo, does the government have

6    anything to add on Mr. Scopo?

7          MR. SAVARESE:  Your Honor, we do not have

8    anything to add.

9          THE COURT:  Go ahead, Mr. Jacobs.

10         MR. JACOBS:  I will break my remarks down into

11   my comments on the trial then my comments on Mr. Scopo.

12         I came into this case and came in before the

13   court and the jury and took a very unusual position.  We

14   made it clear, there was no question Mr. Scopo took payoffs

15   here.  There were no games played.

16         THE COURT:  You admitted it in your opening,

17   sure.  Okay.

18         MR. JACOBS:  Right.  I thought this case should

19   have been tried on the issue of whether there was fear of

20   economic harm.  That's what I argued, that was the defense

21   in this case.  I don't think it's fair for a defendant to

22   be tried where we are going to have a Galante murder

23   present and what I call Mafia hysteria.  I don't think it

24   is fair to have a defendant tried on the issue of economic

25   harm when the government withheld the grand jury testimony

mjd

60

1    of at least two contractors exculpating Mr. Scopo.  In

2    particular, Mr. Bruno's testimony that the government

3    withheld from me and I just learned about the last few days,

4    clearly exculpated Mr. Scopo on the issue of economic harm.

5          THE COURT:  Can I stop you.  Didn't those names

6    figure at some point on the Brady issues and you said you

7    should talk to those people, DeMatteis and Bruno?

8          MR. CHERTOFF:  Exactly.  And the government not

9    only disclosed Mr. Bruno's name but Mr. Dawson came back in

10   and said he had spoken to Mr. Bruno's attorney and Mr.

11   Bruno wouldn't want to cooperate with them.

12         MR. JACOBS:  I am prepared to state that they

13   have sworn grand jury testimony of Mr. Bruno that was not

14   disclosed to me and to Mr. Scopo, because under United

15   States v. Henry, United States v. Driscoll, that testimony

16   was perfectly admissible on the trial and I certainly would

17   have offered it.

18         I tried the case on one issue:  fear of economic

19   harm.  And the question is did the government have within

20   their possession sworn grand jury testimony that was not

21   disclosed to me.  That's the issue.  I was never given Mr.

22   Bruno's grand jury testimony.  Mr. Dawson made a request

23   that the court review any material.  The court declined to

24   do so.  Under those cases it is clearly admissible.

25         This isn't some minor witness.  This is one of

mjd

61

1    the club contractors.

2                MR. CHERTOFF:  Under the case law it is very

3    clear that the appropriate thing to do if counsel felt

4    there was any theory under which grand jury testimony could

5    be offered  --  and frankly the government is not aware of

6    any case which would support that  --  would have been to

7    call Mr. Bruno in and determine whether Mr. Bruno was

8    prepared to testify at trial.  That's what United States v.

9    Leroy says at 687 F.2d.  And counsel chose not to do that

10   being aware as they no doubt are that there are reasons to

11   believe that Mr. Bruno wouldn't so testify, and there is

12   sufficient substantial question about whether there would

13   be anything exculpatory that would come from Mr. Bruno.

14               Having made the decision they are obliged to

15   live up to it, but it was not a Brady issue.

16               THE COURT:  This is not a sentencing issue.

17               MR. JACOBS:  Judge, I think it is important

18   because I want the court to review Mr. Bruno's grand jury

19   testimony before sentencing Mr. Scopo.

20               THE COURT:  I decline to do that.  I have no

21   motion before me to ask for that relief, no briefing,  no

22   nothing.  I'm not going to do that.

23               MR. JACOBS:  I want the record to be clear that

24   Mr. Chertoff was asked the question:  Did Mr. Bruno testify

25   in the grand jury?  He declined to answer the question.  He

A.176

mjc

1    did not say he had grand jury testimony.

2    　　　　MR. CHERTOFF:  Mr. Dawson said -- and Mr. Jacobs

3    was present in the room when he did so -- Mr. Dawson said

4    that he had spoken to Mr. Bruno's attorney who had informed

5    him that Mr. Bruno had testified in the grand jury.

6    Therefore there was nothing that was concealed from Mr.

7    Jacobs.  He was sitting right here when it was all played

8    out in court and this is a plainly frivolous application.

9    　　　　THE COURT:  In some peripheral way Mr. Jacobs

10   feels this bears on the sentencing but I don't happen to

11   see it.

12   　　　　MR. JACOBS:  With respect to that I think the

13   record will speak for itself and what was disclosed to us

14   will speak for itself.  I just want the record to be clear

15   because I was never given a copy of Mr. Bruno's grand jury

16   testimony or Mr. DeMatteis' grand jury testimony and I

17   never had an opportunity under those cases to present it to

18   this jury on the only issue I wanted to argue before this

19   court which is fear of economic harm.  I was deprived of

20   that opportunity on the only issue I controverted in this

21   trial.  I will continue my remarks, your Honor.

22   　　　　Mr. Scopo stands before the court convicted of

23   every single count that he was charged with.  In the four

24   years that this so-called club was in existence, your Honor,

25   despite some of the quotes on the tapes that your Honor has

1  attributed to Mr. Scopo, not one single person had a hair

2  on his head harmed; not one single business suffered any

3  physical harm whatsoever.  I'm not here to argue the

4  question of economic harm under the Second Circuit cases or

5  what I argued to this jury.  But in point of fact, your

6  Honor, in the fours years that this club was in existence

7  and Mr. Scopo is supposed to be responsible about, there is

8  no physical injury, damage to anyone.

9  I think it's an important factor for the court

10  to consider.  Because Mr. Scopo did hold for 40 years

11  legitimate work.  He was an elected official of the union.

12  There is no allegation he was given that job by any Mafia

13  member or anything else like that whatsoever.

14  His criminal record, which I consider to be an

15  extremely minor one, goes back to when he what a teenager

16  and I believe he has one conviction.  There is no

17  allegation, even in the government's own presentence

18  memorandum, that he is responsible for any murders or

19  participated in any murders.

20  I don't think he should stand in the same shoes

21  as some of the other defendants that have been before the

22  court, and I'm not here to say whether I agree or disagree.

23  I certainly disagree with the sentences imposed.  But I

24  don't think that Mr. Scopo, on the issue that was really

25  argued before this court, deserves the type of sentence

mjd

64

1    that the court has been giving out so far. Not on his

2    family background, his medical history or the facts of the

3    case.

4           Your Honor knows Mr. Scopo's wife's condition,

5    your Honor knows Mr. Scopo's medical condition. This is a

6    man that held legitimate occupations for 40 years. Perhaps

7    he does deserve some jail sentence here but I don't think --

8    not in terms of what the court has been imposing. I don't

9    think Mr. Scopo got a fair trial in light of the broad

10   sweep of the indictment, the fact that he was forced to go

11   to trial with the Galante presented to the jury, forced to

12   go to trial I think with unfair Mafia allegations.

13          I think when the testimony will come out, and

14   hopefully when he goes to trial before Judge Keenan in the

15   next month or so and perhaps when the Bruno testimony is

16   presented to a jury we will see another result there. I

17   have nothing else.

18          We do object, your Honor, to that portion of the

19   presentence report which I read to Mr. Scopo that alleges

20   that he is a member of the Colombo family. He disputes

21   that particular allegation.

22          THE COURT: I am not going to base anything on

23   that aspect of the presentence report, although, I tell you,

24   I come to that conclusion from other things at trial, so I

25   take it, Mr. Scopo, you have read the presentence report

1    with your lawyer?

2            MR. SCOPO:  Yes, I have.

3            THE COURT:  Would you like to say anything at

4    this moment?

5            MR. SCOPO:  Yes, your Honor.  What I would like

6    to say is that Mr. Jacobs actually covered everything that

7    I was about to ask you.  This so-called trial was called a

8    Commission case.  I know of no commission and I know of no

9    commission existing.  As far as I know, there is no

10   commission and never existed and I had no part in any

11   commission.  That's all I have to say, your Honor.

12           THE COURT:  Well, you know, I am not going to

13   ask you to respond to my question, but  --

14           MR. SCOPO:  Your Honor, I would respond to any

15   question you ask me.

16           THE COURT:  All right, I will put it to you.  I

17   have a picture of what  --  1984?

18           MR. CHERTOFF:  Yes, May 15.

19           THE COURT:  This is a little bungalow house out

20   in Staten Island.  Here is Tony Salerno standing waiting

21   for his car, here is Gerry Langella walking out all

22   business, with you two behind him.  Here is Mr. Santoro

23   coming out following somebody I can't identify.  Here's

24   Paul Castellano coming out.  Do you want to answer my

25   question:  What were you talking about there?

mjd

1          MR. SCOPO: I was never in that house. I met

2    someone in the street there and says hello to them and ask

3    how they felt and went on to my business. I never was in

4    that house. Is there any pictures, your Honor, has there

5    with us in that house, in the house?

6          THE COURT: No, I must confess there is not.

7          MR. SCOPO: We are not in the house, we are

8    walking in the street. If the person walks by that house

9    that means they were went into and a Commission meeting?

10          MR. SAVARESE: The record should reveal that

11   there is --

12          THE COURT: Forget it. Well, you know, all of

13   this stuff with you reporting to Langella, Junior Persico

14   watching the TV with Freddy DeChristopher seeing you on the

15   screen, there's my boy, you telling Sternchos it wasn't

16   worth killing Joe DePaoli a principle of Dick Underhill

17   because they were going out of business anyway.

18          MR. SCOPO: Never told him that.

19          THE COURT: Let's go to things that we have your

20   voice on.

21          MR. SCOPO: Go ahead.

22          THE COURT: "Having problem with the super,

23   we'll go to talk to him and do what we have to do on the

24   job." Then you spoke to somebody and he says I'll be in

25   the 19th Hole on Monday night. That's Langella's

1     restaurant as I recall.

2              MR. SAVARESE:  Furnari's.

3              THE COURT:  19th Hole.  What is a Colombo family

4     man doing in Furnari's  --

5              MR. SCOPO:  I am not a Colombo family man and

6     what does that have to do with the Commission, if a person

7     goes to eat in the restaurant?

8              THE COURT:  This is your words  --

9              MR. SCOPO:  That's right.

10             THE COURT:  "You be there, I'm going to be there.

11    You know what you do, bring the 50,000 because you are

12    paying." And "I said, anybody bother you this job?  No. So

13    you consider yourself lucky."

14             Then,  "Get rid of him.  It's only money.

15    Here's a guy with a home and family."  Then there was --

16    this goes back fifteen years, this isn't yesterday.  "I

17    went on the job, I knocked them all off." He says "you

18    can't knock him off" and you said "No? Watch me. Well, at

19    that time I called up, no concrete. He called back.  I

20    told the office, don't order no concrete for tomorrow

21    because you're not getting any and that was the end of that.

22    He seen I had a strangle hold on him so he paid the 15,000."

23             That's you.

24             MR. SCOPO:  Yes, but what proof is that that

25    there is a commission and I was part of a commission?

1    THE COURT: Because you walked out the house.

2    MR. SCOPO: And the job that was stopped was

3 because the contractor owed pension and welfare money.

4    THE COURT: The sad thing about you is we have

5 here a situation not only of mob leadership, but you were

6 in a position of union leadership with a duty of

7 faithfulness to the people you were representing, which you

8 absolutely threw done the gutter to enrich yourself. We

9 have pictures of the money passing in the cars, we have

10 tapes of the talks in the cars. You weren't a union leader,

11 you abdicated that. The men were getting no union

12 leadership from you at all. They were entitled to that.

13 Faithless representation.

14    No, it is perfectly clear you are a member of

15 the Colombo family, important to all these people, sitting

16 around with Langella talking. While you weren't what we

17 would call a counselor, you were obviously high enough up

18 in all of this to have full responsibility for all your

19 acts, including being trusted in all of this and I am going

20 to impose a similar sentence.

21    On Counts 1, 2, 4, 12 and 14, 20 years on each

22 for a total of a hundred because they are consecutive. 3,

23 6, 8, 10 and 16, 20 years on each, consecutively for a

24 total of a hundred. Those to run concurrently with

25 sentence imposed on 1, 2, 4, 12 and 14.

1          On Counts 17, 18, 19, 20, 20 years each.   On

2     Count 21, 14 years.   On Counts 5, 7, 9, 11, 13 and 15, one

3     year each.   Those sentences accumulating 100 years are to

4     run consecutively with each other for a hundred.   Those are

5     consecutive sentences to be served concurrently with the

6     sentences on 3, 6, 8, 10 and 16 and the sentences on 1, 2,

7     4, 12 and 14.

8          I would observe while you gave it the old

9     courtroom try, if I may call it, by trying to cut your

10    losses and saying I was just a labor leader taking a labor

11    payoff, you in effect pleaded guilty to 5, 7, 9, 11 and 13

12    before the trial began and it was just a question of state

13    of mind which these tapes blow out of the water, in my

14    opinion.

15         The fines here are $240,000:  $25,000 on 1,

16    $25,000 on 2, $10,000 on 3 through 21 cumulatively for a

17    total of $240,000.  You are assessed the costs of

18    prosecution together with individually and severally with

19    other defendants.  I recommend against parole and you are

20    assessed the $25 Witness and Victim Protection Act fee on 5,

21    7, 9, 11, 13 and 15 and a $50 fee on 1, 2, 3, 4, 6, 8, 10,

22    12, 14 and 16 through 21.

23         You have ten days to appeal.  A lawyer will be

24    provided for you free of charge.

25         MR. JACOBS:  Judge, I assume Mr. Scopo will be

1    kept here for Judge Keenan's case. There's a status on the

2    21.

3            THE COURT: I see no reason not to.

4            MR. CHERTOFF: I would say until the status

5    conference, that would be fine. But thereafter if there is

6    no trial date set, I don't know what the disposition would

7    be.

8            THE COURT: In the meantime I am available for

9    an application by either you or the warden's office or the

10   Bureau of Prisons. The defendant is remanded.

11           THE COURT: Mr. Indelicato, does the government

12   have anything to add?

13           MR. CHERTOFF: Nothing, except to point out that

14   in the case of this defendant, unlike the others, there is

15   the matter of physical incapacitation which is a

16   consideration for sentencing. The other defendants

17   themselves personally on the street are unable to perform

18   the physical acts that have threatened others although they

19   have obviously directed others to do so. In this case we

20   have defendant who is convicted of murders and from

21   evidence from prior convictions has substantial

22   acquaintanceship with firearms and is in fact personally a

23   dangerous individual and the government submits the court

24   ought to take that into account in considering his sentence.

25           THE COURT: Mr. Blossner?

mjc

1    MR. BLOSSFER:  Yes, your Honor, to begin with we

2  have had an opportunity to read the probation report and at

3  this time we would contest page 27 of the report that it is

4  before the court, near the bottom of the page, the

5  government version.

6     THE COURT:  Go ahead.

7     MR. BLOSSFER:  The report states that Mr.

8  Indelicato arrived at the Joe and Mary's Restaurant, the

9  driver stayed out with a rifle in his hand and Mr.

10  Indelicato and two others went into the restaurant and

11  actually murdered Mr. Galante and two others.  That was

12  just not proven at this trial.

13    It begins with the statement that there is

14  circumstantial evidence that Mr. Indelicato participated

15  either in the planning or the carrying out of that event

16  but not as to what he actually did.

17    In his opening, Mr. Chertoff and I believe again

18  in the closing arguments of Mr. Savarese the government

19  stated that they will not be able to prove exactly what Mr.

20  Indelicato did but that he did participate in this.  It may

21  be a moot point, may seem to be moot to the court, a moot

22  point whether he was inside or whether he in fact stole the

23  car for these people or drove the people there.  The

24  problem is when years to come, when you and I are not here

25  to defend the position of Mr. Indelicato, the Bureau of

1    Prisons will take that into consideration of custody

2    matters and he will be confined to institutions that may

3    not be appropriate but does matter at this time.

4         Since it is not proven up in the case, the government

5    has already said we do not know what part he took but we

6    believe he took part in it, and the jury has convicted him

7    of RICO activity I would ask that so much be stricken from

8    page 27 that indicates that Mr. Indelicato actually walked

9    into Joe and Mary's Restaurant.

10        THE COURT:  I think this is the government's

11   version.

12        MR. BLOSSNER:  Your Honor, the government in

13   their opening to the jury said they cannot establish who it

14   was that walked in, who stepped out.  They could not even

15   --

16        THE COURT:  I thought they argued that he went

17   in.

18        MR. CHERTOFF:  Mr. Blossner is wrong.  What we

19   said was there wouldn't be an eyewitness who could say I

20   saw his face because the men were wearing masks.  But the

21   theory of the government through the trial and of the

22   evidence pointing this way is that there were four men in

23   the car.  The driver was not Indelicato.  The other three

24   went in including the man in the back seat who was the man

25   sitting in the position where Indelicato's fingerprint was

1     found, and then the three men went in on a killing spree.

2     We can't tell which of the three gunmen Indelicato was,

3     whether he used a shotgun or handgun.  But the evidence on

4     the trial was that all three were at the killing and fired

5     the weapons.

6            THE COURT:  I decline to strike that.  It seems

7     to me you got a palm right on the right rear door handle

8     from which one could conclude that he was the one who got

9     in the right rear and therefore was not the driver and the

10    eyewitnesses said the driver stood there and waited and

11    everybody he else went in so I think that ought to stand.

12    I decline to strike it.

13           Any other problem?

14           MR. BLOSSMER:  Your Honor, at this point the

15    defendant and I have heard your sentences in the other

16    matters and we realize that your Honor is burdened and I

17    have spent enough  --  quite some time commenting on the

18    what the sentences are here.  We would ask the court to

19    consider the defendant's health condition, his age and the

20    family he leaves behind and our one request is, your Honor,

21    that the court make a recommendation to the Bureau of

22    Prisons that he remain in the northeast region and the

23    court has made a finding of indigency as to Mr. Indelicato

24    and in the years to come it would just be impossible for

25    his young wife and children to visit him in other parts of

mjd

1   the country. We wo  d ask for a recommendation that he be

2   confined to the northeast region, whichever institution.

3           THE COURT:  Let me square things away here.  I

4   have a recollection that I had to authorize his marrying

5   somebody in prison within the last five or six months.

6           MR. BLOSSNER:  That's correct.

7           THE COURT:  What children are we talking about?

8           MR. BLOSSNER:  If the report would indicate, he

9   has a 13 year-old child who is seriously ill, born with a

10  serious illness by prior marriage and he in effect adopted

11  a child of his wife.

12          THE COURT:  Is there any evidence here that he

13  has been visiting on any regular basis, aside from the

14  incarceration situation?  Is there any relationship

15  established there over any period of time?

16          MR. BLOSSNER:  With the child of his present

17  wife?

18          THE COURT:  No, the prior one.

19          MR. BLOSSNER:  Your Honor, for reasons that they

20  have to themselves and the wife establishing a new life,

21  there hasn't been, but that was an agreement between the

22  family.

23          THE COURT:  I don't think given the situation

24  here that I'm going to make a recommendation to the Bureau

25  of Prisons.  That's normally in their discretion and I

mjd                                                                                    75

1    don't have the power to do it anyway.  They can completely

2    disregard anything I say, and I don't want to be in a

3    position of suggesting that he be assigned to a facility

4    that is inappropriate for what they deem to be security

5    problems.

6            MR. BLOSSNER:  Sir, within the northeast region

7    there are penitentiaries.  It is completely up to the

8    Bureau of Prisons where they send him but they will listen

9    to your recommendation.  It is not binding on them.  For

10   the sake of the family we recommend that you  --

11           THE COURT:  I will put on this judgment of

12   commitment that I will say to the Bureau of Prisons that if

13   consistent with their concerns about security he can be

14   placed in the facility in the northeast region, I urge it.

15   On the other hand, I do not go beyond that.

16           MR. BLOSSNER:  Thank you, your Honor.

17           THE COURT:  Mr. Indelicato, do you want to say

18   anything at this time?

19           MR. INDELICATO:  No.

20           THE COURT:  No?

21           MR. INDELICATO:  No.

22           MR. CHERTOFF:  Your Honor may want to ascertain

23   for the record whether Mr. Indelicato himself read the

24   presentence report.

25           MR. INDELICATO:  I went over it.

mjd                                                                76

1           THE COURT:  You went over it with your lawyer,

2    okay.

3           Well, you know, while a lot of the proof did not

4    address itself to your connections with one or more of the

5    families here, there was certainly sufficient evidence that

6    you were one of the members of the Bonanno family during

7    the principal times involved here.  It is perfectly clear

8    from such things as a prior conviction for all of that

9    arsenal of weaponry that you were available to be used to

10   make hits, if indeed you did not do it on prior occasions;

11   but the evidence here of carrying out the Commission's

12   ruling on killing Galante is more than enough to meet the

13   jury's determination of beyond a reasonable doubt as to

14   committing these killings as in furtherance of the

15   enterprise's objectives.

16          We have the testimony of Fred DeChristopher that

17   Galante's execution was authorized, albeit Junior Persico,

18   according to testimony, voted against it.  We have

19   testimony of your making preparations for it up in the

20   Nyack region.  We have the incredible happenstance of your

21   fingerprint on the stolen getaway car in the back seat, and

22   the even more incredible circumstance of the fact that the

23   agents just happened to be videoing the Ravenite Social

24   Club that day when 30 minutes later you heave into view, if

25   I can use an old nautical term, to receive your

1    congratulations and to report not only to Canone who was a

2    Bonanno underboss as I recall, but also to Mr. Dellacroce

3    who was a Gambino underboss, and to receive appropriate

4    pats on the back for a job well done at the request of The

5    Commission, albeit probably indirectly conveyed to you by

6    others.

7              So it's perfectly clear on this record that

8    according to Commission dictates you committed three

9    murders on that day in July of 1979.  I observe that murder

10   is a crime we don't generally get in Federal court and the

11   state regards this as a 25 year-to-life type of thing.

12   There are two counts here, 20 years apiece, with

13   eligibility for parole which I am going to recommend

14   against, but eligibility for parole at the end of ten.

15             I am going to sentence you to 10 years  --  20

16   years, excuse me, on each of Counts 1 and 2 to run

17   consecutively for a total of 40 with the recommendation

18   there be no parole and I assess you $50 on each count under

19   the Witness and Victim Protection Act.  I impose fines of $25,00

20   on each count consecutively for a $50,000 fine.  I did

21   observe, did I not, that these two counts run consecutively

22   for a total of 40.

23             I observe to you that you have a right to appeal.

24   That you should file a notice within ten days, you have a

25   right to a lawyer and if you are unable to afford one for

1    the appellate process one will be afforded to you there

2    just as it has been afforded here upon a proper showing of

3    indigency.

4         I decline to award the cost of prosecution in

5    this case.  Anything else?

6         MR. BLOSSNER:  Yes, in accordance -- I think I

7    would be duty bound to state that in accordance with your

8    Honor and/or a magistrate's finding that Mr. Indelicato is

9    indigent that fines in this matter would be inappropriate

10   and would only create paper work all the way up the line.

11        THE COURT:  We'll see.  You are going to file a

12   notice of appeal, being assigned counsel?

13        MR. BLOSSNER:  Yes.

14        THE COURT:  You are directed to do that.

15        MR. BLOSSNER:  Mr. Indelicato has been indicted

16   presently a matter pending before Judge Kram in which about

17   150 tapes have been handed over for discovery purposes.  I

18   will make an appropriate application before Judge Kram to

19   keep him here, but I would ask the court direct the marshal

20   to keep him here at least through Monday on this matter.

21        THE COURT: Through Monday.  Yes, sir?

22        MR. CARDINALE:  I ask the court's indulgence for

23   one last side bar conference.  I assume not for old time's

24   sake but for one matter to put on the record.

25        MR. GAUDELLI:  I have a application with respect

1    to Mr. Corallo.  He has a matter on January 25 for a

2    continued hearing before a judge in Suffolk County.  The

3    attorney general initially indicated they had no position

4    one way or the other whether he was kept in the at the MCC

5    or not.  That would fly in the face of justice, not to be

6    concerned with the defendant in a criminal proceeding.  I

7    think the judge had a opinion otherwise.  I respectfully

8    request the court to keep Mr. Corallo here until the 23rd

9    of January so that after the 20th if the attorney general

10   should decide to seek process to keep him either in this

11   jurisdiction or Suffolk County they would have the

12   opportunity to do that.

13            THE COURT:  I have no problem with that.

14            MR. CHERTOFF:  I have no problem up to the 23.

15            MR. GAUDELLI:  I think that would be fine.

16            THE COURT:  Counsel, come up.

17

18

19

20            (Discussion at side bar sealed)

21

22

23

24

25

**U.S. Department of Justice**

**Federal Bureau of Investigation**

*Washington, D.C. 20535*

January 9, 2015

MR. ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1303895-000
Subject: DI BELLA, THOMAS

Dear Mr. Dipietro:

Records responsive to your request were previously processed under the provisions of the Freedom of Information Act. Enclosed is one CD containing 1,391 pages of previously-processed documents and a copy of the Explanation of Exemptions. This release is being provided to you at no charge.

Additional records potentially responsive to your subject may exist. Please submit a new FOIA request if you would like the FBI to conduct a search of the indices to our Central Records System.

Submit requests by mail or fax to – Initial Processing, 170 Marcel Drive, Winchester, VA 22602, fax number (540) 868-4997.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Request Number assigned to your request so that it may be identified easily.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
    Dissemination Section
Records Management Division

Enclosure(s)

A.195



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

October 21, 2014

MR. ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No. 1303857-000
Subject: YACOVELLI, JOSEPH

Dear Mr. DiPietro:

Records responsive to your request were previously processed under the provisions of the Freedom of Information Act. Enclosed is one CD containing 1,702 pages of previously-processed documents and a copy of the Explanation of Exemptions. This release is being provided to you at no charge.

Additional records potentially responsive to your subject may exist. Please submit a new FOIA request if you would like the FBI to conduct a search of the indices to our Central Records System.

Submit requests by mail or fax to -- Initial Processing, 170 Marcel Drive, Winchester, VA 22602, fax number (540) 868-4997.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Request Number assigned to your request so that it may be identified easily.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

Enclosure(s)

A.196



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

January 6, 2016

MR. ANTHONY DIPIETRO
LAW OFFICE OF ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1318275-000
Subject: MEYER, STANLEY MARVIN
(1960-2004)

Dear Mr. DiPietro:

Records responsive to your request were previously processed under the provisions of the Freedom of Information Act. Enclosed is one CD containing 130 pages of previously processed documents and a copy of the Explanation of Exemptions. Documents or information originating with other Government agencies originally referred to that agency were not included in this release. This release is being provided to you at no charge.

For your information, a search of the indices to our Central Records System reflected there were additional records potentially responsive to your Freedom of Information Act (FOIA) request. We have attempted to obtain this material so it could be reviewed to determine whether it was responsive to your request. We were advised that the potentially responsive records were not in their expected location and could not be located after a reasonable search. Following a reasonable waiting period, another attempt was made to obtain this material. This search for the missing records also met with unsuccessful results.

Additional records potentially responsive to your subject may exist. Please submit a new FOIA request if you would like the FBI to conduct a search of the indices to our Central Records System.

Submit requests by mail or fax to – Work Process Unit, 170 Marcel Drive, Winchester, VA 22602, fax number (540) 868-4997.

For your information, Congress excluded three discrete categories of law enforcement and national security records from the requirements of the FOIA. See 5 U.S. C. § 552(c) (2006 & Supp. IV (2010). This response is limited to those records that are subject to the requirements of the FOIA. This is a standard notification that is given to all our requesters and should not be taken as an indication that excluded records do, or do not, exist.

For questions regarding our determinations, visit the www.fbi.gov/foia website under "Contact Us." The FOIPA Request Number listed above has been assigned to your request. Please use this number in all correspondence concerning your request. Your patience is appreciated.

A.197

You may file an appeal by writing to the Director, Office of Information Policy (OIP), U.S. Department of Justice, 1425 New York Ave., NW, Suite 11050, Washington, D.C. 20530-0001, or you may submit an appeal through OIP's eFOIA portal at http://www.justice.gov/oip/efoia-portal.html. Your appeal must be received by OIP within sixty (60) days from the date of this letter in order to be considered timely. The envelope and the letter should be clearly marked "Freedom of Information Appeal." Please cite the FOIPA Request Number assigned to your request so that it may be identified easily.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

Enclosures (2)



U.S. Department of Justice

_____

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

February 24, 2015

MR. ANTHONY DIPIETRO
LAW OFFICE OF ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1303982-000
Subject: ALOI, VINCENZO

Dear Mr. Dipietro:

This is in reference to your Freedom of Information Act (FOIA) request.

The Federal Bureau of Investigation (FBI) has located approximately 3,621 pages of records potentially responsive to the subject of your request. By DOJ regulation, the FBI notifies requesters when anticipated fees exceed $25.00.

Releases are made on Compact Disc (CD) unless otherwise requested. Each CD contains approximately 500 reviewed pages per release. The 500 page estimate is based on our business practice of processing medium and large track cases in segments. DOJ regulations provide 100 pages or the cost equivalent ($10.00) free of charge. If all potentially responsive pages are released, you will owe $110.00 in duplication fees to receive the release on CD (8 CDs at $15.00 less $10.00 credit). Should you request that the release be made in paper, you will owe $352.10 in duplication fees.

Please remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemption(s). Also, some information may not be responsive to your subject. Thus, the actual charges could be less. **No payment is required at this time. However, you must notify us in writing within thirty (30) days from the date of this letter of your format decision (paper or CD). You must also indicate your preference in the handling of your request in reference to the estimated duplication fees from the following four (4) options:**

_____ I am willing to pay estimated duplication fees up to the amount specified in this letter.
_____ I am willing to pay duplication fees of a different amount.
               Please specify amount: _____
_____ Provide me 100 pages or the cost equivalent ($10.00) free of charge.
_____ Cancel my request.

If we do not receive your duplication format decision and/or estimated duplication fee selection within thirty (30) days of the date of this notification, your request will be closed. Include the FOIPA Request Number listed above in any communication regarding this matter.

You have the opportunity to reduce the scope of your request; this will accelerate the process and could potentially place your request in a smaller processing queue. This may also reduce search and duplication costs and allow for a more timely receipt of your information. The FBI uses a three-queue processing system to fairly assign and process new requests. Requests track into one of the three queues depending on the number of responsive pages - 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue). Small queue cases usually require the least time to process.

A.199

Please advise in writing if you would like to discuss reducing the scope of your request and your willingness to pay the estimated search and duplication costs indicated above. Provide a telephone number, if one is available, where you can be reached between 8:00 a.m. and 5:00 p.m., Eastern Standard Time. Mail your response to: **Work Process Unit; Record Information/Dissemination Section; Records Management Division; Federal Bureau of Investigation; 170 Marcel Drive; Winchester, VA 22602.** You may also fax your response to: 540-868-4997, Attention: Work Process Unit.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
Dissemination Section
Records Management Division

A.200

**U.S. Department of Justice**



**Federal Bureau of Investigation**
*Washington, D.C. 20535*

March 25, 2015

MR. ANTHONY DIPIETRO
LAW OFFICE OF ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1303982-000
Subject: ALOI, VINCENZO

Dear Mr. Dipietro:

Reference is made to your Freedom of Information Privacy Acts (FOIPA) request for FBI records concerning ALOI, VINCENZO. This letter will serve to document your telephone conversation with my representative on March 25, 2015.

It was explained that your request is currently in the large track of our multi-track backlog of unassigned FOIA requests. This track contains requests for records in excess of 2,500 pages and assignments from this queue to our FOIA Processing Units are typically delayed for a significant amount of time. It was indicated that the FBI located approximately 3700 pages potentially related to your subject, and you were offered the opportunity to reduce the scope of your request to accelerate its assignment for processing. Based on that conversation, you agreed to reduce the scope of your request to just under 2500 pages, with the understanding that you could request additional material later if you choose

In addition, our fees were discussed and you requested to have your documents placed on CD. There is a charge of $15 per CD, but there will not be any fees due for the first release. Department of Justice regulations provide 100 pages of material, or its equivalent ($10 at 10 cents per page for paper copies), free of charge. The remaining $5 for the first release will be added to the cost of the second CD, and you will be asked to pay $20 once you receive your second release. Thereafter a $15 charge per CD applies.

Through negotiation, your request was reduced from a large-track request of 3700 pages to a medium-track request of 2478 pages, which will speed its processing time. We certainly appreciate your consideration in this matter and solicit your continued patience. If you have any further questions, please do not hesitate to telephone GIS Becki Bronson at 540-868-1695.

Very truly yours,

David M. Hardy
Section Chief
Record/Information
 Dissemination Section
Records Management Division

A.201



U.S. Department of Justice

Federal Bureau of Investigation
*Washington, D.C. 20535*

April 9, 2015

MR. ANTHONY DIPIETRO
LAW OFFICE OF ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1321771-000
Subject: PERSICO, ALPHONSE (1929-1989)

Dear Mr. DiPietro:

This is in reference to your Freedom of Information Act (FOIA) request.

The Federal Bureau of Investigation (FBI) has located approximately 13,722 pages of records potentially responsive to the subject of your request.   By DOJ regulation, the FBI notifies requesters when anticipated fees exceed $25.00.

Releases are made on Compact Disc (CD) unless otherwise requested. Each CD contains approximately 500 reviewed pages per release.   The 500 page estimate is based on our business practice of processing medium and large track cases in segments.  DOJ regulations provide 100 pages or the cost equivalent ($10.00) free of charge. If all potentially responsive pages are released, you will owe $410.00 in duplication fees to receive the release on CD (28 CDs at $15.00 less $10.00 credit).   Should you request that the release be made in paper, you will owe $1,362.20 in duplication fees.

Please remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemption(s).  Also, some information may not be responsive to your subject. Thus, the actual charges could be less.  <u>No payment is required at this time.</u>  **However, you must notify us in writing within thirty (30) days from the date of this letter of your format decision (paper or CD). You must also indicate your preference in the handling of your request in reference to the estimated duplication fees from the following four (4) options:**

> ____ I am willing to pay estimated duplication fees up to the amount specified in this letter.
> ____ I am willing to pay duplication fees of a different amount.
> Please specify amount:  _____
> ____ Provide me 100 pages or the cost equivalent ($10.00) free of charge.
> ____ Cancel my request.

If we do not receive your duplication format decision and/or estimated duplication fee selection within thirty (30) days of the date of this notification, your request will be closed.   Include the FOIPA Request Number listed above in any communication regarding this matter.

You have the opportunity to reduce the scope of your request; this will accelerate the process and could potentially place your request in a smaller processing queue.   This may also reduce search and duplication costs and allow for a more timely receipt of your information.   The FBI uses a three-queue processing system to fairly assign and process new requests.   Requests track into one of the three queues depending on the number of responsive pages - 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue).   Small queue cases usually require the least time to process.

A.202

Please advise in writing if you would like to discuss reducing the scope of your request and your willingness to pay the estimated search and duplication costs indicated above. Provide a telephone number, if one is available, where you can be reached between 8:00 a.m. and 5:00 p.m., Eastern Standard Time. Mail your response to: **Work Process Unit; Record Information/Dissemination Section; Records Management Division; Federal Bureau of Investigation; 170 Marcel Drive; Winchester, VA 22602.** You may also fax your response to: 540-868-4997, Attention: Work Process Unit.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
Dissemination Section
Records Management Division

A.203



**U.S. Department of Justice**

**Federal Bureau of Investigation**
*Washington, D.C. 20535*

April 9, 2015

MR. ANTHONY DIPIETRO
LAW OFFICE OF ANTHONY DIPIETRO
15 CHESTER AVENUE
WHITE PLAINS, NY 10601

FOIPA Request No.: 1321774-000
Subject: LANGELLA, GENNARO ADRIANO
(1938-2013)

Dear Mr. DiPietro:

This is in reference to your Freedom of Information Act (FOIA) request.

The Federal Bureau of Investigation (FBI) has located approximately 73,480 pages of records potentially responsive to the subject of your request. By DOJ regulation, the FBI notifies requesters when anticipated fees exceed $25.00.

Releases are made on Compact Disc (CD) unless otherwise requested. Each CD contains approximately 500 reviewed pages per release. The 500 page estimate is based on our business practice of processing medium and large track cases in segments. DOJ regulations provide 100 pages or the cost equivalent ($10.00) free of charge. If all potentially responsive pages are released, you will owe $2,195.00 in duplication fees to receive the release on CD (147 CDs at $15.00 less $10.00 credit). Should you request that the release be made in paper, you will owe $7,338.00 in duplication fees.

Please remember this is only an estimate, and some of the information may be withheld in full pursuant to FOIA/Privacy Act exemption(s). Also, some information may not be responsive to your subject. Thus, the actual charges could be less. **No payment is required at this time. However, you must notify us in writing within thirty (30) days from the date of this letter of your format decision (paper or CD). You must also indicate your preference in the handling of your request in reference to the estimated duplication fees from the following four (4) options:**

    \_\_\_\_    I am willing to pay estimated duplication fees up to the amount specified in this letter.
    \_\_\_\_    I am willing to pay duplication fees of a different amount.
             Please specify amount: _____
    \_\_\_\_    Provide me 100 pages or the cost equivalent ($10.00) free of charge.
    \_\_\_\_    Cancel my request.

If we do not receive your duplication format decision and/or estimated duplication fee selection within thirty (30) days of the date of this notification, your request will be closed. Include the FOIPA Request Number listed above in any communication regarding this matter.

You have the opportunity to reduce the scope of your request; this will accelerate the process and could potentially place your request in a smaller processing queue. This may also reduce search and duplication costs and allow for a more timely receipt of your information. The FBI uses a three-queue processing system to fairly assign and process new requests. Requests track into one of the three queues depending on the number of responsive pages - 500 pages or less (small queue), 501 pages to 2500 pages (medium queue), or more than 2500 pages (large queue). Small queue cases usually require the least time to process.

A.204

Please advise in writing if you would like to discuss reducing the scope of your request and your willingness to pay the estimated search and duplication costs indicated above. Provide a telephone number, if one is available, where you can be reached between 8:00 a.m. and 5:00 p.m., Eastern Standard Time. Mail your response to: **Work Process Unit; Record Information/Dissemination Section; Records Management Division; Federal Bureau of Investigation; 170 Marcel Drive; Winchester, VA 22602.** You may also fax your response to: 540-868-4997, Attention: Work Process Unit.

Sincerely,

David M. Hardy
Section Chief,
Record/Information
Dissemination Section
Records Management Division

A.205

b7D

but that lately the family was crumbling and losing cohesion and PERSICO even feared they could be "absorbed" by another family. Accordingly, there had been continuing meetings on Tuesday, Wednesday and Thursday, where a number of new proposals were put forth.

JOSEPH YACOVELLI, who is presently a member of the Commission, having taken JOE COLOMBO's spot, was proposed as Boss with ALPHONSE PERSICO to become Underboss; THOMAS "SHORTY" SPIRO would be made Acting Captain, and take over the PERSICO crew; HARRY FONTANA, Capo, would be demoted to a Soldier because of his disinterest; that peace will be made with the GALLOs and, in fact, PERSICO had offered to meet with [          ] at [          ] appointed time and place providing [          ] furnished one;
that the Commission would be petitioned to allow the Family to make new members and they are proposing that JERRY LANGELLA, SALVA-TORE ALBANESE, ANDREW RUSSO (a loyal PERSICO relative), [          ] and at least one additional GALLO "nominee".

b6
b7C

PERSICO continued if these proposals are accepted, YACOVELLI will then be in a position to call in the GALLOs at any time and that when convenient they would all be killed. In addition, PERSICO said that after the GALLOs "were taken care of" they would then kill GREGORY SCARPA since bad blood existed between YACOVELLI and SCARPA and further SCARPA was getting "too big" comparing him to [          ] [          ] COLOMBO Soldier, who is missing and believed dead.

b6
b7C

PERSICO also advised he had heard a rumor that the GENOVESE crew is considering putting the entire family into legitimate pur-suits for a year or two because of the heat and because of TOMMY EBOLI's murder.

It is noted after informant furnished the names of the "proposed new members" he was asked why his name was not mentioned, to which informant laughed and said "you know damn well what I am". This aspect was not pursued at this time but NY is certain informant is a member of the COLOMBO family under ALPHONSE PERSICO and in the future, will be carried as such. As soon as it is feasible, informant will again be queried regarding this.

EFFORTS TO EXPAND COVERAGE

Additional targets have been selected to increase TECIP coverage.

A.206

NY 137-6684

Informant added that one ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ also is active in this       b6 -2
operation and is also a shylock.                               b7C -2

JOSEPH COLOMBO
AR
NY 92-1965

BUDDY SCIANDRA
TECIP
NY 137-NEW

On 9/22/71, informant advised he is familiar
with one BUDDY SCIANDRA aka Fat Buddy, who although not
a "member" of the COLOMBO family had in the past been a
close associate of JOE COLOMBO's. Informant said he recently
learned that SCIANDRA had put on the street approximately
$30,000 of CARLO GAMBINO's money and that SCIANDRA had
become jammed up due to his gambling losses and had used
juice payments to cover same. He stated consequently he
is unable to pay GAMBINO and has no other funds available.
Informant said SCIANDRA allegedly went to GAMBINO and threw
himself at his mercy. GAMBINO, however, supposedly told
SCIANDRA that he "didn't want to know anything but just
wanted his money back or else". Informant said SCIANDRA
is consequently upset over this situation.

It is felt that SCIANDRA might make a logical
target under the TECIP of the NYO.

JOSEPH YACOVELLI
AR
NY 92-3196

On 9/24/71, informant advised that he had
learned through a source that YACOVELLI had requested
to be allowed to step down as boss of the COLOMBO family
stating he disliked the pressures being brought to bear
on him since he has been designated boss. His request
was agreed to and VINCENT ALOI, Former Captain, COLOMBO
"family" has been designated boss with YACOVELLI to
serve as Consiglieri.

Clemente (2) 798

Informant furnished the following information
on 9/29/71:

- 5 -

A.207

NY 137-6684

On 5/10/72, source advised he had been in conversation with ERNEST LA PONZINA, acting captain for RICHARD FUACO, who advised they were hopeful that peace could be made with the GALLOs and that "this stupid war" should be ended.

On 5/17/72 source advised he had learned ⬚⬚⬚⬚⬚ has been aligned with the GALLOs but is staying in ⬚⬚⬚⬚⬚⬚⬚ had recently contacted ⬚⬚⬚ a close and trusted friend, and advised ⬚⬚⬚ that he should tell TONY THE CHIEF BONASERA, a COLOMBO soldier, that the GALLOs intend to make hits on GREGORY and SALVATORE SCARPA. Source opined that ⬚⬚⬚⬚⬚ is trying to stay close to long time friends who are in the COLOMBO family but who are not openly at war with the GALLOs.

b6 -2
b7C -2



Source continued he heard on the previous Tuesday that JOHNNY "BATHBEACH" ODDO had returned to Florida but that peace efforts were still being made by JOSEPH BRANCATO who remains one of the acting bosses of the COLOMBO family.

On 5/23/72, source advised he heard VINCENT ALOI has been made the boss of the COLOMBO family and is no longer considered an acting boss. Source said that ALOI in company with ROCCO MIRAGLIA and NICHOLAS BIANCO have been meeting regularly with FUNZIE TIERI, acting boss of the GENOVESE family, and CARLO GAMBINO, in an effort to make peace with the GALLOs. Source said that JOHNNY "BATHBEACH" ODDO and JOSEPH BRANCATO have been named as the official mediators in the war. Informant continued that the entire GALLO crew has been granted amnesty and have the option that they could go to any LCN family they felt they would be comfortable with and "turn themselves in" and no harm will befall them. Source stated the only exception to this peace offer was MOONEY CUTRONE who must go to his own family and his fate would be decided by them. Source pointed out that the above holds true because so far the war that has been going on has not been turned into the Commission as a complaint. Source stated it is felt so far that the Commission feels what has been done was right. Source continued that if the COLOMBOs at this point violate the peace, the whole COLOMBO family would be brought before the Commission and that they would lose their family independence. The GALLOs in the meantime have been told that if they don't come in soon, not only will the COLOMBOs be looking to kill them but the entire country will have an open contract. Source stated so far no response has been made by the GALLOs since it is felt that they are attempting to kill at least 2 reputable COLOMBOs so that they can go in with dignity.

Clemente (2) 1830

-6-

A.208

      Attached teletype reports that a
New York informant recently met with
Salvatore Profaci, son of former La Cosa
Nostra (LCN) "boss" Joseph Profaci.
Profaci said he recently attended funeral
in Detroit (probably William Tocco –
prominent LCN member, buried 6/1/72).
Profaci received $14,500 from "boss"
of St. Louis (Joseph Giardano) LCN "family"
to be given to Joseph Colombo "family."
This payment was said to be one of two annual
payments given to Colombo as his share of
junket activity to Las Vegas Dunes Hotel.
Profaci requested informant to arrange
meeting between him and Vincent Aloi,
acting "boss" of Colombo "family."  Informant
contacted capo Charles Panarella who will
arrange meeting between Joseph Yacovelli and
Profaci.  Panarella said that while Aloi
is "boss," Yacovelli "calls the shots."


EDH:rar

A.209

FD-36 (Rev. 5-22-64)

FBI

Date: 10/27/72

Transmit the following in _____ EN CODE
_____
(Type in plaintext or code)

Via _____ TELETYPE _____ NITEL
_____
(Priority)

TO:      ACTING DIRECTOR, FBI  (92-5509)

FROM:    SAC, NEW YORK (92-1965)


         JOSEPH A. COLOMBO, AR.


         ON OCTOBER TWENTY FIVE, LAST, [_____]     b6
[___] ADVISED HE HAD RECENTLY LEARNED FROM [_____]     b7C
                                                             b7D
COLOMBO CAPTAIN, THAT A LARGE COLOMBO "FAMILY" SITDOWN HAD

OCCURRED THE PREVIOUS WEEKEND.  THE "SIT" WAS OCCASIONED BY

1 - NEW YORK [_____]
1 - NEW YORK [_____]
1 - NEW YORK (92-6703)
1 - NEW YORK (92-5954)
1 - NEW YORK (92-3189)
1 - NEW YORK (92-2107)
1 - NEW YORK (92-3190)
1 - NEW YORK (92-3196)
1 - NEW YORK (92-2300)
11) 1 - SUPV #52

Approved: _____   Sent _____ M   Per _____
         Special Agent in Charge

                                        b6
                                        b7C
                                        b7D

☆U.S.Government Printing Office: 1972 — 455-574

A.210

FD-36 (Rev. 5-22-64)

# F B I

Date:

Transmit the following in _____
                        *(Type in plaintext or code)*

Via _____
                        *(Priority)*

NY 92-1965

PAGE TWO

b6
b7C
b7D

ADDITIONALLY, THAT VINCENT ALOI WAS STEPPING DOWN AS ACTING BOSS

BECAUSE HE "COULDN'T TAKE THE HEAT" AND THAT JOE YACAVELLI,

CONSIGLIERI, WOULD TAKE OVER AS ACTING BOSS TO WHICH BOTH MIRAGLIA

AND SCARPA IMMEDIATELY EXPRESSED GREAT DISPLEASURE. [        ] THEN

ADMITTED HE WAS [                                    ]

Approved: _____     Sent _____ M   Per _____
                Special Agent in Charge                      ☆U.S.Government Printing Office: 1972 — 455-574

A.211

FP-36 (Rev. 5-22-64)

F B I

Date:

Transmit the following in _____
(Type in plaintext or code)

Via _____    _____
(Priority)

---

NY 92-1965

PAGE THREE

WOULD"REALLY"BECOME ACTING BOSS.

ON OCTOBER TWENTY SEVEN, INSTANT, _____

_____ ADVISED THAT HE HAD LEARNED THE FOLLOWING INFORMA-

TION ON THE PREVIOUS EVENING FROM _____

_____

_____ COMPLAINED THAT AT ONE TIME THE COLOMBO

"FAMILY," _____

_____

WAS THE MOST FEARED MOB IN THE USA, BUT THAT LATELY THE FAMILY

WAS _____

_____ ACCORDINGLY, THERE

HAD BEEN CONTINUING MEETINGS ON TUESDAY, WEDNESDAY AND THURSDAY,

WHERE A NUMBER OF NEW PROPOSALS WERE PUT FORTH.

JOSEPH YACAVELLI, WHO IS PRESENTLY A MEMBER OF THE

COMMISSION, HAVING TAKEN JOE COLOMBO'S SPOT, WAS PROPOSED AS

"BOSS," WITH _____

_____ AND TAKE OVER THE

PERSICO CREW; HARRY FONTANA, CAPO, WOULD BE DEMOTED TO A

b6
b7C
b7D

---

Approved: _____    Sent _____ M   Per _____
Special Agent in Charge

☆U.S.Government Printing Office: 1972 — 455-574

A.212

FD-36 (Rev. 5-22-64)

F B I

Date: _____

Transmit the following in _____
                          *(Type in plaintext or code)*

Via _____
                          *(Priority)*

NY 92-1965

PAGE FOUR

"SOLDIER" BECAUSE OF HIS "DISINTEREST;" THAT PEACE WILL BE MADE

WITH THE GALLOS AND, IN FACT, [                    ]                    b6
                                                                       b7C
[              ] AT [          ] APPOINTED TIME AND PLACE PROVIDING [      ]    b7D

[                                                    ] THAT THE COMMISSION

WOULD BE PETITIONED TO ALLOW THE "FAMILY" TO "MAKE NEW MEMBERS"

AND THEY ARE PROPOSING THAT [                ] SALVATORE ALBONESE

, [                                              ] AND AT

LEAST ONE ADDITIONAL GALLO "NOMINEE."

            [          ] CONTINUED THAT IF THESE PROPOSALS ARE ACCEPTED,

YACAVELLI WILL THEN BE IN A POSITION TO CALL IN THE GALLO'S AT

ANY TIME AND THAT WHEN CONVENIENT THEY WOULD ALL BE KILLED.   IN

ADDITION, [        ] SAID THAT AFTER THE GALLO'S "WERE TAKEN CARE OF"

[
                                                                      
                                                                      
                                                                      
]

WHO IS MISSING AND BELIEVED DEAD.

            [          ] ALSO ADVISED HE HAD HEARD A RUMOR THAT THE

GENOVESE CREW IS CONSIDERING PUTTING THE ENTIRE FAMILY INTO

Approved: _____   Sent _____ M   Per _____
              Special Agent in Charge           ☆U.S.Government Printing Office: 1972 — 455-574

A.213

FD-36 (Rev. 5-22-64)

FBI

Date:

Transmit the following in _____
                                    (Type in plaintext or code)

Via _____
                                    (Priority)

NY 92-1965

PAGE FIVE

LEGITIMATE PURSUITS FOR A YEAR OR TWO BECAUSE OF THE "HEAT" AND

BECAUSE OF TOMMY EBOLI'S MURDER.

b6
b7C
b7D

AS SOON AS IT IS FEASIBLE, INFORMANT WILL AGAIN BE

QUERIED REGARDING THIS.

Approved: _____    Sent _____ M    Per _____

Special Agent in Charge

☆U.S.Government Printing Office: 1972 — 455-574

A.214

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | JUN 20 1972 | 3/3/72 – 6/7/72 |

| TITLE OF CASE | REPORT MADE BY | TYPED BY |
|---|---|---|
| JOSEPH YACOVELLI | ANTHONY L. CHRISTY | |

CHARACTER OF CASE

AR

b6
b7C

REFERENCES:

New York report of SA RICHARD A. GENOVA, dated 3/10/72.

Newark letter to New York, dated 3/29/72.
New York airtel to Newark, dated 4/27/72.
Newark airtel to New York, dated 5/3/72.
New York airtel to Newark, dated 5/8/72.
Newark airtel to New York, dated 5/27/72.
New York airtel to Newark, dated 5/31/72.

-P-

ADMINISTRATIVE:

On 3/1/72, [          ] advised that JOSEPH YACOVELLI, ROCO MIRAGLIA and VINCENT ALOI were presently in control of

b7D

| ACCOMPLISHMENTS CLAIMED | ☐ NONE | | | | ACQUIT-TALS | CASE HAS BEEN: |
|---|---|---|---|---|---|---|
| CONVIC. | AUTO. | FUG. | FINES | SAVINGS | RECOVERIES | |

PENDING OVER ONE YEAR ☒YES ☐NO
PENDING PROSECUTION OVER SIX MONTHS ☐YES ☒NO

| APPROVED | SPECIAL AGENT IN CHARGE | DO NOT WRITE IN SPACES BELOW |
|---|---|---|

COPIES MADE:

3-Bureau
1-USA, SDNY
1-Strike Force, SDNY
7-New York (92-3196)
    (1-179-566)
    (1-92-4756)
    (1-92-4123)
    (1-92-6781)
COPIES CONT'D COVER PAGE B

62-3166- 371

b6
b7C

Dissemination Record of Attached Report

Notations

| Agency | | | |
|---|---|---|---|
| Request Recd. | | | |
| Date Fwd. | | | |
| How Fwd. | | | |

GPO : 1971—445-529

NY 92-3196

ADMINISTRATIVE (Cont'd)

the remanents of the COLOMBO family.  On 4/11/72, [____]    b6
[_____] NJ, advised                              b7C
that on Saturday 4/8/72 between 3:30 P.M. and 4:15 P.M.     b7D
seven or eight automobiles were at subject's residence,
400 Piermont Road.  Men and women were in attendence
and were observed to be wearing black.  After the above
vehicles departed a second group of automobiles came to
the residence, staying approximately 45 minutes to an hour.

        On 4/16/72, [_____] advised that JOE GALLO
was killed [_____] was with YACOVELLI during the GALLO-PROFACI
war and is a ruthless killer who has nothing for brains.
[_____] was with "Sonny Pinto" (true name CARMINE DI BIASE)
early in the morning of 4/7/72 and they saw GALLO in Umberto's
Clam Bar.

        On 5/25/72, [_____] advised that he had
received information that he considers to be be reliable,
that subject was officially designated as the new boss of the
COLOMBO family on Saturday 4/22/72.  Source stated that this is
being kept very quiet at this time.  Source noted that
subject is very well regarded by all and believes this will
be well received by LCN members.

        Source further noted that subject is very close
to [_____] and has been for many years.  Source considers
this very significant in view of reports that [____] with
SONNY PINTO (true name CARMINE DI BIASE) are responsible for
the shooting of JOE GALLO.

        On 4/27/72, [_____] advised tht [_____]
[_____] is JOE YACOVELLI [_____].

COPIES (Cont'd)
1-USA, EDNY
1-Strike Force, EDNY
1-Charlotte
1-Boston
2-Newark (92-1776)
1-New Haven
1-Philadelphia
1-San Juan

                        -B-
                   COVER PAGE

A.216

NY 92-3196

## ADMINISTRATIVE (Cont'd)

On 5/12/72, [        ] NJ, advised that during March of 1972 on a Sunday morning he was in conversation with [        ] Last Name Unknown (LNU) at telephone number [        ] Source stated that [        ] LNU was [        ] at subject's residence at 400 Piermont Road, Norwood, NJ. [        ] was done by [        ] LNU working on weekends. On one occasion [        ] LNU telephoned source to ask about the technicalities of the [        ] and source could hear subject in background. [        ] LNU made the comment that no one was supposed to know subject was there.

On 5/12/72 a review of the current telephone directory reflects that the subscriber to telephone number [        ]

On 5/24/72 at 12:25 P.M. AUSA [        ] telephone [        ] advised a source (not identified), advised that a meeting is to take place in the Bahamas, specific location unknown, this weekend, for the purpose of naming a temporary boss to the COLOMBO family. Source advised that the meeting is being held to determine who is going to call the shots in the COLOMBO family inasmuch as subject was tried but did not work out.

On 5/25/72, [        ] was shown numerous photographs of known associates of subject. Source selected a photograph of [        ] as an individual who appeared identical to a passenger in an automobile registered to [        ], which source observed on the premises of the Gateway Motel, Secaucus, NJ, in the company of three other individuals.

On 5/23/72, [        ] advised that he had heard that VINCENT ALOI has been made boss of the COLOMBO family.

On 6/5/72 [        ] advised that subject continues to be in hiding but is presently considering "sending in" CARMINE DI BIASE (SONNY PINTO) to see if he is to be arrested. In the event subject is not to be arrested he will then come out of hiding and more actively participate in "family" business. Source stated that he had heard that DI BIASE is a "marked man" and will be killed when he is of no further use to subject.

On 5/15/72, [        ] was exhibited a photograph of DOMINICK TRINCHERO who informant identified as the same individual who in March of 1972 had visited subject at his Nyack apartment. Subject also identified

-C-
COVER PAGE

A.217

b6
b7C
b7D

NY 92-3196

ADMINISTRATIVE (Cont'd)

a photograph of [          ] as being identical to the
individual who had rented subject's Nyack apartment.
Source advised that [      ] resided at [
[                    ], NY, telephone [          ].

       On 5/26/72, [                          ] furnished
to Buagents pertinent information concerning shylock loan to
[                                    ] ECT case re subject
opened, [              ] and is receiving intensive investigative
effort.

       On 5/16/72 AR case opened re Hedonics, Inc.,
101 Gedney St., Nyack, NY, NY 92-6781. [          ] is
subject of instant investigation and matter is receiving
intensive investigative effort.

INFORMANTS:

Identity of Source           Contacting Agent

                              SC [          ]

                              SA RICHARD A. GENOVA

LEADS:

    BOSTON

    AT PEABODY, MASSACHUSETTS.  1.  Ascertain subscriber
to telephone number [          ] and discreetly conduct appropriate
investigation to fully identify subscriber bearing in mind
that subscriber may be involved in narcotic operation described
by NY T-2.  Emphasis of investigation should be directed
towards LCN association of subscriber.

-D-
COVER PAGE

A.218

OPTIONAL FORM NO. 10
MAY 1962 EDITION
GSA FPMR (41 CFR) 101-11.6

UNITED STATES GOVERNMENT

# *Memorandum*

TO : SAC, NEW YORK

DATE: 4/25/72

FROM : SA

b6
b7C
b7D

SUBJECT:

JOE YACOVELLI aka
AR
NY File 92-3196

On 4/25/72, informant advised that he has received information he considers reliable that subject was officially designated the new boss of the Columbo family on Saturday, April 22, 1972. He stated that this is being kept very quiet at this time. He noted Joe Yak is very well regarded by all and he believes this will be well received by LCN members.

Informant noted further that Joe Yak is very close to [        ] and has been for many years. He considered this significant in view of reports that [        ] with Sonny Pinto De Biasi are responsible for the shooting of JOE GALLO.



92-3196-330

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____
APR 2 1972
NEW YORK

b6
b7C
b7D



1 -
(1) 92-3196

A.219

FD-263 (Rev. 1-7-72)

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | 1/22/73 | 9/18/72-12/27/72 |

| TITLE OF CASE | REPORT MADE BY | TYPED BY |
|---|---|---|
| JOSEPH YACOVELLI aka | ANTHONY L. CHRISTY | b6 |
| | CHARACTER OF CASE | b7C |
| | AR | |

REFERENCE:

New York report of SA ANTHONY L. CHRISTY, dated 9/18/72.

-P-

ADMINISTRATIVE:

In the interest of brevity, investigation conducted to locate and apprehend JOSEPH YACOVELLI is being reported in NY 88-14194 and is not being duplicated herein.

INFORMANTS:

On October 27, 1972, [                    ] advised that    b7D
JOSEPH YACOVELLI, who is presently a member of the commission, having taken JOE COLOMBO's spot, was proposed as "Boss", with

| | ACCOMPLISHMENTS CLAIMED | | | ☒ NONE | ACQUIT-TALS | CASE HAS BEEN: | |
|---|---|---|---|---|---|---|---|
| CONVIC. | FUG. | FINES | SAVINGS | RECOVERIES | | PENDING OVER ONE YEAR ☒YES ☐NO | |
| | | | | | | PENDING PROSECUTION OVER SIX MONTHS ☐YES ☒NO | |

| APPROVED | SPECIAL AGENT IN CHARGE | DO NOT WRITE IN SPACES BELOW |
|---|---|---|

COPIES MADE:

    3 - Bureau (92-7506)
    1 - USA, SDNY
    1 - Strike Force, SDNY
    1 - USA, EDNY
    1 - Strike Force, EDNY
    3 - New York (92-3196)
    # 2   (1-88-14194)

92-3196-453

| Dissemination Record of Attached Report | | Notations |
|---|---|---|
| Agency | | |
| Request Recd. | | |
| Date Fwd. | | |
| How Fwd. | | |
| By | | |

COVER PAGE

NY 92-3196

INFORMANTS (CONT'D)

ALPHONSE PERSICO to become "underboss"; THOMAS "Shorty"
SPIRO would be made acting captain and take over the
PERSICO crew; HARRY FONTANA, capo, would be demoted to
soldier because of his disinterest. Source advised that
after YACOVELLI became boss peace would be made with the
GALLO's thus enabling YACOVELLI to be in a position to
call them in and when convenient they would all be killed.

On 10/28/72, [        ] advised that YACOVELLI     b7D
is planning to take punitive action against the GALLOs to
prevent further inroads into COLOMBO interests and to assert
he is running the COLOMBO family.

On 12/26/72, [        ] advised that THOMAS       b6
DI BELLA was made the new boss and ANTHONY "Abby" ABBATTEMARCO   b7C
was made underboss. Source further advised that [        ]   b7D
[        ], and JOSEPH YACOVELLI are still in charge of
the family, and DI BELLA is a figurehead.

| Identity of Informant | Contacting Agent |
|---|---|
| NY T-1 [        ] | SA [        ] |
| NY T-2 [        ] | SA [        ] |
| NY T-3 [        ] | Newark letter of 11/10/72 |
| NY T-4 [        ] | SA ANTHONY L. CHRISTY |

b6
b7C
b7D

LEADS:

NEW YORK

AT NEW YORK, NEW YORK. Will interview JAMES
PICARELLI re business association with and alledged shylock
loan from JOSEPH YACOVELLI.

Will interview [        ] re knowledge of YACOVELLI.     b6
b7C

COVER PAGE
-B*-

A.221

1/3/73

AIRTEL

TO:        ACTING DIRECTOR, FBI (66-2542-11-34)

FROM:      SAC, NEW YORK                                              b7D

SUBJECT:   TOP ECHELON CRIMINAL
           INFORMANT PROGRAM
           NEW YORK DIVISION

           The following is a summary of accomplishments of the
TECIP for the month ending 12/29/72.  Also set forth are the
number of PC's, CTE's, [        ] sources and [        ] targets.

                    PC's and CTE's

           As of 12/29/72, the NYO had [   ] CTE's and [   ] PC's.    b7D

           [        ] SOURCES AND [        ] TARGETS

           As of 12/29/73, the NYO had [          ] sources and
[        ] targets.

                              CTE's    PC's    TARGETS

1 - SAC, DIVISION
1 - SA WILLIAM A. VERICKER, #51
1 - Supvr. #51
1 - Supvr. #52
1 - Supvr. #53
1 - Supvr. #54
1 - Supr. #55      1 - Supvr. #58
2 - Bureau
1 - New York

WAV:dpk
(11)

ADIC
(info)

SEARCHED ___ INDEXED ___
SERIALIZED ___ FILED ___
JAN 9 1973
FBI — NEW YORK                                                        b7D

A.222

b7D

b6
b7C
b7D

b6
b7C
b7D

b6
b7C
b7D

NY 3461-C-TE advised that he had learned that
CHARLES "MOOSE" PANARELLA has a hijacking crew which is operating
out of Milways Tavern.  Informant said                who is part of PANARELLA's "crew" and one
who has a connection for "loads coming out of New Jarsey".
Informant said          also has a "drop" on Richmond Terrace which

b6
b7C

- 3 -

A.223

b7D

and which resulted in the

arrests of                    and

b6
b7C

Informant said that CHARLIE MOOSE confided that he was a little concerned about         since         had never been busted for these other loads and he suspected         may be         PANARELLA said if any of his crew ever gets pinched that he would "kill"         in a minute.

b6
b7C

b6
b7C

b6
b7C
b7D

NY 3461-C-TE was contacted and stated he learned that the following official changes had been made within the COLOMBO "family" after a series of carefully guarded meetings:

The new boss is THOMAS DI BELLA. Informant said he himself expressed surprise at the news since JOSEPH COLOMBO was still alive. He was told this was not an act of "disrespect" but an act of necessity and desperation, because of the present condition of the "family". In addition, he learned that DI BELLA's father many years ago had been boss of this "family".

- 4 -

A.224

b7D

Informant said DI BELLA in the past had been under CARMINE PERSICO and that in order for him to rise to the position of "boss" it was a necessary formality that ALPHONSE PERSICO temporarily step down, elevate DI BELLA to acting boss and finally boss. When this was accomplished ALPHONSE moved back to acting captain.

Informant continued that when a new boss is named by the commission, all ranking members voluntarily surrender their positions and the new boss is then able to name those he desires to be in positions of command. ANTHONY ABBATEMARCO has been moved to underboss. Informant noted this was a complete surprise to him but observed that he was also under PERSICO and it is now evident that PERSICO and YACOVELLI are now "calling the shots" and the prior meetings were meaningless.

JOSEPH BRANCATO has been named a captain, an obvious attempt to appease the "moderate faction" of the "family".

MIMI SCIALO has been named a captain.

Informant said CHARLES PANARELLA has made no secret of his ambition and has indicated a desire to be made Consiglieri. Informant said a Consiglieri is allowed to have one or two soldiers directly under him and it is rumored he would select GREGORY SCARPA.

ROCCO MIRAGLIA would not be considered for position of captain. Informant said he heard an unconfirmed story that after JOE COLOMBO began having trouble with JOE GALLO in April, 1971, PERSICO requested to see COLOMBO at Cantalupo Realty. When PERSICO approached COLOMBO, MIRAGLIA allegedly "frisked" PERSICO. When he finished, PERSICO told MIRAGLIA that if MIRAGLIA ever touched him again he would kill him. Informant thinks this story may now have truth in it.

Informant said he had heard rumors that new members might be "made" in the COLOMBO "family" and that active members might be polled for candidates. He said if queried he would suggest PHILLIP "CHUBBY" ROSILLO (the person who shot JEROME JOHNSON).

- 5 -

A.225

b7D

NY 3461-C-TE advised a meeting of all the hierachy of
the COLOMBO "family" which included VINCENT ALOI, CHARLES "MOOSE"
PANARELLA, ALLEY BOY PERSICO, JOE BRANCATO, SALVATORE PROFACI,
son of the late JOE PROFACI, who is now an acting Capo in the
COLOMBO "family", NICK BIANCO, ROCCO MIRAGLIA and possibly others
met in a secret location unknown to informant. At this meeting,
it appeared that the COLOMBO "family" was broken into
two factions with BRANCATO leading the more moderate faction and
ALLEY BOY PERSICO as the leader of a more wild and reckless faction.

b6
b7C
b7D

## EFFORTS TO EXPAND COVERAGE

Agents assigned to each of the Criminal Intelligence
Squads have been assigned, exclusive of all other duties, to the
development of informant under the TECIP.

- 6 -

A.226



2/5/73

AIRTEL

TO:         ACTING DIRECTOR, FBI (66-2542-11-34)

FROM:       SAC, NEW YORK [          ]                              b7D

SUBJECT:    TOP ECHELON CRIMINAL
            INFORMANT PROGRAM
            NEW YORK DIVISION

        The following is a summary of accomplishments
of the TECIP for the month ending 1/31/73. Also set forth
are the number of PC's, CTE's, [        ] sources and
[          ] targets.                                            b7D

        <u>PC's AND CTE's</u>

        As of 1/31/73, the NYO had [    ] CTE's and [    ] PC's.

[        ] <u>SOURCES AND</u> [    ] <u>TARGETS</u>

        As of 1/31/73, the NYO had [        ] sources
and [        ] targets.

                                      b7D

2-Bureau
1-New York
GTB:mmg
(11)

SEARCHED _____
SERIALIZED _____
INDEXED _____
FILED _____

A.227

b7D

## ACCOMPLISHMENTS

NY 3461-C-TE furnished information leading
to the recovery of $350,000 in stolen jewelry.

b6
b7C
b7D

- .2 -

A.228

b7D

b6
b7C
b7D

NY 3461-C-TE advised that on 1/10/73, a
meeting took place which was attended by most of the
active soldiers in the COLOMBO family of LCN. At this
meet it was "officially" announced that the "family"
was now structured as follows:

Boss – THOMAS DI BELLA; Underboss – ANTHONY
ABBETEMARCO; CONSIGLIERI – Not appointed to date; Captains –
"JIGGS" FORLANO; ALPHONSE PERSICO; MIMI SCIALO; CHARLES

– 4 –

A.229

b7D

PANARELLA; JOSEPH BRANCATO and TOOTIE LOMBARDINO (from New Jersey).

NY 3461-C-TE said the following are now considered "soldiers" not withstanding their former positions:

(CARMINE PERSICO and JOSEPH YACOVELLI's names were not mentioned).

VINCENT ALOI, DICK FUSCO, ERNIE LA PONZINA, JOHN ODDO, SONNY FRANZESE, SAL PROFACI, JR., ROCCO MIRAGLIA and NICK BIANCO.

To date all soldiers have not been assigned to specific captains but this is expected to be done shortly.

b6
b7C
b7D

## EFFORTS TO EXPAND COVERAGE

Intelligence, substantive and informant files of the Criminal Intelligence Squads are currently under review to select targets for the TECIP and additional targets have been selected to increase TECIP coverage.

A.230

OPTIONAL FORM NO. 10
MAY 1962 EDITION
GSA FPMR (41 CFR) 101-11.6

UNITED STATES GOVERNMENT

# *Memorandum*

TO : SAC ☐  DATE: 7/31/73

FROM : SUPERVISOR ☐ #52

SUBJECT:

      Informant was contacted on 7/20/73 and
7/26/73 and he furnished the following information:

      Source furnished the following breakdown
of active members and associates in the COLOMBO family
of LCN (members designated by asterisk*):

| | |
|---|---|
| Boss | THOMAS DI BELLA |
| Underboss | ANTHONY ABBATEMARCO |
| Consiglieri | ALPHONSE PERSICO |

I.   Capo

   Crew Members

      ROCCO MIRAGLIA*

      GREGORY SCARPA*
      SALVATORE SCARPA*
      JOSEPH DE DOMENICO

      ERNEST LA PONZINA*
      ANTHONY LA PONZINA *

      GEORGE TROPIANO*
      RALPH TROPIANO*
      NICK SORRENTINO*
      JOSEPH GENTILE
      FRANK RICHARD FUSCO*

92-3196-499

b6
b7C



b7D

b6
b7C

SALVATORE FUSCO
BENNY LO CICERO*
FRANK LO CICERO*

FRED CLEMENZA*
JAMES CLEMENZA*

II.   Capo                 DOMINICK SCIALO

Crew Members

SAL PERITORE*

b6
b7C

FRANK MUSACCHIO*
MIKE SAVINO*

HARRY FONTANA*
PHILIP FONTANA*
JOHN FONTANA*

III.   Capo                JOSEPH BRANCATO

Crew Members

b6
b7C

ANTHONY PERAINO*
JOSEPH PERAINO*

- 2 -

A.232

b7D

ANTHONY AUGELLO*
JOSEPH VITACCO*

b6
b7C

TUTTI FRANZESE

IV. Acting Capo

Crew Members

LEONARD DELLO*

RALPH SPERO*

b6
b7C

SALVATORE ALBANESE*

TONY RICCIARDI*

SALVATORE MINEO*
JOSEPH YACOVELLI*
JAMES SCIANNA*
ANTHONY SCIANNA*

V. Capo                    NICHOLAS FORLANO

Crew Members

VINCENT ALOI

b6
b7C

VI. Capo                   SALVATORE LOMBARDINO

Crew Members (to extent known)

- 3 -

A.233

b7D

## SALVATORE PROFACI, JR.

ROSARIO LOMBARDINO
PAUL LOMBARDINO

b6
b7C

JOHN MISURACA

Source advised that HARRY FONTANA, BIG
JOHN MISURACA, [           ], VINCENT RANDAZZO,
BENEDETTO D'ALESSANDRO, CHARLES MINEO, [           ]
and VINCENT MANGANO are all inactive in LCN circles.

b6
b7C

Source stated that old LORENZO LAMPASI, SR.
died several months ago. Also that [           ]
has been transferred to the GAMBINO crew. Source
unaware of any specific illegal activities of THOMAS
DI BELLA or his new address. JOHNNY BATH BEACH ODDO
answers directly to the Boss, DI BELLA, and no longer
has a crew other than [           ]. The feeling is
prevalent also that JOE COLOMBO made the biggest
mistake of his life by creating the IACRL and taking on
the FBI.

b6
b7C

Informant reiterated that the balance of
power rests with the PERSICO faction and that [           ]
[           ] is still calling the shots in the family.

b6
b7C

He stated further that [           ],
[           ], is very well thought
of and respected not only by the COLOMBO members but by
leading LCN figures throughout the country.
was on a first name basis with many of these out of town
chiefs since he often accompanied [           ] on trips
Source advised that [           ] could conceivably make a
good compromise boss in the future, particularly in
view of his low profile, lack of arrest record, wealth
and string of legitimate enterprises.

b6
b7C

Source advised that [           ]

b6
b7C
b7D

- 4 -

A.234

FD-204 (Rev. 3-3-59)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

Copy to:      1 - Strike Force, EDNY

Report of:

Date:    AUG - - 1973        Office:    New York, New York

Field Office File #:    92-2723        Bureau File #:    92-6611

Title:    THOMAS DI BELLA

Character:    ANTI-RACKETEERING

b6
b7C

Synopsis:    Subject continues as Boss of the JOSEPH COLOMBO
La Cosa Nostra (LCN) Family. [_____] has mentioned to several people that [_____]
THOMAS DI BELLA, is the Boss of the Family. [_____]
himself, however, [_____] THOMAS
DI BELLA is generally considered a good choice for Boss because
of his age, experience and desire to quell feuds within the
Family. DI BELLA is reportedly getting a cut of all COLOMBO
Family operations, but he does not appear to be personally
involved in any illegal activity. DI BELLA has been observed
by SAS of the FBI in the company of ANTHONY ABBATEMARCO, reported
underboss of the COLOMBO Family.

-P-

## DETAILS:

On June 4, 1973, NY T-1 advised that THOMAS DI BELLA
had been designated permanent new Boss of the COLOMBO La Cosa
Nostra (LCN) Family by CARLO GAMBINO. On July 12, 1973, NY T-2
confirmed the above.

On June 4, 1973, NY T-1 further advised that [_____]
[_____] had informed certain individuals
that [_____] THOMAS DI BELLA, was the new head of the
COLOMBO Family. On June 22, 1973, NY T-3 advised that [_____]

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

NY 92-2723

On June 14, 1973, NY T-4 advised that DI BELLA is considered a good choice for Boss inasmuch as he has been around for a long time and has a great deal of experience. Furthermore, it is felt that due to his age, DI BELLA will not be overly ambitious but will be more anxious to settle various disputes that arise within the Family in a "fair" manner.

On June 19, 1973, NY T-5 advised that THOMAS DI BELLA had been seen occasionally in the Red Hook Section of Brooklyn, but that he does not go to President Street which is the area frequented by the GALLO faction of the COLOMBO Family.

On June 22, 1973, NY T-3 advised that THOMAS DI BELLA is getting a cut of all illegal operations being conducted by members of the COLOMBO LCN Family because he is the "Boss". According to the source, however, DI BELLA does not appear to be personally involved in any illegal activity.

On June 12, 1973, THOMAS DI BELLA was observed by a Special Agent (SA) of the Federal Bureau of Investigation (FBI) in conversation with ANTHONY ABBATEMARCO in front of ABBATEMARCO's residence on 83rd Street in Brooklyn, New York.

On July 19, 1973, DI BELLA was observed by an SA of the FBI entering the residence of ANTHONY ABBATEMARCO, 1126 83rd Street, Brooklyn, New York. DI BELLA drove to ABBATEMARCO's in his 1968 brown Cadillac accompanied by his wife. Mrs. DI BELLA remained in the car while the subject entered ABBATEMARCO's residence where he remained from 9:41 am, to 10:06 am, at which time he departed, re-entered his car and drove off.

On August 7, 1973, NY T-3 advised that THOMAS DI BELLA was still Boss of the COLOMBO LCN Family.

-2*-

FD-204 (Rev. 3-3-59)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

Copy to:     1-Strike Force, EDNY

Report of:
Date:     JAN 8 1974         Office: New York, New York

Field Office File #:    92-2723         Bureau File #:   92-6611

b6
b7C

Title:     THOMAS DI BELLA

Character:     ANTI-RACKETEERING

Synopsis:     On 9/19/73, THOMAS DI BELLA moved from his former residence at 80 Lovelace Ave., SI, NY, to 18 Adlai Circle, SI, NY. He is currently residing at the latter address. Results of physical surveillances and interviews related to same set forth. Subject continues to consolidate his position as "boss" of the JOSEPH COLOMBO LCN family. Results of interviews of subject set forth.

-P-

## DETAILS:

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

NY 92-2723

III.   Subject's Position Within the Family

On September 13, 1973, NY T-2 advised that THOMAS
DI BELLA is consolidating his power as the true boss of the
JOSEPH COLOMBO La Cosa Nostra (LCN) family although the
PERSICO sympathizers are still very influential.   According
to the source, it has become apparent that CARMINE PERSICO
can not control the family from his jail cell in view of his
brother's, ALPHONSE PERSICO's, ineffectiveness.

IV.   Interviews of Subject

A.238

FD-204 (Rev. 3-3-59)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

Copy to:  1 - Strike Force, EDNY  (COLOMBO Family)

Report of:

Date:  July 26, 1974          Office:  New York

Field Office File #:  92-2723          Bureau File #: 92-6611

Title:  THOMAS DI BELLA

Character:  ANTI - RACKETEERING

Synopsis:                    continues to maintain residence at

EDNY.

-P*-

<u>DETAILS:</u>

All sources whose identities are concealed in this communica-
tion have furnished reliable information in the past.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

NY 92-2723


On January 8, 1974, NY T-1 advised that CARLO GAMBINO was exerting considerable influence on all the other La Cosa Nostra (LCN) Families in New York City, in particular, the JOSEPH COLOMBO Family whose boss, THOMAS DI BELLA, was considered too cautious to exert any real power.

On June 7, 1974, NY T-2 advised that one of the reasons THOMAS DI BELLA was made "boss" of the COLOMBO Family was because of his close friendship with CARLO GAMBINO. GAMBINO had threatened to take over the entire Family if a boss was appointed who he found unsuitable.

On January 16, 1974, NY T-3 advised that DI BELLA seems to be doing a very good job of keeping the COLOMBO Family together. Source advised that DI BELLA was well liked and respected by the members of the COLOMBO Family.

On March 14, 1974, NY T-4 advised that THOMAS DI BELLA was firmly established as boss of the COLOMBO Family.

On May 30, 1974, NY T-5 confirmed that DI BELLA was still boss, and that ANTHONY ABBATEMARCO was the under-boss of the COLOMBO Family,

FD-263 (Rev. 1-7-72)

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | 7/26/74 | 1/3/74 - 7/12/74 |

| TITLE OF CASE | REPORT MADE BY | TYPED BY |
|---|---|---|
| THOMAS DI BELLA aka | | |

CHARACTER OF CASE

AR; Contempt of Court

b6
b7C

## REFERENCE

New York report of SA [            ] 1/8/74;
New York airtels to the Bureau, 2/21/74 and 5/6/74;
New York nitels, 6/10/74, 6/14/74, 6/27/74, 7/5/74,
7/10/74 and 7/12/74.

-P*-

b6
b7C

## ADMINISTRATIVE

Case being placed in a P* status because the subject
is currently incarcerated.

| ACCOMPLISHMENTS CLAIMED | | | | | □ NONE | ACQUIT-TALS | CASE HAS BEEN: |
|---|---|---|---|---|---|---|---|
| CONVIC. | FUG. | FINES | SAVINGS | RECOVERIES | | | PENDING OVER ONE YEAR ☒YES □NO |
| 1 | | | | | | | PENDING PROSECUTION OVER SIX MONTHS □YES ☒NO |

| APPROVED | SPECIAL AGENT IN CHARGE | DO NOT WRITE IN SPACES BELOW |
|---|---|---|

COPIES MADE:

3 - Bureau (92-6611) (D+1)
1 - Strike Force, EDNY
    (COLOMBO Family)
3 - New York (92-2723)
    (1 - 92-1965 Sub A)

92 - 6611 39

REC [ ]
b6
b7C

1 AUG 1 1974

| Dissemination Record of Attached Report | | Notations |
|---|---|---|
| Agency | | |
| Request Recd. | CC, AAG, Criminal Division, | NEW |
| Date Fwd. | Organized Crime & Racketeering Section, Room | DATA PRO |
| How Fwd. | | |
| By | 58 AUG 23 1974 | |

-A-
COVER PAGE

A.241

NY 92-2723

<u>ADMINISTRATIVE</u>   (continued)

The investigative period of this report is somewhat lengthly in order that it might contain the final disposition and covert action taken against ⬚⬚⬚⬚⬚⬚⬚⬚                                    b3

⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚ The Bureau has been kept closely advised and case has been maintained in a current status by separate communication.

Daily contact has been maintained with the Strike Force, Eastern District of New York, in order to insure prompt dissemination of all pertinent details relative to the subject's status.

Original surveillance logs contain details of surveillances referred to in this report and are located in New York files 92-1965, 182-903 Sub A and 92-2723 Sub A.

The subpoena which was served to ⬚⬚⬚⬚⬚⬚⬚
May 4, 1974 was in connection with case entitled: ⬚⬚⬚⬚⬚⬚⬚
⬚⬚⬚⬚ Et Al RICO  (New York file 183:165)                    b3
                                                              b6
                                                              b7C
                                                              b7D

<u>INFORMANTS</u>

<u>Contacting Agent</u>

NY T-1

Special Agent

-B-
COVER PAGE

A.242

NY 92-2723

INFORMANTS (continued)

| | | |
|---|---|---|
| NY T-2 | Special Agent | b6 b7C b7D |
| NY T-3 | Special Agent JACK H. LUPTON | |
| NY T-4 | Special Agent | |
| NY T-5 | Supervisor | |

The following information received from informants is being placed in the administrative section by virtue of its extremely sensitive and singular nature:

b7D

On January 14, 1974,      advised that THOMAS DI BELLA had been heard to remark that he should have had his "head examined" for taking over as boss of the COLOMBO La Cosa Nostra (LCN) Family. DI BELLA was also overheard saying that he would not forget the disrespect which had been shown him in the past by ALPHONSE PERSICO and other members of the COLOMBO Family.

On February 11, 1974,      advised that THOMAS DI BELLA was meeting regularly with members of the COLOMBO Family at the Grotta D'Oro Restaurant, Brooklyn, New York. The informant advised that THOMAS DI BELLA had fully established himself as the Head of the Family, but that he had been having some problems with      a Capo in the Family from Staten Island.

b6 b7C b7D

On February 27, 1974,      advised that DI BELLA had stated at a recent party that he did not intend to honor a subpoena which he had received commanding him to appear at the Eastern District of New York.

-C-
COVER PAGE

A.243

NY 92-2723

INFORMANTS  (continued)

On June 12, 1974,                    advised that the          b7D
subject is "an old timer" and is "well respected" by the
wiseguys.  The source stated that DI BELLA was made Boss
of the Family in an attempt to "settle things down and bring
the Family members together".  Informant advised that all
the "wiseguys" were very concerned about the Court problems
that DI BELLA was having and everyone was "standing by" to
see what would happen to him.  Source further stated that
ANTHONY ABBATEMARCO was handling all the problems in connection
with Family matters because of DI BELLA's legal entanglements.
The source stated that things in the COLOMBO Family were very
unsettled because of DI BELLA's court battle.

On June 25, 1974,                    advised that
ANTHONY ABBATEMARCO and THOMAS DI BELLA had recently had a
meeting in order to make arrangements for ABBATEMARCO to
take over leadership in the Family when DI BELLA was to be
incarcerated.  Among those present in addition to ABBATEMARCO
and DI BELLA were SALVATORE ALBANESE and                       b6
The source advised that ABBATEMARCO was complaining about     b7C
"too much to handle now" since DI BELLA's immobilization.      b7D
ABBATEMARCO was heard to say that the job was too much for
one man to handle.

On July 11, 1974,                    confirmed that
ABBATEMARCO was slated to take over the job of boss if and
when DI BELLA went to jail.  It was the general feeling
within the Family that the underboss position would then
probably remain vacant.

On June 28, 1974,                    advised that THOMAS
DI BELLA

-D-
COVER PAGE

A.244

PLAINTEXT

9/11/74

NITEL

TO:        DIRECTOR, FBI (92-5509)

FROM:      SAC, NEW YORK (92-1965)

           JOSEPH ANTHONY COLOMBO, AR.

           PAST SEVERAL DAYS, COLOMBO MEMBER SOURCE NY 3461-CTE
ADVISED OF IMMINENT CHANGES IN HIERARCHY OF COLOMBO LCN FAMILY
DUE TO PENDING PROSECUTIVE PROBLEMS OF CERTAIN FAMILY LEADERS.
THIS DATE SOURCE ADVISED THAT CAPOREGIME JOSEPH BRANCATO HAS BEEN
APPOINTED ACTING BOSS IN VIEW OF THOMAS DI BELLA'S INCARCERATION
FOR CONTEMPT. UNDERBOSS, ANTHONY ABBATEMARCO, HAS BEEN DESIGNATED
ACTING CONSIGLIERE IN VIEW OF CHARLIE MOOSE PANARELLA'S PENDING
STATE GUN CHARGES AND FEDERAL GRAND JURY IMMUNITY PROCEEDINGS
RESULTING FROM RECENT NYO TITLE 3.  ROCKY MIRAGLIA HAS BEEN NAMED
TO TAKE OVER PANARELLA'S STATEN ISLAND CREW AND SA____ ORE _____
HAS BEEN NAMED ACTING CAPOREGIME                             b6
                                                            b7C
BEGAN SERVING FEDERAL PERJURY SENTENCE THIS WEEK.  NYO SURVEILLANCES
LAST THREE DAYS HAVE PUT ABBATEMARCO, BRANCATO AND OTHERS TOGETHER
AT VARIOUS LOCATIONS AT HEAVY MEETINGS.  ADDITIONALLY, OPEN STRIFE
                                                            b6
BETWEEN THE OLD GALLO FACTION,                              b7C
                                                 WHICH
AND THE REBEL GALLO FACTION HEADED BY JOHN MOONEY CUTRONE, HAS NOW
SIDED WITH THE PERSICO ELEMENT, CONTINUES IN BROOKLYN.

1-92-5954
2-137-6684
1-352
RJT:lm
(4)

A.245

PAGE TWO

THE ONLY REMAINING HOODLUMS OF ANY STATURE FAITHFUL TO GALLO HAVE
BEEN SHOT IN THE PAST THREE DAYS,

b6
b7C

NYO HAS INITIATED AN
INTERVIEW AND GRAND JURY PROGRAM DESIGNED TO CAPITALIZE ON THE
ABOVE SITUATIONS FROM THE STANDPOINT OF DEVELOPING FURTHER
INTELLIGENCE OR INFORMANT COVERAGE.

BUREAU WILL BE KEPT ADVISED OF DEVELOPMENTS.

IT SHOULD BE EMPHASIZED FROM INVESTIGATION AND CONTACT
WITH ALL KNOWLEDGEABLE SOURCES THE RECENT RASH OF GANGLAND
SLAYINGS IN AND AROUND BROOKLYN ARE INDICATIVE OF ONLY THE GALLO
INTER-FACTIONAL WAR AND NOT OF ANY ATTEMPT BY MAJOR LCN FIGURES
TO TAKE OVER THEIR OWN OR OTHER FAMILIES.

A.246

SAC [                    ]                    3/7/74                    b6
                                                                       b7C
SA [                    ] (#52)                                        b7D

[                    ]

On 3/4/74, source was contacted and furnished
the following information:

ALPHONSE PERSICO aka
AR
NY 92-6703

Source advised that there are numerous indications
of trouble brewing in the family since JOE YACOVELLI's
return. A couple of months ago YACOVELLI sent word to
PERSICO that [                    ]

[                                                                    ]

YACOVELLI told PERSICO that he (YACOVELLI) is a boss and
when he needs things, people are to respond.

YACOVELLI and [                    ] are extremely          b6
close and in fact it was [                    ] who pushed YACOVELLI    b7C
for the leadership of the family when JOE COLOMBO was shot.           b7D
[                    ] told other members of the family that "JOE YAK"

[                                                                    ]

Source advised that "wise guys" in other families
hold the COLOMBO "Family" and specifically [                    ]
responsible for numerous troubles that the LCN has come upon
in recent times.

Source further stated that "ALLIE BOY" will be
lucky th have anything when he gets out of jail.

1 - 92- 3196 (YACOVELLI)
1 - 92-2895
1 - TECIP

(4)

A.247



FD-209 (Rev. 11-24-72)
OPTIONAL FORM NO. 10
MAY 1962 EDITION
GSA GEN. REG. NO. 27    5010-106

UNITED STATES GOVERNMENT

# *Memorandum*

TO : SAC    137-6684    DATE: 11/4/74

FROM : SA _____ #52    b6
b7C

SUBJECT:    3461-C-TE

---

Dates of Contact
        10/31/74

File #s on which contacted (Use Titles if File #s not available or when CI provides positive information)

Joseph Colombo AC    92-1165
Dominick Scialo AC   92-2107
Joseph Brancato AC   92-3189
    etal.

---

Purpose and results of contact

☐ NEGATIVE
☒ POSITIVE
☐ STATISTIC

    Source advised regarding the body found buried along side DOMINICK SCIALO last month by the FBI that he heard the following story from very reliable sources:

    The individual murdered was named (FNU) COCCHIO, a kid who was murdered about 10 years ago at the request of JUNIOR PERSICO to JOE COLOMBO who ordered the hit. Source heard that COCCHIO apparently had killed a relative of PERSICO in a bar fight. COCCHIO was grabbed off the street in Bay Ridge by NICK BIANCO and GREGORY SCARPA who administered a severe beating to COCCHIO ████████████████. COCCHIO was then taken to the garage adjacent to ████████ residence on ████████ Brooklyn, where source heard he was killed by

b6
b7C

☐ POSITIVE ASSIGNMENT GIVEN (Ghetto only)

---

Has informant shown any indication of emotional instability, unreliability or furnishing false information?    No

☒ Informant certified that he has furnished all information obtained by him since last contact, including information concerning narcotics.

Coverage
AR

CHIEF CLERK
POST

137-6684-1718
α α
NOV 7 1974
r.r. N.Y.

PERSONAL DATA

| | | |
|---|---|---|
| 1-92-1965 | 1-92-3171 | 1-92-2729 |
| 1-92-2657 | 1-92-3187 | 1-92-3200 |
| 1-92-3189 | 1-92-6754 | 1-92-3407 |
| 1-92-4850 | 1-92-2107 | 1-92-2668 |
| 1-92-2895 | 1-182-120 | 1-92-5084 (C) |
| 1-TECIP | RJT:1m | (17) |

A.248

NY 137-6684

DUKE SANTORO with one bullet in the head. The body was put
back in BIANCO's car and delivered to PERSICO's crew
Downtown who in turn apparently buried the body in the
basement of the social club. (NYCPD advised of identity of body)

### NO DISSEMINATION OR USE WHATSOEVER OF THIS INFORMATION SHOULD BE MADE WITHOUT PRIOR DISCUSSION WITH DESK 52.

Source heard that NICKY MAINEELO recently released
from Danbury Prison is the subject of a sit down between
CHARLIE MOOSE PANARELLA, his Captain, and ⬚
representing CARLO GAMBINO. MAINELLO's handbook operation had
been taken over by GAMBINO's people while he was in prison
and MAINELLO and PANARELLA feel that it should be returned
to the COLOMBO Family. Source also heard that MAINELLO was
called in by PANARELLA to explain his part in the recent
securities indictment which the FBI obtained against MAINELLO
and others.

b6
b7C

Source heard that TONY LA PONZINA is dealing in swag
and that MOOSE PANARELLA is pretty much staying on his own
in and around his work site in Staten Island after having put
out the word for everybody to stay away from him because of the
FBI's investigative pressure.

The word on the street is that the PERSICO faction is
"out" in COLOMBO power circles and that JOE BRANCATO appears
to be the low key figure the Family has been seeking as a
leader for several years. MOONEY CUTRONE is back in the fold
and is assigned under Captain JIMMY MUCE. Source heard also
that ANDREW RUSSO is moving very big on Long Island in many
legitimate ventures and that RUSSO is quite close to JOE BRANCATO
also.

Source advised that a young "hood' nicknamed ⬚
who ⬚

⬚ Source stated ⬚
by GENOVESE Captain GUS FRASCA. Source knows of no further
specifics with regard to this operation.

b6
b7C

(Above was disseminated to US Secret Service, 11/4/74,
by the writer.)

-2-

A.249

OPTIONAL FORM NO.
JULY 1973 EDITION
GSA FPMR (41 CFR) 101-11.6

## UNITED STATES GOVERNMENT

# *Memorandum*

TO : SAC [            ]                    DATE: 6/5/74          b6
                                                                b7C
FROM : SUPV. [              ] #52                               b7D

SUBJECT: [              ]

On 5/30/74, source furnished the following
up-to-date breakdown of members (*) and associates in
the COLOMBO LCN Family:

Boss                          THOMAS DI BELLA
Underboss                     ANTHONY ABBATEMARCO
Consigliere                   ALPHONSE PERSICO
Acting Consigliere                                              b6
                              [                    ]            b7C

Captain- [                    ]

ERNIE LAPONZINA*              JOHN SAPONARO
GREGORY SCARPA*
ROCCO MIRAGLIA*               SALVATORE FUSCO
JOSEPH GENTILE                BENNY LO CICERO*
[                    ]        [                    ]
ANTHONY LAPONZINA*
[                    ]        JOHN COIRO
                             ALBERT MUGNOLO
TOMMY BARBUSCA                [                    ]
[                    ]        FRED CLEMENZA*
(FNU) [              ]        (LNU)*

## Captain - VINCENT "JIMMY" MUCE

SALVATORE PERITORE*          [                    ]
[                    ]        PHILIP FONTANA*
MIKE SAVINO*                  JOHN FONTANA*
[                    ]        (LNU) (nephew of the

92--3196-570
88--17194-627

1-Each Case File *Yacovelli*
1-TECIP

SEARCHED
SERIALIZED
#52 JUN 11 1974

*Buy U.S. Savings Bonds Regularly on the Payroll*

A.250



FD-302 (REV. 11-27-70)

FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____ 6/7/74

A confidential source advised that based upon conversations with and observations of ANTHONY ABBATEMARCO and SALVATORE ALBANESE on numerous occasions over the past year, that ANTHONY ABBATEMARCO and SALVATORE ALBANESE are currently conducting the daily operation of the COLOMBO "Brugad," (source's English translation-"family"), an organized criminal association. Source stated the COLOMBO "Brugad" or "family" formerly the PROFACCI "Brugad," is one of numerous criminal associations, commonly referred to by the media as the "La Cosa Nostra" or "Mafia," operating throughout the United States, whose function is to accumulate power and wealth through criminal activity. Source stated that COLOMBO "Brugad" is structured as follows: Boss (currently THOMAS DI BELLA), Underboss (currently ANTHONY ABBATEMARCO), Consigliere (currently ALPHONSE PERSICO), Capos or Lieutenants (currently include CHARLES PANARELLA, also known as "Moose"; JOSEPH BRANCATO, and others), and members or soldiers and that the "family's" regular activities include illegal gambling, loansharking, cigarette smuggling, narcotics, and infiltration of labor unions and private sanitation businesses. Source advised that due to THOMAS DI BELLA's age, ANTHONY ABBATEMARCO has assumed many of the powers and responsibilities of the boss, including the direction of the overall family policy. Source further advised that SALVATORE ALBANESE is ANTHONY ABBATEMARCO's enforcer who assists ABBATEMARCO in the conduct of the "family's" affairs.

Also on June 5, 1974, source advised that within the past six months, on several occasions, ANTHONY ABBATEMARCO has expressed concern that the FBI or the police were "bugging" his telephone and residence and as a result ABBATEMARCO has stated he will discuss "family" business only when in a safe place, such as public restaurants, the street, or his or a trusted "member's" automobile. Source further advised that he has observed ANTHONY ABBATEMARCO and SALVATORE ALBANESE together on numerous occasions within the last six months either in ABBATEMARCO's Chevrolet or ALBANESE's Buick, and as a result of conversations with the aforesaid subjects during the aforesaid time period, source has determined the subjects utilize their aforesaid personal

Interviewed on ___ 6/5/74 ___ at ___ New York, New York ___ File # _____

by ___ SA [                    ] /mc ___ Date dictated ___ 6/6/74

b6
b7C

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

 

OPTIONAL FORM NO. 10
MAY 1962 EDITION
GSA FPMR (41 CFR) 101-11.6

UNITED STATES GOVERNMENT

## Memorandum

TO : SAC (137-6684)  DATE: 8/30/74

FROM : SA [ ] (#52)  b6
b7C

SUBJECT: JOSEPH COLOMBO, SR.
AR - CONSPIRACY
(92-1965)

On 8/29/74, NY 3461-C-TE advised that there has been
a re-organization of the COLOMBO LCN family, with the following
changes:

ROCCO MIRAGLIA is acting captain for CHARLEY MOOSE;
JOSEPH BRANCATA is acting boss for THOMAS DI BELLA;
ANTHONY ABBATEMARCO is acting captain for ALPHONSE
PERSICO.

Source further advised that there is to be additional
changes and that these will be provided to Bureau as they
occur.

This information should not be disseminated outside
the Bureau as this information is very singular in nature.

1 - 92-2723 (DI BELLA)
1 - 92-

WLF:mmz
(4)

137-6684-1711
52:

b6
b7C



*Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan*

A.252

FD-263 (Rev. 1-7-72)

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | MAR 18 1975 | 7/15/74 - 3/3/75 |

TITLE OF CASE

REPORT MADE BY       TYPED BY

THOMAS DI BELLA

CHARACTER OF CASE

AR

## REFERENCES

NYrep of SA [            ] dated 7/26/74
NYlet to Bureau, dated 1/20/75.
NYairtel to Bureau, dated 2/25/75.
NYairtel to Bureau, dated 3/4/75.

- P* -

## ADMINISTRATIVE

    The investigative period of this report is somewhat
lengthy in order to include information developed while the
subject was incarcerated and this case was in a P* status.

    In view of the subject's current incarceration,

b6
b7C

| ACCOMPLISHMENTS CLAIMED | | | | □ NONE | ACQUIT-TALS | CASE HAS BEEN: |
|---|---|---|---|---|---|---|
| CONVIC. | FUG. | FINES | SAVINGS | RECOVERIES | | PENDING OVER ONE YEAR ☒YES □NO |
| 1 | | | | | | PENDING PROSECUTION OVER SIX MONTHS □YES ☒NO |

APPROVED     SPECIAL AGENT IN CHARGE     DO NOT WRITE IN SPACES BELOW

COPIES MADE:

3-Bureau (92-6611)
1-Strike Force, EDNY (COLOMBO Family)
1-USA, EDNY
1-Strike Force, SDNY
1-USA, SDNY
3-New York (92-2723)
  (1-92-1965 Sub A)

92- 6611 - 43

MAR 20 1975    EX 104

b6
b7C

| Dissemination Record of Attached Report | | | Notations |
|---|---|---|---|
| Agency | | | |
| Request Recd. | | | |
| Date Fwd. | | | |
| How Fwd. | | | |
| By | | | |

CC, AAG, Criminal Division, Organized Crime & Racketeering Section, Room

- A -
COVER PAGE

A.253

NY 92-2723

ADMINISTRATIVE (Cont'd)

this case is again being placed in a P* status.

Close contact has been maintained with
Strike Force, SDNY, in order to insure that this matter receives
continuing priority attention.

b6
b7C

The original surveillance logs containing details of
surveillances referred to in this report are located in NYfile
92-2723 Sub A.

INFORMANTS

On 7/24/74, [                    ] advised that on 7/11/74,
THOMAS DI BELLA had a meeting at the Hofbrau Restaurant in
Brooklyn, NY, with ANTHONY ABBATEMARCO, SALVATORE ALBANESE,
JOSEPH BRANCATO, [          ] and [          ] In-
formant advised at that time that ABBATEMARCO had been desig-
nated "acting boss" of the COLOMBO Family, in view of DI BELLA's
pending jail term.

b6
b7C
b7D

Informant further advised that same day that DI BELLA
had visited ABBATEMARCO at the latter's residence on 7/15/74.

On 8/12/74, [          ] advised that TONY PERAINO
is in contact with incarcerated COLOMBO Boss, THOMAS DI BELLA,
and is attempting to get DI BELLA's approval to "wack out"
[                              ] Source advised that PERAINO be-
lieved that he had all the evidence necessary to show that
[                    ] was incompetent and had committed acts against
the past interests of the Family.

b6
b7C
b7D

On 8/29/74, [                    ] advised that there had
been a re-organization in the COLOMBO LCN Family with the
following changes:

- B -
COVER PAGE

A.254

NY 92-2723

ADMINISTRATIVE (Cont'd)

b6
b7C

JOSEPH BRANCATO is acting boss for THOMAS DI BELLA;
ANTHONY ABBATEMARCO is acting captain for ALPHONSE
PERSICO.

On 10/9/74, [                    ] advised that [                    ]

b7D

On 12/27/74, [          ] advised [                    ]

On 1/8/75, [                    ]

b7D

- C -
COVER PAGE

A.255

Case 16-2361, Document 23, 10/11/2016, 1880537, Page258 of 309

NY 92-2723

ADMINISTRATIVE (Cont'd)

On 1/27/75, [ ] advised [ ]                                    b7D

        The informant advised that since DI BELLA is
permanent Boss of the COLOMBO Family, ABBATEMARCO, their
underboss and formerly acting boss before JOSEPH BRANCATO,
( a former captain), was made acting boss, no major deci-
sions would be made without consultation among the triad.
The informant went on to say, however, that DI BELLA and
ABBATEMARCO are practically immobile as a result of legal
problems and "FBI heat"; therefore, BRANCATO is handling
all the routine decisions and meets on the street level.
The source went on to say that contact between the COLOMBOs
and GAMBINOs is frequent and that meetings occur between
ANTHONY ABBATEMARCO and CARLO GAMBINO every two or three
weeks.

                                                              b7D
        On 2/14/75, [ ] advised that JAMES
"Jimmy the Bat" CARDELLA, died on Sunday night, 2/25/75.
The entire COLOMBO Family turned out for the wake including
TOMMY DI BELLA and ANTHONY ABBATEMARCO.

        On 2/17/75, [ ] advised that DI BELLA
had recently been seen in public frequenting the Diplomat
Lounge and Monte's in Brooklyn, NY.



# UNITED STATES DEPARTMENT OF JUSTICE

### FEDERAL BUREAU OF INVESTIGATION
New York, New York
March 1, 1975

b2 -1,2

CONF IDES

NEW YORK SYMBOL NUMBER
NEW YORK FILE NUMBER
BUREAU FILE NUMBER

## SPECIFIC DATES OF CONTACT

Source contacted on October 31, 1974, December 20, 1974, and January 2, 1975. Source was not contacted every 30 days as source was travelling and was not available.

## OUTCOME OF CASES NOT COMPLETED

None

## SUCCINCT SUMMARY OF INFORMATION FURNISHED

DOMINICK SCIALO aka;
AR
NY 92-2107

JOSEPH COLOMBO aka;
AR
NY 92-1965

JOSEPH BRANCATO aka;
AR
NY 92-3189

*179-1996-*

On October 31, 1974, source advised regarding the body found buried alongside DOMINICK SCIALO last month by the FBI that he heard the following story from very reliable sources:

b2 -2

b6 -1
b7C -1

NOT RECORDED
MAR 6 1975

MAR 14 1975

A.257

7

The individual murdered was named (First Name
█████)(FNU) COCCHIO, a kid who was murdered about 10 years
██ at the request of JUNIOR PERSICO to JOE COLOMBO who
█████ the hit. Source heard that COCCHIO apparently had
█████ a relative of PERSICO in a bar fight. COCCHIO was
█████ off the street in Bay Ridge by NICK BIANCO and
█████ SCARPA who administered a severe beating to COCCHIO.
█████ was then taken to the garage adjacent to JOE IANNACI's
█████ on Bay 10th Street, Brooklyn, where source heard
█████ killed by DUKE SANTORO with one bullet in the head.
█████ body was put back in BIANCO's car and delivered to
█████'s crew downtown, who in turn apparently buried the
█████ in the basement of the social club. (New York City Police
█████ (NYCPD) advised of identity of body).

<span style="float:right">b6 -2<br>b7C -2</span>

Source heard that [                    ] recently released
from Danbury Prison is the subject of a sit down between
CHARLIE MOOSE PANARELLA, his Captain, and JIMMY BROWN FAILLA,
representing CARLO GAMBINO, [            ] operation had
been taken over by GAMBINO's people while he was in prison
and [        ] and PANARELLA feel that it should be returned to
the COLOMBO Family. Source also heard that [        ] was
called in by PANARELLA to explain his part in the recent
securities indictment which the FBI obtained against [        ]
and others.

Source heard that TONY LA PONZINA is dealin in
swag and that MOOSE PANARELLA is pretty much staying on his
own in and around his work site in Staten Island after having
put out the word for everybody to stay away from him because
of the FBI's investigative pressure.

The word on the street is that the PERSICO faction
is "out" in COLOMBO power circles and that JOE BRANCATO
appears to be the low key figure the Family has been seeking
as a leader for several years. MOONEY CUTRONE is back in the
fold and is assigned under [            ] Source heard
also that ANDREW RUSSO is moving very big on Long Island in
many legitimate ventures and that RUSSO is quite close to JOE
BRANCATO also.

<span style="float:right">b6 -2<br>b7C -2</span>

-2-

A.258

b6 -2
b7C -2



Source advised that a young hood nicknamed _____
_____ has been handling counterfeit
$100 bills out of the Starlight Bar and Grill at 13th Avenue
between 69th and 70th Streets, Brooklyn. Source stated this
was a bar _____ Source
knows of no further specifics with regard to this operation.

(Above was disseminated to United States Secret
Service, November 4, 1974, by the writer.)

On January 2, 1975, source stated that ALLIE BOY
PERSICO spends quiet drinking evenings in the Regis Room of
the St. Regis Hotel in Manhattan where he claims no one
"knows" him.

Source stated several COLOMBO members "have the
feeling" that JOE YACOVELLI is definitely influencing family
policies although remaining in the background. It is an
La Cosa Nostra (LCN) axiom, according to source, that a member
retires or gives up his position as Consigliere he cannot be
reinstated.

Source advised further that GEORGE TROPIANO was
attempting to get approval from Acting Boss JOE BRANCATO to
have a "witness" hit.

b6 -2
b7C -2
Informant advised he heard that CHARLIE "MOOSE"
PANARELLA had a Christmas party for his entire crew one night
the week of December 15, 1974, between 6-10 PM at the Casa
Storta Restaurant in Brooklyn. ALPHONSE PERSICO attended
with some of his crew. Both "goodfellos" and associates
attended this almost purely social gathering. JOE GENTILE,
ERNIE and TONY LA PONZINA were not present citing the ongoing
Internal Revenue Service (IRS) trial in Federal Court. PAPA
DICK FUSCO did not attend. Two former underlings of MIMI
SCIALO who are now with PANARELLA attended by the names of
_____ (phonetic)(ph) and _____ a bookmaker
(who was involved in the COLOMBO numbers case 182-120 according
to source).

-3-

A.259

ET AL;
RICO
NY 183-238

On December 20, 1974, source advised that
are still active in backing X-rated films. Source
stated                              and JOE LANE are
actively involved in promoting a film called
Source advised that CHARLES "MOOSE" PANARELLA is getting an
end from any profits that the GENTILE group may derive. In-
formant heard the above three are attempting to force the
legitimate owners or producers of the above film to sell part
or all of their interest. They feel they can persuade other
COLOMBO members,                              to back their venture
and to use their influence in the business as well as their
distribution system. Source heard further that these COLOMBO
hoods have their "in" through JOE LANE who is very close to
a wealthy widow involved in this firm.

b6 -2
b7C -2

GEORGE TROPIANO
AR
NY 92-2656

On December 20, 1974, source was contacted also
regarding GEORGE TROPIANO and his relationship to CHARLES
PANARELLA. Source stated TROPIANO is very lightly regarded
and has no crew and is really in the words of source a "nothing
guy" who is not capable of directing any heavy work such as
major thefts or contract killings.

Source has been contacted on two occasions by
the alternate Agent. He continues to be reliable and emo-
tionally stable.

Information furnished, where possible, has been
corroborated through other sources or independent investiga-
tion.

-4*-

A.260

10

FD-204 (Rev. 3-3-59)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

Copy to:
1-Strike Force, EDNY (COLOMBO Family)
1-USA, EDNY
1-Strike Force, SDNY
1-USA, SDNY

Report of:
Date:  MAR 1 9 1975

Office:  New York, New York

b6
b7C

Field Office File #:  92-2723

Bureau File #:  92-6611

Title:  THOMAS DI BELLA

Character:  ANTI-RACKETEERING

Synopsis:

b3

- P* -

## DETAILS:

On January 21, 1975, THOMAS DI BELLA was physically observed at his residence, 18 Adlai Circle, Staten Island, New York (NY), by Special Agents of the Federal Bureau of Investigation (FBI).

On January 28, 1975, a 1968 brown Cadillac, bearing NY license 527 RLM, which is registered to THOMAS DI BELLA, was observed parked outside 18 Adlai Circle, Staten Island, NY.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

NY 92-2723

## Position Within the JOSEPH COLOMBO La Cosa Nostra (LCN) Family

On Thursday, July 11, 1974, THOMAS DI BELLA was ob-
served meeting with ANTHONY ABBATEMARCO, SAL ALBANESE, JOSEPH
BRANCATO, CARMINE "Tutti" FRANZESE and                     at the          b6
Hofbrau Restaurant on Fourth Avenue, Brooklyn, NY. The meeting   b7C
took place from approximately 1:00 P.M. through 2:15 P.M.

Reliable informants have reported that THOMAS DI BELLA
is currently the boss of the JOSEPH COLOMBO LCN Family, ANTHONY
ABBATEMARCO is currently the underboss, and JOSEPH BRANCATO is
acting boss in place of DI BELLA, while the latter is incarcerated.

b3

- 2 -

A.262

FD-36 (Rev. 5-22-64)

F B I

Date: 4/18/75

Transmit the following in _____
                          (Type in plaintext or code)

Via ___ AIRTEL _____
                          (Priority)

TO:      DIRECTOR, FBI

FROM:    SAC, NEW YORK (70-4468) (#56)

SUBJECT: THOMAS DI BELLA

                                        - VICTIM
         CGR - ATTEMPTED MURDER
         (OO: NY)

         Captioned victim is confessed murderer of EMANUEL
GAMBINO, nephew of CARLO GAMBINO, boss, GAMBINO LCN family.
Subject, DI BELLA, is boss of the JOSEPH COLOMBO LCN
family.

         On 11/26/74, victim was poisoned allegedly by          b6
captioned subject while all were incarcerated at Federal        b7C
House of Detention. West Street. Manhattan. New York. In
addition to [                    ]has
recently come forward and indicated that he has information
concerning this matter. During interview, [        ] has advised
that he saw THOMAS DI BELLA pass a phial of poison to
[          ]who, thereafter, assisted by [              ], placed
the poison in hot chocolate which was subsequently consumed
by [          ]is currently testifying for the State
of New Jersey and DEA concerning the [          ]narcotic network.
[          ]at one time, was the South American connection for
the importation of large quantities of narcotics into the
United States.)

(3)- Bureau
     (1 - 92-6611)
1 - New York (92-2723)
1 - New York

SFJ:kbm
(5)

Approved: _____          Sent _____ M _____ Per
          Special Agent in Charge

U.S. GOVERNMENT PRINTING OFFICE: 1971

FD-302 (REV. 11-27-70)

1.

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription _____ 4/21/75

[                              ] was interviewed at the office of
Organized Crime Strike Force, Southern District of New York,
New York, New York. He was advised of the identity of the
interviewing agents and that he was being questioned concerning
the attempt made to poison him which occurred at the Federal
House of Detention, West Street, New York, New York, on the evening
of November 23, 1974. Also present during the interview was
Special Attorney [                    ] Strike Force, Department of
Justice, Southern District of New York.

[          ] advised that during the period of the incident
in question, the following individuals were incarcerated in the
Maximum Security Wing of the Federal House of Detention:

Section C-1 housed THOMAS DI BELLA. [                    ],
[                                        ], and          b6
                                                         b7C

Housed in Section C-2 was [                    ] (Last Name
[                                                          ]

Section C-3 housed [                      ] two
black males whose names [          ] could not recall, and a Jewish
kid who had a deformed leg.

Section C-4 housed [                ] (PH), and other individuals
whom [          ] could not recall.

[          ] stated that it was known throughout the facility
that THOMAS DI BELLA was the boss of the JOSEPH COLOMBO La Cosa
Nostra (LCN) Family. and that [          ] had some criminal ties
to DI BELLA. [          ] stated that his relationship with DI BELLA
was casual, but that there was no hostility exhibited toward him
until a week prior to the poisoning incident. He stated that at
that time DI BELLA stopped conversation entirely with him,
and he behaved in a manner which led [          ] to believe that DI BELLA
wanted nothing more to do with him. [          ] advised that in addition
to DI BELLA, other individuals on the wing also behaved cruelly
toward him [          ] during his last week there. He advised that

Interviewed on __4/16/75__ at __New York, New York__ File # __NY 70-4468__

by __SAS__ and [                ] /SrJ/dm Date dictated __4/21/75__

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

A.264

FD-209 (Rev. 6-18-70)
OPTIONAL FORM NO. 10
MAY 1962 EDITION
GSA GEN. REG. NO. 27

UNITED STATES GOVERNMENT

# Memorandum

TO : SAC [ ]          DATE: OCT 14 1975

b6
b7C
b7D

FROM : SA [ ] (#52)

SUBJECT: Former [ ]

| Dates of Contact | 10/8/75 |
|---|---|

File #s on which contacted (Use Titles if File #s not available or when CI provides positive information)

92-1965

Purpose and results of contact

[ ] NEGATIVE
[X] POSITIVE
[ ] STATISTIC

THE FOLLOWING INFORMATION IS SINGULAR IN
NATURE AND SHOULD NOT BE DISSEMINATED.

On 10/8/75, former [ ] provided the
following organizational structure of the COLOMBO LCN family.
He cautioned that the hierarchy is in a state of flux.

b6
b7C
b7D

| Boss | TOMMY DI BELLA |
|---|---|
| Underboss | ANTHONY ABBATEMARCO |
| Consigliere | ALPHONSE PERSICO |
| | |
| Captain | JOE BRANCATO |
| | ANTHONY PERAINO |
| | JOE PERAINO |
| | SAM NASTASI |

[ ] POSITIVE ASSIGNMENT GIVEN

Has informant shown any indication of emotional instability, unreliability or
furnishing false information?     No

[X] Informant certified that he has furnished all information obtained by him
since last contact, including information concerning narcotics.

Coverage
92-3196-636

PERSONAL DATA
1-92-1965
[ ]
(1)

92-3196

56

#56

A.265

FD-204 (Rev. 3-3-59)

## UNITED STATES DEPARTMENT OF JUSTICE
### FEDERAL BUREAU OF INVESTIGATION

Copy to:
1 - Strike Force, EDNY
1 - USA, EDNY
1 - Strike Force, SDNY
1 - USA, SDNY

Report of:
Date:            JAN 2 7 1976

Office: **New York, New York**     b6
                                    b7C

Field Office File #:   **92-2723**

Bureau File #:  **92-6611**

Title:  **THOMAS DI BELLA**

Character:  **ANTI-RACKETEERING**

Synopsis:
          THOMAS DI BELLA continues to reside at 18 Adlai
          Circle, Staten Island, New York, and is driven
about by THOMAS VENETUCCI, who utilizes two vehicles :
a 1974 tan Lincoln and a 1973 yellow Cadillac.  DI BELLA is
currently the boss of the COLOMBO LCN family and he has
attended numerous functions involving all the members of
that family.

                                              b3

                                              Results
of physical surveillance set forth.

- P -

## DETAILS

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

☆ U.S.GPO:1975-O-575-891

A.266

FD-263 (Rev. 1-7-72)

# FEDERAL BUREAU OF INVESTIGATION

| REPORTING OFFICE | OFFICE OF ORIGIN | DATE | INVESTIGATIVE PERIOD |
|---|---|---|---|
| NEW YORK | NEW YORK | JAN 27 1976 | 3/31/75 - 1/13/76 |

| TITLE OF CASE | REPORT MADE BY | | TYPED BY |
|---|---|---|---|
| | | | b6 |
| THOMAS DI BELLA | | | b7C |
| | CHARACTER OF CASE | | |
| | AR | | |

## REFERENCES

NYrep of SA [            ] dated 3/18/75.　　　　　b6
NYlet to Bureau, dated 8/7/75.　　　　　　　　　b7C
NYlet to Bureau, dated 10/28/75.
NYairtel to Bureau, dated 12/11/75.

- P -

## ADMINISTRATIVE

The investigative period of this report is lengthy due to the fact that the subject has been incarcerated and this matter was in a pending inactive status. Bureau has been kept appraised of significant developments through referenced communications.

| ACCOMPLISHMENTS CLAIMED | | | | ☒ NONE | ACQUIT-TALS | CASE HAS BEEN: | |
|---|---|---|---|---|---|---|---|
| CONVIC. | FUG. | FINES | SAVINGS | RECOVERIES | | PENDING OVER ONE YEAR ☒ YES ☐ NO | |
| | | | | | | PENDING PROSECUTION OVER SIX MONTHS ☐ YES ☒ NO | |

| APPROVED | SPECIAL AGENT IN CHARGE | DO NOT WRITE IN SPACES BELOW |
|---|---|---|

COPIES MADE:

3 - Bureau (92-6611)
1 - Strike Force, EDNY
1 - USA, EDNY
1 - Strike Force, SDNY
1 - USA, SDNY
3 - New York (92-2723)
    (1 - 92-1965-Sub A)

92-6611 -　49　REC 8

5 JAN 29 1976　　ST-105

b6
b7C

| Dissemination Record of Attached Report | | Notations: |
|---|---|---|
| Agency | | NINE |
| Request Recd. | CC, AAG, Criminal | DATA PROC |
| Date Fwd. | Division Organized Crime Racketeering Section | |
| How Fwd. | Room 2244 for 2/5/76 | |
| By | | |

1 FEB 13 1976

A
COVER PAGE

A.267

NY 92-2723

Surveillance logs of surveillances set forth in the details are located in NY file 92-2723-Sub A.

INFORMANTS

b7D

On 3/31/75, [                    ] advised that during the period of [                                    ] JOSEPH BRANCATO was [                                    ] behalf, but that BRANCATO purposely maintained a low profile.

On 4/2/75, [                    ] advised that THOMAS DI BELLA was extremely upset about being incarcerated and he was at the time considering giving up the COLOMBO family reigns. According to the source, however, DI BELLA did not know how he might "retire" from the position.

On 6/2/75, [                    ] advised that BRANCATO continued to act in behalf of DI BELLA and that DI BELLA remained firmly placed as boss of the COLOMBO family. According to source, BRANCATO took orders from DI BELLA and insured that the latter's instructions were carried out.

On 10/8/75, [                    ] advised that JOSEPH BRANCATO continues to "run things" in the COLOMBO family even though THOMAS DI BELLA had been released at that time from jail. Source advised that DI BELLA wanted to remain in the background due to the fact that his jail term had made him "sick" and he does not want a repeat sentence. DI BELLA visited ANTHONY ABBATEMARCO, COLOMBO family underboss, once or twice a week, usually in the morning at ABBATEMARCO's residence.

b7D

On 11/7/75, [                    ] advised that the COLOMBO family had decided to start a crap game in the near future. According to source, SAL ALBANESE and all captains in the family were canvassing their respective crews for money to

b7D

- B -
COVER PAGE

NY 92-2723

get the game going. Each captain was slated to designate a representative to keep tabs on the game and protect each crew's financial interest. According to the source, the COLOMBO family's consigliere, ALLEY BOY PERSICO, was to oversee the game operation and mediate any disputes which may arise between crews.

On 11/7/75, [                    ] advised that THOMAS DI BELLA continues to visit ANTHONY ABBATEMARCO a couple of times a week. According to the source, DI BELLA was being driven to these meetings by THOMAS VENETUCCI in VENETUCCI's Cadillac. Source advised that DI BELLA is an early riser and is out of his house by about 8:00 AM - 8:30 AM.

b7D

On 11/26/75, [                    ] advised that THOMAS DI BELLA had recently been at Monte's Restaurant, located in Brooklyn, where he met with various members of the COLOMBO LCN family.

b7D

On 12/5/75, [                    ] advised that THOMAS DI BELLA was boss of the COLOMBO LCN family and that ANTHONY ABBATEMARCO was underboss. Source stated additionally that AL PERSICO is consigliere to the family and that the three are seen meeting together frequently at PERSICO's residence. Source further stated that JOSEPH BRANCATO was continuing to be the "acting boss" taking care of the street problems and mediate "beefs" between the various crews within the family. Source pointed out that although BRANCATO was the "acting boss", he would do nothing involving a major decision until contacting the above triad.

Source went on to say the COLOMBO family had initiated the crap game which they had previously planned.

On 12/16/75, [                    ] advised that THOMAS DI BELLA's [                    ]

b6
b7C
b7D

- C -
COVER PAGE

A.269

NY 92-2723

conduct a shylocking and bookmaking operation in the Sheepshead
Bay section of Brooklyn. According to the source,

b6
b7C

| Identity of Source | Contacting Agent | |
|---|---|---|
| NY T-1 former | SA | b6 b7C b7D |
| NY T-2 | SA | |
| NY T-3 | SA | |
| NY T-4 | SA | |

LEADS

NEW YORK

AT NEW YORK, NEW YORK. Will continue to conduct
surveillances of subject in order to determine his activities.

2) Will conduct interviews, on a selective basis,
of individuals with whom DI BELLA comes into contact in order
to determine if they might provide information concerning his
activities.

3) Will maintain contact with DAVID MARGOLIS, Chief,
Strike Force, EDNY, in order to insure that FGJ proceedings

b3

4) Will keep Bureau apprised of any significant
developments.

- D* -
COVER PAGE

A.270

FD-204 (Rev. 3-3-59)

# UNITED STATES DEPARTMENT OF JUSTICE
## FEDERAL BUREAU OF INVESTIGATION

Copy to:

Report of:

Date: **1/21/77**

Office: New York, New York

b6
b7C

Field Office File #: 92-2300

Bureau File #: 92-6054

Title: LA COSA NOSTRA
NEW YORK DIVISION

Character: ANTI-RACKETEERING - CONSPIRACY

Synopsis: The five families of LCN continue to operate
in the NYC area. CARLO GAMBINO, head of the
GAMBINO family, died of natural causes on 10/15/76.
New boss of family PAUL CASTELLANO. CARMINE GALANTE
now heads the BONANNO family. Bosses of other New York
families are GENOVESE boss FRANK TIERI, LUCHESE boss CARMINE
TRAMUNTI (incarcerated), COLOMBO boss THOMAS DI BELLA.
In 1976, LCN books were opened in New York. Names of
new LCN members, leadership, and membership lists for the
five LCN families in NYC set out. Gambling and shylocking
continue to be major illegal money-making activities of
LCN.

-P-

## DETAILS:

Sources whose identities are
concealed herein have furnished
reliable information in the
past except where otherwise
noted.

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

271 (11) 102

NY 92-2300

The following individuals have been identified as holding positions of leadership in the COLOMBO "Family":

| | |
|---|---|
| THOMAS DI BELLA | Boss |
| ANTHONY ABBATEMARCO | Underboss |
| ALPHONSE PERSICO | Consiglieri |
| JOE COLOMBO | Former Boss (Permanently Incapacitated) |
| JOSEPH BRANCATO | Capodecina |
| CHARLES PANARELLA | Capodecina |
| VINCENT MUCE | Capodecina |
| ANIELLO GIANNATTASIO | Capodecina |
| VINCENT GUGLIARO | Capodecina |
| SALVATORE LOMBARDINO | Capodecina |
| JAMES CLEMENZA | Capodecina |
| JOHN FRANZESE | Capodecina (Incarcerated) |
| CARMINE PERSICO | Capodecina (Incarcerated) |

- 9 -

A.272

NY 183A-2356

RLD:pg
1

On March 9, 1982, NY 3461-TE advised Special Agent R. LINDLEY DE VECCHIO that there is currently no individual acting as the consigliere in the Colombo family, and GERRY LANGELLA continues to be the acting boss, with assistance from DOMINICK MONTEMARANO.

The source advised that the former Colombo family boss, THOMAS DI BELLA, who was boss of the family prior to 1981, has been acting in the capacity as an advisor, and has been such since CARMINE PERSICO and GERRY LANGELLA started running the day to day operations of the Colombo family. DI BELLA is respected as the former boss and holds a special position at this time as advisor and is consulted on the major issues which arise in that family.

DI BELLA maintains a low profile due in part to his age, and in part to being discovered at a meeting in Brooklyn last year wherein most of the Colombo and De Cavalcante family hierarchy were engaged in a meeting. DI BELLA, however, is in contact with members of the Colombo family on a daily basis and frequently meets with LANGELLA and MONTEMARANO at either LANGELLA's house or MONTEMARANO's club.

The source advised that DI BELLA has been seen recently in company with FRANK "The Beast" FALANGA at MONTEMARANO's social club. The source also noted that DI BELLA, although very cautious, has a tendency to discuss certain matters of "family" business over his home telephone, and this has been personally observed by the source.

OCIS



Sub A—
489

92-928/

b6
b7C

A.273

On August 26, 1980, NY 3461-TE advised
SA R. LINDLEY DE VECCHIO that the following is a
current breakdown of the COLOMBO Family structure:

BOSS                          THOMAS DIBELLA

UNDERBOSS                     CARMINE PERSICO

CONSIGLIERI                   JERRY LANGELLA (acting)

CAPOS

    JOHN FRANZESE
    JERRY LANGELLA
    JOHN MATERA (Miami, Florida)
    SALVATORE PROFACI (New Jersey)
    VINCENT RANDAZZO
    ANDREW RUSSO
    ANTHONY SCARPATI
    JOE TOMASELLO
    DOMINICK MONTEMARANO

              BREAKDOWN BY CREW

    THOMAS DI BELLA — BOSS

    JAMES CLEMENZA
    PAUL D'AMICO (Las Vegas)
    NICHOLAS GRANCIO
    VICTOR ORENA
    ANTHONY PERAINO

UNDER CARMINE PERSICO

    JACKIE DE ROSS
    ERNEST LA PONZINA

b6
b7C

A.274

COLOMBO FAMILY
92-9281 SUB A

On November 5, 1980, NY 3461-TE provided the
following information to SA R. LINDLEY DE VECCHIO:

Source advised that CARMINE PERSICO has been
officially elevated to the position of boss of the
COLOMBO Family and JERRY LANGELLA is the acting
consigliere.

Source said no underboss has been named
at this time.

The source said THOMAS DI BELLA was requested
to step down in favor of PERSICO with the approval of the
commission. The source noted that in recent months,
PERSICO has had numerous meetings with the bosses of the
GAMBINO, LUCHESE and GENOVESE families.

OGIS
E
RD
D

92-9281 sub A
185

A.275

NY 92-3171

INFORMANTS (Continued)

On 1/3/75, [          ] advised that [          ] ANTHONY PERAINO, NY, button man in the COLOMBO family. [          ]    b6
b7C
b7D

[          ] PERAINO at one time "owned" the movie "Deep Throat." and sold interest in the movie to various persons,

On 1/24/75, [          ] advised SA [          ] that TONY LA PONZINA meets with [          ] usually [          ] LA PONZINA is short of money and is trying to obtain any kind of "paper" that he can.    b6
b7C
b7D

On 1/27/75, [          ] advised that [          ] is working at a [          ] that is supposed to last about [          ] Source advised [          ]    b6
b7C
b7D

On 1/31/75, [          ] advised that "LILO" GALENTE is definitely the new boss of the old BONANNO family. He has been sanctioned as boss by FUNZI TIERI (GENOVESE head), [          ] and DI BELLA of the COLOMBO family. Source said that RASTELLI is not the boss anymore because he is weak and did not want to be boss in the first place.    b6
b7C
b7D

CONFIDENTIAL INFORMATION

-H-
COVER PAGE

A.276

(6-83)

## Memorandum

To : SAC (137-6684)                          Date   12/18/85

From : SSA   R. LINDLEY DE VECCHIO (C-10)

Subject : NY 3461-TE

Dates of Contact
        12/17/85

File #s on which contacted (Use Titles if File #s not available)
        NY 92-9283 Sub A   (GAMBINO FAMILY)

Purpose and results of contact

☐ NEGATIVE
☒ POSITIVE
☐ STATISTIC

| Description of Statistical Accomplishment | Title of Case | File No. |
|---|---|---|
| | | |

137-6684 A 1386

SEARCHED _____ INDEXED _____
SERIALIZED _____ FILED _____

DEC 20 1985

FBI — NEW YORK

b7E

PERSONAL DATA ① - 137-6684
              1 - NY 92-9283 Sub A
              1 - [        ]

RLD-16tm
(3)

FBI/DOJ

A.277

RLD:btm
1.

On December 17, 1985, NY 3461-TE advised Supervisory
Special Agent R. LINDLEY DE VECCHIO that the hit on PAUL
CASTELLANO and THOMAS BILOTTI was set up by JOHN GOTTI and
FRANK DE CICCO. The source said this information came from
DE CICCO, and COLOMBO boss CARMINE PERSICO was aware of the
plans to hit CASTELLANO. The source said PERSICO neither
approved nor disapproved of the hit, but made no attempts to
oppose it.

The above information is extremely singular and should
not be disseminated outside the Bureau without contact with the
writer.

A.278

UNITED STATES GOVERNMENT

*Memorandum*

UNITED STATES DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVESTIGATION

TO : SAC (137-6684)           DATE: 10/8/80

FROM : SA R. LINDLEY DE VECCHIO (M-7)

SUBJECT: NY 3461-TE
SMOOTH TALKER

Captioned informant was re-opened in July, 1980, after being closed for approximately five years, and since its re-opening has been in a position to furnish extremely singular information concerning the breakdown and current activities of the Colombo Family.

It is requested that informant be paid $400.00 ($300.00 services, $100.00 expenses) for the following information furnished for the period 6/26/80 to 9/12/80:

COLOMBO FAMILY
92-9281 SUB A

On 6/26/80, source advised that THOMAS DI BELLA is merely a figurehead in the Colombo Family and the actual boss is CARMINE PERSICO. The source also identified that DOMINICK MONTEMARANO, JERRY LANGELLA, CHARLES PANARELLA, ANDREW RUSSO, and ANTHONY SCARPATI as Capos in the Colombo Family.

With respect to ANDREW RUSSO, the source noted that he and HUGH MC INTOSH, a close associate of the Colombo Family, are both in hiding as a result of a current IRS investigation. The source also noted that [                    ] has been killed.

b7I

The source also identified three other individuals as members of the Colombo Family.

RLD:jp
(2)

137-6684-1745
SERIALIZED_____ FILED_____
OCT 8 198
FBI — NEW YORK



54

NY 137-6684

On 8/5/80, source provided information concerning
Colombo member FRANK MIELE,
noting that he has been involved in a number of burglaries
with his brother, although ROBERT is not a member of the
Colombo Family.

b6
b7C

Source advised that JERRY LANGELLA will become the
consigliere of the Colombo Family in the near future to replace
the vacancy left by ALPHONSE PERSICO.

On 8/12/80, source advised that the hits on RALPH
and SHORTIE SPERO were carried out by Genovese member JERRY PAPPA,
as a result of extensive junk deals with RALPH SPERO. Source
advised that CARMINE PERSICO, upon learning of this, requested
that the Genovese Family take care of PAPPA, who was hit
approximately one month ago.

Source advised that CHARLES PANARELLA's crew has been
disbanded and the members have been positioned in other crews.

The source also noted that JOE TOMASELLO has recently
been made a new Capo in the Colombo Family.

On 8/26/80, source advised that DOMINICK SOMMA was
recently "hit" on a contract approved by CARMINE PERSICO.

Source advised that Colombo Family boss, THOMAS DI BELLA,
recently bought a place in Upstate, New York, next door to
Colombo member NICKY RIZZO. The source noted that DI BELLA has
gone into retirement and that location, although still a boss,
allows CARMINE PERSICO to run the family.

Source advised that JERRY LANGELLA, in the absence of
ALPHONSE PERSICO, has been meeting with Luchese Capo CHRIS
FURNARI at the 19th Hall, 86th Street and 14th Avenue, Brooklyn,
New York. Source noted that there has been a long-time association
between the two families with respect to the exchange of
information, and LANGELLA is now handling this contact.

-2-

55

A.280

919

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :

                                            CR-90-446

         -against-                United States Courthouse
                              :   Brooklyn, New York

VENERO MANGANO,
BENEDETTO ALOI,
PETER GOTTI,                                      :
JOSEPH ZITO,
DENNIS DeLUCIA,
CAESAR GURINO,
VINCENT RICCIARDO,
JOSEPH MARION,
THOMAS McGOWAN,

         Defendants.
                              :   May 6, 1991
                                  10:00 o'clock a.m.

- - - - - - - - - - - - X

                    TRANSCRIPT OF TRIAL
         BEFORE THE HONORABLE RAYMOND F. DEARIE
         UNITED STATES DISTRICT JUDGE AND A JURY

APPEARANCES:

For the Plaintiff:       ANDREW J. MALONEY
                         United States Attorney
                         BY:  CHARLES ROSE,
                              GREGORY J. O'CONNELL
                                 and NEIL ROSS
                         Assistants United States Attorney
                         225 Cadman Plaza East
                         Brooklyn, New York 11201

         MICHAEL PICOZZI, RPR       OFFICIAL COURT REPORTER

A.281

Case 16-2361, Document 23, 10/11/2016, 1880537, Page284 of 309

3

1   A    I was in the car.

2   Q    Who killed Joey Marino?

3   A    Joseph Mazzoni.

4   Q    Was Jerry Pappa in the vicinity?

5   A    Yes.  He was approximately half a block away.

6   Q    Am I correct that you were questioned about these --

7   those homicides in February, 1988?

8   A    Yes.

9   Q    At the time that you were questioned about Mr. Marino's

10  homicide you left out certain information?

11  A    Yes, I did.

12  Q    Tell the jury what you left out?

13  A    I left out the part that I was sitting in the car.

14        THE COURT:  What do you mean "the car"?

15        THE WITNESS:  The car where he was killed.

16        THE COURT:  He was killed in the car?

17        THE WITNESS:  Yes.

18        THE COURT:  You were in the car?

19        THE WITNESS:  Yes.

20  Q    In March, 1989, did you plead guilty to aiding and

21  abetting Mr. Marino's murder, as far as the racketeering

22  charge?

23  A    Yes.

24  Q    Turning your attention to February 24, 1980 and March 24,

25  1980, did you become involved in the murders of persons named

GR        OCR        CM        CSR

A.282

1071

Savino-direct-O'Connell

1  Ralph Spiro and Tommy or Shorty Spiro?

2  A    Yes.

3  Q    Can you tell the jury who Ralph Spiro and Shorty Spiro

4  were?

5  A    They were brothers.

6  Q    Were they affiliated with any crime family?

7  A    Yes, they were.

8  Q    Tell the jury which one?

9  A    Tommy Sprio, Shorty was a captain in the Colombo family.

10  Q    Who was Ralph?

11  A    His brother, an associate.

12  Q    Did you receive orders to assist in their murders?

13  A    Yes.

14  Q    From whom?

15  A    Jerry Pappa.

16  Q    Did any person make a request of the murder of Ralph

17  Spiro and Shorty Spiro?

18  A    Yes.

19  Q    Who was that?

20  A    Two drug dealers.

21  Q    Where did Ralph Spiro's murder take place?

22  A    In Brooklyn, the Bath Beach section of Brooklyn.

23          MR. WASHOR:  A little louder, please, Judge.

24          THE COURT:  Yes.

25          Did you hear that answer?

GR      OCR      CM      CSR

A.283

Case 16-2361, Document 23, 10/11/2016, 1880537, Page286 of 309

Savino-direct-O'Connell

1    MR. WASHOR:  Something --

2    THE COURT:  In Brooklyn, in the Bath Beach section of

3  Brooklyn.

4    MR. WASHOR:  Thank you.

5  Q    What role did you play?

6  A    I drove in the second car.

7  Q    Who killed Ralph Spiro?

8  A    Jerry Pappa.

9  Q    Where did Shorty Spiro's murder take place?

10  A    In the warehouse office in Brooklyn.

11  Q    These were your offices?

12  A    Yes.

13  Q    Was this the same place where Mr. Scarcella was killed?

14  A    Yes.

15  Q    Were you on the premises at the time Shorty Spiro was

16  killed?

17  A    Yes, I was.

18  Q    Do you know who killed Shorty Spiro?

19  A    Jerry Pappa.

20  Q    Did you see it happen?

21  A    No, I did not.

22  Q    Where were you?

23  A    In the upstairs office.

24  Q    Now, did these drug dealers you referred to pay money for

25  the murders of these two persons?

GR        OCR        CM        CSR

A.284

1073

Savino-direct-O'Connell

1   A   Yes, they did.

2   Q   How much?

3   A   Five hundred thousand dollars.

4   Q   Did you get a share of this money?

5   A   Yes, we did.

6   Q   Tell the jury who split this money?

7   A   Bobby Farenga, myself, Joey Mazzoni and Jerry Pappa.

8   Q   In March, 1989, did you plead guilty for aiding and

9   abetting these homicides as part of your racketeering charge?

10  A   Yes.

11  Q   You testified that Mr. Scarcella was killed in the

12  basement of this warehouse owned by your company?

13  A   Yes.

14  Q   Did there come a time when Mr. Scarcella's remains were

15  moved?

16  A   Yes.

17  Q   Where were they moved to?

18  A   To the Scott Avenue address.

19  Q   For a time was Mr. Spiro also buried in the basement?

20  A   Yes.

21  Q   Did there come a time when his remains were moved?

22  A   Yes.

23  Q   Where were they moved?

24  A   Scott Avenue address.

25      MR. HAFETZ:  Can we fix a time for the removal of the

GR     OCR     CM     CSR

A.285

Case 16-2361, Document 23, 10/11/2016, 1880937, Page288 of 309

1  bodies?

2  Q    Approximately how long after Mr. Scarcella was killed

3  were his remains moved?

4  A    About a year.

5  Q    Approximately how long after Mr. Spiro was killed were

6  his remains moved?

7  A    About three months.

8  Q    Now, during the late 1970s, when these homicides

9  occurred, were you providing any information to the

10  government?

11  A    I couldn't hear that.

12  Q    During the late 1970s when these homicides occurred, were

13  you providing any information to the government?

14  A    No.

15  Q    Am I correct that your role in each of these homicides

16  you understand will be considered by the Court at the time of

17  your sentencing?

18  A    Yes.

19  Q    I'd like to turn your attention now to the summer of

20  1978.  You testified that you were involved in the locker and

21  shelving business?

22  A    Yes.

23  Q    Did there come a time when you entered into the window

24  replacement business?

25  A    Yes, I did.

GR        OCR        CM        CSR

A.286



U.S. Department of Justice



*United States Attorney*
*Eastern District of New York*

*United States Courthouse*
*225 Cadman Plaza East*
*Brooklyn, New York 11201*

April 26, 1991

Honorable Raymond J. Dearie
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:  **United States v. Venero Mangano, et al.**
      **Criminal Docket No. CR 90-446(RJD)**

Dear Judge Dearie:

Several weeks ago the defense requested that
Peter Savino's confidential informant file be reviewed
for §3500, <u>Brady</u> and <u>Giglio</u> material. As the court is
well aware, access to FBI informant files is limited to
FBI agents. Accordingly, the file was reviewed by agents
assigned to the investigation, and Special Agent James
Roth, the principal legal advisor for the New York Field
Office. Agent Roth is an attorney who is well aware of
the requirements of §3500, <u>Brady</u> and <u>Giglio</u>.

At the outset, we note that nothing in Savino's
file is §3500 material. The reports contained therein
were neither written, read nor reviewed by Savino, and
are therefore not "otherwise adopted or approved by him"
as required under §3500.

With regard to <u>Brady</u> and/or <u>Giglio</u> material,
the following information is provided. It is based upon
the review of the file by the agents and my review of
certain redacted material they consented to provide to
this office.

A. 287

2

## Savino's Informant Status

Savino was first opened as a CI on May 16, 1973, and closed on September 8, 1976, when he proved to be unproductive. He was reopened October 16, 1980, and continued to provide information regarding the LCN and related criminal activities from then on. During his CI status, he was paid a total of $800.

Up until December, 1987, Savino was promised that he would neither testify, nor be exposed as a CI. In general, Savino identified numerous persons as being members of organized crime, their criminal activity and their positions in their respective LCN families. With regard to the defendants on trial or their coconspirators, there is nothing inconsistent in prior information provided by Savino.

## **Brady** and/or **Giglio** Material

A.    Between January and the summer of 1979, Peter Savino conspired to bribe officials of the Fall River Housing Authority [FRHA] in connection with the awarding of a window installation contract in Massachusetts. When Savino was implicated in the FRHA bribery scheme, he contacted the FBI, which was the impetus for his being reopened as a CI in 1980. The FBI and the Boston U.S. Attorney's Office agreed not to prosecute Savino in return for his cooperation in the FRHA investigation.

B.    Savino did not inform the FBI of his criminal involvement in the window installation business until he agreed to cooperate and testify. He did, however, as early as 1986, identify Vic Amuso and Anthony Casso as having control over Local 580.

C.    On November 17, 1980, Savino falsely stated that Jerry Papa was not involved in the murders of Thomas Spero and Ralph Spero. Following his agreement to cooperate fully, he admitted that he, Papa and others were responsible for the Spero murders and others.

D.    On September 17, 1980, Savino falsely stated that he was "made" in the Genovese LCN on April 27, 1978. Savino did not correct this statement until January 30, 1988, when he disclosed that he was not a "made" member, but an "associate."

A.288

3

The CI file reports that were provided by the
FBI are available for inspection if the court so desires.

Respectfully submitted,

ANDREW J. MALONEY
United States Attorney

By: _____

CHARLES E. ROSE
Executive Assistant United
States Attorney

cc:  All Counsel
     Clerk of the Court

A.289

RECEIVED
TELETYPE UNIT

FORMS.TEXT HAS 1 DOCUMENT

INBOX.1 (#3781)

TEXT: VZCZCNYO161

2 MAR 85    1 9 0 5

FEDERAL BUREAU
OF INVESTIGATION

RR HQ

DE NY #0161 0610114

ZNR EEEEE

R 012311Z MAR 85

FM FBI NEW YORK

TO DIRECTOR FBI                    ROUTINE

        ATTN:    SUPV

        ATTN:    ORGANIZED CRIME SECTION. CID

BT

UNCLAS E F T O

                                b6 -1
                                b7C -1
                                b2 -1,2,3,5
                                b7E -1

CONF. INFT.

THE BUREAU IS REQUESTED TO AUTHORIZE A LUMP SUM PAYMENT OF

THIS MEMBER SOURCE WAS REOPENED IN JULY, 1980, AND SINCE THAT

TIME, HAS BEEN IN A POSITION TO FURNISH EXTREMELY SINGULAR AND HIGH

QUALITY ORGANIZED CRIME INFORMATION CONCERNING ALL FIVE LCN FAMILIES

IN THE NEW YORK CITY AREA.

                        b2 -3

                        SEE CID ADDENDUM PAGE 6          25 MAR 28 1985

Total
AUTH
9|13|82
2|22|83
6|5|84

ROUTE IN ENVELOPE

PAGE TWO DE NY 0161 UNCLAS E F T O

COLOMBO FAMILY

OVER THE COURSE OF THE PAST FIVE YEARS, THIS SOURCE HAD
FURNISHED VAST QUANTITIES OF SINGULAR INFORMATION CONCERNING THE
COLOMBO FAMILY WHICH HAS DIRECTLY LED TO 17 AFFIDAVITS IN SUPPORT OF
TITLE III INTERCEPTS, AND 50 RE-AUTHORIZATIONS OF THESE INTERCEPTS.
AS A RESULT, THE NYO IN OCTOBER, 1984, ARRESTED THE BOSS, UNDERBOSS,
THREE CAPOS, THE FORMER BOSS, THREE MEMBERS, AND TWO ASSOCIATES OF
THE COLOMBO FAMILY (NY 183B-2356 "ECLIPSE STAR", NY 183A-2636
"STARQUEST").

FURTHERMORE, THIS SOURCE PROVIDED THE NECESSARY PROBABLE CAUSE
LEADING TO A TITLE III IN THE MIAMI DIVISION CONCERNING A COLOMBO
CAPO IN THAT AREA; PROVIDED INFORMATION CONCERNING THE LOCATION OF A
SECRET MEETING PLACE WHERE COLOMBO BOSS CARMINE PERSICO MET WITH
COLOMBO CAPOS; HAS IDENTIFIED THE SHOOTERS IN SEVERAL "HITS" HANDLED
BY THE COLOMBO FAMILY; AND HAS CONTINUOUSLY UPDATED THE MEMBERSHIP,
TO INCLUDE NEWLY MADE MEMBERS, AND POWER SHIFTS WITH RESPECT TO THE
CAPOS AND HIERARCHY.

A.291

PAGE THREE DE NY 0161 UNCLAS E F T O

GENOVESE FAMILY

THIS SOURCE PROVIDED THE NECESSARY PROBABLE CAUSE LEADING TO
THE CURRENT TITLE III REGARDING GENOVESE BOSS ANTHONY "FAT TONY"
SALERNO, WHICH HAS PROVEN TO BE THE MOST SIGNIFICANT AND PRODUCTIVE
TITLE III IN THE ORGANIZED CRIME FIELD (NR 183A-2828). IT IS
ANTICIPATED THAT SALERNO AND NUMEROUS GENOVESE MEMBERS WILL BE
PROSECUTED AS A DIRECT RESULT OF THIS INVESTIGATION.

b6 -2
b7C -2
b3 -2

THE SOURCE ALSO PROVIDED THE NECESSARY PC FOR A TITLE III OF
GENOVESE _____ AS A RESULT OF THIS WIRE. 20
INDICTMENTS AND ARRESTS ENSUED ON FEBRUARY 19, 1985.

FIVE-STAR (NY 183A-3150)

THIS MATTER INVOLVES THE INDICTMENT AND SUBSEQUENT ARRESTS OF
ALL THE BOSSES OF EACH OF THE FIVE LCN FAMILIES IN NEW YORK WHO
COMPOSE THE "COMMISSION" AS WELL AS TWO UNDERBOSSES, A CONSIGLIERE,
AND A HIGH RANKING SOLDIER. THIS INVESTIGATION AND SUBSEQUENT

A.292

PAGE FOUR DE NY 0151 UNCLAS E F T O

PREDICATE VIOLATIONS ARE BASED UPON TITLE III INTERCEPTS WHICH HAVE
PROVIDED THE NECESSARY FACTS TO SUPPORT PROSECUTION. THESE
INTERCEPTS PARTICULARLY FROM THE COLOMBO AND GENOVESE WIRES ARE
DIRECTLY ATTRIBUTABLE TO THE PROBABLE CAUSE INITIALLY PROVIDED BY
THIS SOURCE. THEREFORE, NOT ONLY HAS INFORMATION DIRECTLY FROM THIS
SOURCE CAUSED THE ARREST OF AT LEAST 30 MAJOR MEMBERS OF ORGANIZED
CRIME, BUT HAS RESULTED IN THE ARREST OF EVERY BOSS OF ALL FIVE LCN
FAMILIES IN NEW YORK.                                          b2 -3

    THE ABOVE REPRESENTS ONLY A SMALL PORTION OF THE QUANTITY OF
SIGNIFICANT INFORMATION PROVIDED, WHICH IF FULLY DOCUMENTED WOULD
REQUIRE A LENGTHY SUMMARY REPORT. THE SOURCE HAS BEEN PAID, OVER
TIME, RELATIVELY SMALL SUMS FOR THIS INFORMATION. IN FACT, SINCE
RE-OPENING, THE SOURCE HAS ONLY BEEN PAID A TOTAL OF [        ] FOR
SERVICES AND EXPENSES. THE OVERALL SUM OF MONEY IS CERTAINLY NOT
COMMENSURATE WITH THE HIGH QUALITY OF THE INFORMATION, CONSIDERING
THE NUMEROUS INDICTMENTS, ARRESTS, AND SHEER AMOUNT OF SINGULAR
INFORMATION WHICH WOULD NOT HAVE BEEN AVAILABLE FROM ANY OTHER
SOURCE. THE RESULT IS THE SAVING OF COUNTLESS THOUSANDS OF MAN
HOURS IN INVESTIGATIVE TIME, AND WINDOW INTO THE INNER WORKINGS OF

A.293

PAGE FIVE DE NY 0161 UNCLAS E F T O

THE MOST SIGNIFICANT ORGANIZED CRIME GROUP IN THE COUNTRY.

FURTHERMORE, THE AMOUNT REQUESTED REPRESENTS THE FBI'S
APPRECIATION OF NOT ONLY THE INFORMATION, BUT THE HIGH DEGREE OF
RISK ASSUMED BY THE SOURCE AT EVERY CONTACT WHILE SO DOING. SOURCES
OF THIS CALIBER ARE EXTREMELY RARE IN THE FBI AND SERVE AS A TRIBUTE
TO THE INFORMANT DEVELOPMENT PROGRAM IN THE ORGANIZED CRIME FIELD.

THE SAC, CRIMINAL DIVISION, CONCURS WITH THE ABOVE REQUEST, AND
CONSIDERS THIS SOURCE TO BE OF EXTRAORDINARY SERVICE AND VALUE.

THE BUREAU IS ALSO REQUESTED TO WIRE OR SEND A SEPARATE CHECK
FOR THIS PAYMENT.

BT

#0161

NNNN

-->

A.294

NOTE:

b2 -1,3

BY TELETYPE TO FBIHQ ON 3/2/85, ADIC, NEW YORK REQUESTED
A [        ] LUMP SUM PAYMENT FOR [        ] IN CONNECTION WITH
THE FOLLOWING SERVICES/INFORMATION:

INFORMATION PROVIDED BY THE INFORMANT HAS LED DIRECTLY TO
17 AFFIDAVITS IN SUPPORT OF TITLE IIIS, ● APPROXIMATELY 50
RE-AUTHORIZATIONS ON THE COLOMBO LCN FAMILY, RESULTING IN THE
ARREST OF THE BOSS, UNDERBOSS, 3 CAPOS AND 3 MEMBERS.

THE INFORMANT PROVIDED PC WHICH LED TO A TITLE III TOUTED
AS ONE OF THE MOST IMPORTANT TITLE IIIS WITH NATIONAL SIGNIFICANCES
CONCERNING ANTHONY "FAT TONY" SALERNO. NEW YORK EXPECTS TO PROSE-
CUTE SALERNO AND NUMEROUS GENOVESE FAMILY MEMBERS AT THE CONCLUSION
OF THE TITLE III. IN ADDITION, SOURCE'S INFORMATON USE IN A
TITLE III WHICH RESULTED IN THE INDICTMENT OF 20 INDIVIDUALS AND
ARRESTS ON 2/19/85.

IN CASE ENTITLED "FIVE STAR", SOURCE'S INFORMATION WAS
USED AS PART OF THE PC WHICH RESULTED IN THE INDICTMENT AND ARREST OF
THE HEADS OF ALL THE LCN FAMILIES. THIS HIGHLY SIGNIFICANT CASE WAS
HIGHLIGTED BY THE NATIONAL NEWS MEDIA.

THE LCN UNIT, OC SECTION CONCURS IN ADIC, NEW YORK'S
REQUEST FOR THE [        ] LUMP SUM PAYMENT FOR THE INVALUABLE
SOURCE.                                                    b2 -3

THE CI/WSP UNIT HAS REVIEWED THIS REQUEST AND RECOMMENDS
TH[        ] LUMP SUM PAYMENT.

-2-

**The New York Times**

N.Y. / REGION

# For Ex-F.B.I. Agent Accused in Murders, a Case of What Might Have Been

By ALAN FEUER    APRIL 15, 2006

R. Lindley DeVecchio once stood atop the New York office of the F.B.I. as a legendary Mafia hunter, a storied agent who helped break the back of the mob in the celebrated Commission Case.

Now he stands accused of helping the mob commit murders, charged in a state indictment last month with feeding lethal secrets to a captain of organized crime.

Mr. DeVecchio has been hailed as a hero and tarnished as a scourge, and yet there was a moment in a Pennsylvania parking lot 30 years ago that almost caused him to be neither.

In 1976, as a young F.B.I. agent, Mr. DeVecchio sold old handguns to undercover officers, who later sought to charge him with a felony. Had he been convicted, the case might have led to prison or his dismissal as an agent. But Mr. DeVecchio, who said he acted legally and to benefit a widow, was neither jailed nor fired.

The case against him was ultimately discarded without an indictment by officials at the highest levels of the Justice Department, a decision that the federal prosecutor in

the original case says was largely made by the top aide to the deputy United States attorney general, a 32-year-old attorney named Rudolph W. Giuliani.

"Rudy expressed no other reason not to prosecute the guy except the guy was a cop," said the former prosecutor, Daniel M. Clements, who is now in private practice. "And he didn't want to embarrass the bureau."

Mr. Clements said last week that he recalled in detail his meetings 30 years ago with Mr. Giuliani, as well as his frustration that the case was dismissed as unimportant.

Mr. Giuliani, who built a reputation in part by prosecuting corrupt police officers, said through a spokeswoman, Sunny Mindel, that he had no recollection of the DeVecchio case.

Whatever the level, if any, of Mr. Giuliani's role, the case stands as a long-buried piece of law enforcement history, a fork in the road that, if traversed differently, may have led to an entirely different set of consequences. Indeed, from the vantage point of 1976, the gun case may have seemed a minor matter. There was no way to know that seven years later, according to the state indictment filed last month in Brooklyn, Mr. DeVecchio would step across the line, helping a Mafia informant kill at least four people.

But if Mr. DeVecchio had been pursued in 1976, would he have risen to lead the F.B.I. squad that hunted the Colombo crime family? Would he have had a role in some of the government's watershed cases against the mob? Would he now stand accused of second-degree murder?

His lawyer, Douglas E. Grover, said federal officials were right to never charge his client in the gun case because they were merely antiques that were peddled at a gun show. But he acknowledged that had that case been successfully pursued Mr. DeVecchio would probably have lost his job. "It also means that they may made not have made the Commission Case," he said, referring to a 1986 trial at which top organized crime leaders in New York City were convicted.

**A.297**

The gun case began in early 1976 when Mr. DeVecchio traveled from New York to King of Prussia, Pa., to sell a Nazi-era Luger at the Valley Forge Gun Show, which promotes itself as "a gun show in the truest American tradition."

He was looking, according to his testimony in a later case, to sell the weapons "for the benefit of the widow" to whom they belonged.

Without a license, he moved through the stalls of the firearms bazaar, and was soon approached by Michael Flax, an undercover agent with the Federal Bureau of Alcohol, Tobacco and Firearms, Mr. Flax said. Mr. Flax's job was to troll the show in plainclothes looking for such illicit deals. That year alone, he said, several people he caught similarly selling guns without paperwork went to prison. "I was usually like, 'Gee I'd like to get this gun,' " he said in an interview from his retirement home in San Diego. ' "Do we have to go through all the paperwork?' "

Mr. Flax recalled that he bought the Luger in a parking lot outside the show. Over several weeks, he said, he pursued an investigation of Mr. DeVecchio in which a second agent secretly recorded the F.B.I. man selling another gun. He said that Mr. DeVecchio, at one point, gave him a phone number at which he might be reached. It was, he said, an office of the New York F.B.I.

A few weeks later, Mr. Flax brought the case to Mr. Clements, then a young federal prosecutor in Baltimore. Mr. Clements is now in private practice and active in the Democratic Party, having given money to candidates like John Kerry and Al Gore.

"Flax comes to me saying, 'You're not going to believe this,' " Mr. Clements said last week. " 'I have an F.B.I. agent selling guns illegally.' "

A few months later, Mr. Clements said he told the F.B.I. as a courtesy that he was investigating one of its agents. A few weeks passed, he said, with discussions back and forth with F.B.I. officials in Maryland and in Washington. "The next person I heard from," he went on, "was Rudolph Giuliani."

Mr. Giuliani was, at that point, an aide to Harold Tyler, the deputy attorney general, who reviewed such cases. Mr. Giuliani had joined his staff in 1975 after

serving in the United States attorney's office in Manhattan where he had helped direct the prosecution in the Prince of the City police corruption case.

Over several weeks, Mr. Clements said, Mr. Giuliani asked him to write a pair of memoranda on the case in which he noted that Mr. DeVecchio had sold the guns without the proper paperwork, a crime, Mr. Clements said, for which he thought there was sufficient evidence to prosecute. Mr. Clements said he attended a pair of meetings about the case with Mr. Giuliani, including one in Mr. Giuliani's office also attended by Mr. Tyler and Jervis Finney, the United States attorney in Maryland who was then Mr. Clements's boss.

Mr. Finney, now the chief lawyer for the governor of Maryland, said last week he has no recollection of the meeting. But Mr. Clements produced a datebook he said he had saved that listed a meeting with Mr. Giuliani in June 1976.

At that meeting and a subsequent meeting in October, Mr. Clements said Mr. Giuliani repeated his desire not to prosecute the case, saying the guns were old and the sale of them without paperwork did not warrant prosecution.

Judge Tyler, who Mr. Clements said was at the second meeting, died last year. The bottom line, after both meetings, Mr. Clements said, was that the case would be dropped.

In the ensuing years, Mr. DeVecchio rose to lead the F.B.I.'s special unit that investigates the Colombo crime family, a position in which he had success in part because of his relationship with a captain in the family, Gregory Scarpa Sr., who became his informant.

The closeness of that relationship ultimately led to a two-year inquiry of Mr. DeVecchio by the F.B.I. that ended in 1996 with the decision to bring no charges against him. But Mr. DeVecchio soon retired.

In 1997, the old gun case briefly resurfaced. At a federal appeals hearing in Brooklyn. Mr. DeVecchio was called as a witness by a gangster, Victor J. Orena, who was trying to win his freedom by suggesting that Mr. DeVecchio was a corrupt agent

Case 16-2361, Document 25, 10/11/2016, 1880537, Page302 of 309

who had lied about the facts in his case. Under questioning by Gerald Shargel, Mr. Orena's lawyer, Mr. DeVecchio acknowledged selling the guns to the federal agents.

Mr. Shargel then went on to ask him: "Do you remember agents of the A.T.F. reporting to the F.B.I. and Rudolph Giuliani -- not yet the mayor -- that you had lied to those agents who questioned you, that when confronted with the crimes that you committed, you gave them false exculpatory statements?"

Mr. DeVecchio said that he did not.

In the new indictment, announced last month by Charles J. Hynes, the Brooklyn district attorney, Mr. DeVecchio is accused of helping Mr. Scarpa commit at least four murders in the 1980's and early 1990's in exchange for weekly payments. Most of the victims had been talking to the authorities, prosecutors said, and thus were a threat to Mr. Scarpa.

When Mr. Clements read of the indictment, he said he was surprised. At the same time, he recalled the words that he and Mr. Flax had swapped, years ago, when the gun case, as he put it, "went away."

It was an old-time adage on those who break the law, a general theory of recidivist crime. "If someone's a bad actor, we'll get him again," he remembered telling Mr. Flax.

---

© 2016 The New York Times Company

CLOSED,APPEAL

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:85−cr−00139−KTD−10

Case title: USA v. Salerno, et al

Date Filed: 02/25/1985
Date Terminated: 01/22/1987

Assigned to: Judge Kevin Thomas
Duffy

### Defendant (10)

**Carmine Persico**
*TERMINATED: 01/22/1987*

represented by **Anthony Dipietro**
Law Office of Anthony DiPietro
15 Chester Avenue
White Plains, NY 10601
914−948−3242
Fax: 914−948−5372
Email: dipietrolaw@yahoo.com
*ATTORNEY TO BE NOTICED*

**Mathew J. Mari**
Law Offices of Mathew J. Mari
30 Wall Street
8th Floor
New York, NY 10005
(212) 227−5335
Email: mjmesq@aol.com
*ATTORNEY TO BE NOTICED*

### Pending Counts

18:1962−9999.F RICO CONSP
FEDERAL STATUTES, OTHER
(1ss)

18:1962−9999.F RICO FEDERAL
STATUTES, OTHER
(2ss)

18:1951.F Hobbs Act,
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(3ss)

18:1951.F Hobbs Act,
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(4ss)

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE

### Disposition

Imprisonment for a total term of 20 years on counts
1,2,4,12 and 14 to run consecutively with each other
for a total prison term of one hundred years. Count
17,19,22,23,24,5,7,9,11,13, and 15 are to run
consecutively with each other and concurrently with
counts1,2,4,12,14,3,6,8,10 and 16.

Imprisonment for a total term of 20 years on counts
1,2,4,12 and 14 to run consecutively with each other
for a total prison term of one hundred years. Count
17,19,22,23,24,5,7,9,11,13, and 15 are to run
consecutively with each other and concurrently with
counts1,2,4,12,14,3,6,8,10 and 16.

Imprisonment for a total term of 20 years on counts
3,6,8,10, and 16 to run consecutively with each
other and concurrently with counts 1,2,4,12, and 14.
Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run
consecutively with each other and concurrently with
counts1,2,4,12,14,3,6,8,10 and 16.

Imprisonment for a total term of 20 years on counts
1,2,4,12 and 14 to run consecutively with each other
for a total prison term of one hundred years. Count
17,19,22,23,24,5,7,9,11,13, and 15 are to run
consecutively with each other and concurrently with
counts1,2,4,12,14,3,6,8,10 and 16.

Imprisonment for a total term of 1 years on counts
5,7,9,11,13, and 15. Count
17,19,22,23,24,5,7,9,11,13, and 15 are to run

A.301

(5ss)

consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F Hobbs Act, INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(6ss)

Imprisonment for a total term of 20 years on counts 3,6,8,10, and 16 to run consecutively with each other and concurrently with counts 1,2,4,12, and 14. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

29:186B.F Fraud Other, REQUEST DEMAND FOR MONEY, THING OF VALUE
(7ss)

Imprisonment for a total term of 1 years on counts 5,7,9,11,13, and 15. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F Hobbs Act INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(8ss)

Imprisonment for a total term of 20 years on counts 3,6,8,10, and 16 to run consecutively with each other and concurrently with counts 1,2,4,12, and 14. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

29:186B.F Fraud Other, REQUEST DEMAND FOR MONEY, THING OF VALUE
(9ss)

Imprisonment for a total term of 1 years on counts 5,7,9,11,13, and 15. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F Hobbs Act INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(10ss)

Imprisonment for a total term of 20 years on counts 3,6,8,10, and 16 to run consecutively with each other and concurrently with counts 1,2,4,12, and 14. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

29:186B.F, Fraud Other, REQUEST DEMAND FOR MONEY, THING OF VALUE
(11ss)

Imprisonment for a total term of 1 years on counts 5,7,9,11,13, and 15. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(12ss)

Imprisonment for a total term of 20 years on counts 1,2,4,12 and 14 to run consecutively with each other for a total prison term of one hundred years. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(13ss)

Imprisonment for a total term of 1 years on counts 5,7,9,11,13, and 15. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(14ss)

Imprisonment for a total term of 20 years on counts 1,2,4,12 and 14 to run consecutively with each other for a total prison term of one hundred years. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE
(15ss)

Imprisonment for a total term of 1 years on counts 5,7,9,11,13, and 15. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run consecutively with each other and concurrently with counts1,2,4,12,14,3,6,8,10 and 16.

18:1951.F, Hobbs Act,INTERFERENCE WITH

Imprisonment for a total term of 20 years on counts 3,6,8,10, and 16 to run consecutively with each

COMMERCE BY THREAT OR
VIOLENCE
(16ss)

18:1951.F, Hobbs
Act,INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(17ss)

18:1951.F, Hobbs
Act,INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(19ss)

18:1951.F, Hobbs
Act,INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(22ss)

18:1951.F, Hobbs
Act,INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(23ss)

18:1951.F, Hobbs
Act,INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(24ss)

### Highest Offense Level (Opening)

Felony

### Terminated Counts

18:1962–9999.F RICO CONSP
FEDERAL STATUTES, OTHER
(1)

18:1962–9999.F RICO CONSP
FEDERAL STATUTES, OTHER
(1s)

18:1962–9999.F RICO FEDERAL
STATUTES, OTHER
(2)

18:1962–9999.F RICO FEDERAL
STATUTES, OTHER
(2s)

18:1951.F Hobbs Act,
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(3–4)

18:1951.F Hobbs Act,
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(3s–4s)

other and concurrently with counts 1,2,4,12, and 14.
Count 17,19,22,23,24,5,7,9,11,13, and 15 are to run
consecutively with each other and concurrently with
counts1,2,4,12,14,3,6,8,10 and 16.

Imprisonment for a total term of 20 years on counts
17,19,22, and 23. Count 17,19,22,23,24,5,7,9,11,13,
and 15 are to run consecutively with each other and
concurrently with counts1,2,4,12,14,3,6,8,10 and
16.

Imprisonment for a total term of 20 years on counts
17,19,22, and 23. Count 17,19,22,23,24,5,7,9,11,13,
and 15 are to run consecutively with each other and
concurrently with counts1,2,4,12,14,3,6,8,10 and
16.

Imprisonment for a total term of 20 years on counts
17,19,22, and 23. Count 17,19,22,23,24,5,7,9,11,13,
and 15 are to run consecutively with each other and
concurrently with counts1,2,4,12,14,3,6,8,10 and
16.

Imprisonment for a total term of 20 years on counts
17,19,22, and 23. Count 17,19,22,23,24,5,7,9,11,13,
and 15 are to run consecutively with each other and
concurrently with counts1,2,4,12,14,3,6,8,10 and
16.

Imprisonment for a total term of 14 years on count
24. Count 17,19,22,23,24,5,7,9,11,13, and 15 are to
run consecutively with each other and concurrently
with counts1,2,4,12,14,3,6,8,10 and 16.

### Disposition

All open counts are dismissed on the motion of the
US

All open counts are dismissed on the motion of the
US

All open counts are dismissed on the motion of the
US

All open counts are dismissed on the motion of the
US

All open counts are dismissed on the motion of the
US

All open counts are dismissed on the motion of the
US

A.303

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(5)

All open counts are dismissed on the motion of the
US

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(5s)

All open counts are dismissed on the motion of the
US

18:1951.F Hobbs Act,
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(6s)

All open counts are dismissed on the motion of the
US

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(7)

All open counts are dismissed on the motion of the
US

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(7s)

All open counts are dismissed on the motion of the
US

18:1951.F Hobbs Act
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(8)

All open counts are dismissed on the motion of the
US

18:1951.F Hobbs Act
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(8s)

All open counts are dismissed on the motion of the
US

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(9)

All open counts are dismissed on the motion of the
US

29:186B.F Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(9s)

All open counts are dismissed on the motion of the
US

18:1951.F Hobbs Act
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(10)

All open counts are dismissed on the motion of the
US

18:1951.F Hobbs Act
INTERFERENCE WITH
COMMERCE BY THREAT OR
VIOLENCE
(10s)

All open counts are dismissed on the motion of the
US

29:186B.F, Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(11)

All open counts are dismissed on the motion of the
US

29:186B.F, Fraud Other, REQUEST
DEMAND FOR MONEY, THING
OF VALUE
(11s)

All open counts are dismissed on the motion of the
US

A. 304

| | |
|---|---|
| 18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (12−20) | All open counts are dismissed on the motion of the US |
| 18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (12s−20s) | All open counts are dismissed on the motion of the US |
| 18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (18ss) | All open counts are dismissed on the motion of the US |
| 18:1951.F, Hobbs Act,INTERFERENCE WITH COMMERCE BY THREAT OR VIOLENCE (20ss−21ss) | All open counts are dismissed on the motion of the US |

**Highest Offense Level (Terminated)**

Felony

**Complaints**                                          **Disposition**

None

---

**Plaintiff**

**United States Of America**                 represented by   **Matthew D Podolsky**
United States Attorney's Office−SDNY
One St. Andrew's Plaza
New York, NY 10007
212−637−1947
Email: matthew.podolsky@usdoj.gov
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/25/1985 | 58 | SEALED INDICTMENT as to Carmine Persico (10) count(s) 1, 2, 3−4, 5, 7, 8, 9, 10, 11, 12−20. (kw) (Entered: 07/05/2016) |
| 06/26/1985 | | Order to Unseal Indictment as to Carmine Persico. (Signed by Judge Richard Owen on 6/26/85)(kw) (Entered: 07/05/2016) |
| 11/19/1985 | 118 | (S1) SUPERSEDING INDICTMENT FILED as to Carmine Persico (10) count(s) 1s, 2s, 3s−4s, 5s, 7s, 8s, 9s, 10s, 11s, 12s−20s. (kw) (Entered: 07/05/2016) |
| 03/13/1986 | 146 | (S2) SUPERSEDING INDICTMENT FILED as to Carmine Persico (10) count(s) 1ss, 2ss, 3ss−4ss, 5ss, 6ss, 7ss, 8ss, 9ss, 10ss, 11ss, 12ss−24ss. (kw) (Entered: 07/05/2016) |
| 07/29/1992 | 340 | Fld. True Copy of Mandate From The U.S.C.A. for the Second Circuit. On consideration whereof, it is now hereby ordered, adjudged and decreed that the order of said district court be and it hereby is affirmed in accordance with the opinion of this court. (rag) (Entered: 08/05/1992) |
| 04/21/1995 | 347 | Filed letter by USA: Kathleen A. Zebrowski dated February 28, 1995 to Mr. Church we write to inform you that the records from the United States Bureau of Prisons show that the deft. died in United States Prison, Lewisburg, Pennsylvania, |

**A.305**

| | | on March 9, 1993. (dd) (Entered: 04/25/1995) |
|---|---|---|
| 07/13/2015 | 357 | NOTICE OF ATTORNEY APPEARANCE: Anthony Dipietro appearing for (85−Cr−139−10) Carmine Persico. Dated: July 13, 2015. [*** NOTE: Sent this document to Judge Preska's Chambers after docketing on 7/13/2015. ***] (bw) (Entered: 07/13/2015) |
| 07/13/2015 | 358 | NOTICE OF ATTORNEY APPEARANCE: Matthew J. Mari appearing for Carmine Persico. Dated: July 13, 2015. [*** NOTE: Sent this document to Judge Preska's Chambers after docketing on 7/13/2015. ***] (bw) (Entered: 07/13/2015) |
| 07/13/2015 | 359 | MOTION for an Order: 1. Vacating his 100−year sentence pursuant to Fed. R. Crim. P. 35(a); 2. For any other relief that is necessary and proper. Attached affirmation of Anthony DiPietro Esq., the accompanying memorandum of law, and the previous papers filed and proceedings had herein. Document filed by (85−Cr−139−10) Carmine Persico. [*** NOTE: Sent this document to Judge Preska's Chambers after docketing on 7/13/2015. ***] (bw) (Entered: 07/13/2015) |
| 07/15/2015 | | NOTICE OF CASE REASSIGNMENT as to Carmine Persico, to Judge Kevin Thomas Duffy. (pgu) (Entered: 07/15/2015) |
| 07/17/2015 | 360 | ORDER TO RESPOND as to Carmine Persico. This case has been reassigned to Judge Kevin Thomas Duffy, and the Court is in receipt of Defendant Carmine Persico's motion pursuant to Fed. R. Crim. P. 35(a), dated July 13, 2015 (the "Motion"). It is ORDERED that the Government shall respond to the Motion within twenty−one (21) days of the date of this Order. SO ORDERED (Signed by Judge Kevin Thomas Duffy on 7/17/2015)(jw) (Entered: 07/17/2015) |
| 08/05/2015 | 362 | NOTICE OF ATTORNEY APPEARANCE: Matthew D. Podolsky, Assistant United States Attorney, appearing for USA. In USA v. Carmine Persico. (bw) (Entered: 08/07/2015) |
| 08/06/2015 | 361 | ENDORSED LETTER as to (85−Cr−139−10) Carmine Persico addressed to Judge Kevin Thomas Duffy from AUSA Matthew D. Podoksy dated August 5, 2015 re: On July 13, 2015, Carmine Persico filed a motion pursuant to Federal Rule of Procedure 35(a) to vacate his sentence on the grounds that, inter alia, his sentence is substantively unreasonable under the Sixth Amendment, illegal under the Due Process Clause of the Fifth Amendment, and "constitutionally defective" as a result of the Government's alleged failure to disclose exculpatory information. On July 17, 2015, the Court ordered the Government to respond to the motion within 21 days. In order to permit the Government to address various factual claims in Persico's motion, the Government respectfully requests an extension of time to respond to the motion of 30 days, until September 8, 2015. ENDORSEMENT: Request granted. The Government's response is due on September 8, 2015. SO ORDERED. (Signed by Judge Kevin Thomas Duffy on 8/6/2015)(bw) (Entered: 08/06/2015) |
| 09/16/2015 | 363 | REPLY MEMORANDUM. For the reasons set forth in Mr. Persico's opening and reply pleadings, it is respectfully submitted that the Court grant Mr. Persico relief pursuant to Fed. R. Crim. P. 35(a), or, in the alternative, permit further fact−finding pursuant to an evidentiary hearing. Document filed by (85−Cr−139−10) Carmine Persico. Dated September 15, 2015. (bw) (Entered: 09/29/2015) |
| 04/01/2016 | 364 | LETTER by Carmine Persico addressed to Judge Kevin Thomas Duffy from Anthony DiPietro re: To request a stauts conference in order to address the pendency of his motion pursuant to Fed.R.Crim.P. 35(a) and (2) potentially outstanding Brady Materials that may be relevant to the Court's adjudication of such motion (jw) (Entered: 04/04/2016) |
| 06/24/2016 | 365 | MEMORANDUM AND ORDER as to Carmine Persico. For the foregoing reasons, Persico's motion is DENIED in all respects. The Clerk of the Court is directed to close Docket No. 359. SO ORDERED. (Signed by Judge Kevin Thomas Duffy on 6/24/2016)(ft) (Entered: 06/24/2016) |
| 07/01/2016 | 366 | NOTICE OF APPEAL by Carmine Persico from 365 Order. Filing fee $ 505.00, receipt number 465407013224. (tp) (Entered: 07/06/2016) |

| 07/06/2016 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Carmine Persico to US Court of Appeals re: 366 Notice of Appeal. (tp) (Entered: 07/06/2016) |
| 07/06/2016 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Carmine Persico re: 366 Notice of Appeal were transmitted to the U.S. Court of Appeals. (tp) (Entered: 07/06/2016) |